UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL EXPRESS CORPORATION,

                                                  Case:

              Plaintiff,

v.

IKHILOV LAW GROUP, P.C. d/b/a IKHILOV &
ASSOCIATES;
ZORIK "ERIK" IKHILOV;
(*Legal Services Providers*)

STAND-UP MRI OF MANHATTAN, P.C.;
NEXRAY MEDICAL IMAGING, P.C. d/b/a SOUL
RADIOLOGY;
FAST CARE MEDICAL DIAGNOSTICS, PLLC;
(*Radiology Providers*)

NYC CARE PT, P.C.;
GRAIG GRANOVSKY CHIROPRACTIC P.C.;
APEX MEDICAL P.C.;
COMPLETE CARE CHIROPRACTIC OF
HARTSDALE, P.C. d/b/a COMPLETE CARE
CHIROPRACTIC;
MACINTOSH MEDICAL, P.C.;
RUTLAND MEDICAL, P.C.;
(*Gatekeeper Providers)*

NEW YORK PAIN MANAGEMENT GROUP, PLLC
CONRAD F. CEAN, M.D.;
ARDEN M. KAISMAN, M.D.;
NEW YORK PM ASSOCIATES, INC.;
ROCKLAND PAIN MANAGEMENT OF SPRING
VALLEY, P.C.;
(*Pain Management Providers*)

ORTHOPAEDICS SPINE & SPORTS MEDICINE,
LLC d/b/a TOTAL ORTHOPAEDICS & SPORTS
MEDICINE;
ALEXIOS APAZIDIS, M.D.;
BAY RIDGE ORTHOPEDIC ASSOCIATES, P.C.
MICHAEL MURRAY, M.D.
WILLIAM L. KING, M.D., P.C. d/b/a

---

**COMPLAINT**                                                  **PAGE 1 OF 92**

**NYC ORTHOPEDIC GROUP;**
**WILLIAM L. KING, M.D.;**
(*Surgical Providers*)

**INTEGRATED SPECIALTY ASC LLC;**
**ALL CITY FAMILY HEALTHCARE CENTER, INC.;**
(*Ambulatory Surgery Center Providers*)

**JOHN DOES 1–50;**

**Defendants.**

---

**COMPLAINT**

---

Plaintiff FEDERAL EXPRESS CORPORATION (hereinafter referred to as "FedEx"), by and through its attorneys, THE WILLIS LAW GROUP, PLLC, allege as follows:

**I.    PRELIMINARY STATEMENT**

1.    FedEx is a global transportation, logistics, and supply-chain services company headquartered in Memphis, Tennessee. Founded in 1971, FedEx pioneered overnight package delivery in the United States and has since grown into one of the world's largest providers of integrated shipping, freight, and business logistics solutions. Through its operating companies, including FedEx Express, FedEx Ground, FedEx Freight, and FedEx Logistics, FedEx provides time-definite delivery, freight transportation, e-commerce solutions, and supply-chain management services to customers in the United States and around the world.

2.    Because of the nature and scale of its operations, FedEx maintains one of the largest commercial vehicle fleets in the United States, with more than 100,000 delivery and freight vehicles operating daily on public roadways. As a result, FedEx vehicles collectively travel millions of miles each year in urban, suburban, and highway environments, necessarily increasing

the company's exposure to motor vehicle accidents despite extensive safety protocols and driver training. Public reporting reflects that, over a multi-year period, FedEx vehicles have been involved in hundreds to thousands of reported roadway crashes nationwide, a figure that corresponds to fleet size and operational scope rather than any anomaly in safety performance when compared to similarly situated national carriers.

3.     The high visibility and insured status of commercial fleets such as FedEx's also make them known targets for staged and intentionally caused motor vehicle accidents, a form of insurance fraud widely recognized by insurers, regulators, and law enforcement agencies. Industry and insurance authorities report that organized fraud rings deliberately orchestrate collisions commonly known as "swoop-and-squat," "drive-down," or sideswipe schemes.  These schemes specifically target delivery trucks and commercial vehicles because of their predictable routes, professional drivers, and higher policy limits. The National Insurance Crime Bureau and commercial insurance providers have identified staged accidents involving commercial fleets as a growing nationwide problem costing insurers and businesses billions of dollars annually, with fraud rings frequently operating in coordinated, repeat schemes involving fabricated witnesses and exaggerated medical claims.

4.     The scheme alleged in this Complaint employs low-impact collision often times achieved through methods known as "swoop-and-squat", "drive-down" and sideswipe. Defendants have orchestrated a fraudulent enterprise that targets FedEx for the very reasons described above, i.e. deep pockets, predictable routes, etc.  This enterprise recruits claimants to stage or exaggerate accidents, fabricate injuries, and uses falsified medical documentation to inflate claims. Defendants direct claimants to undergo unnecessary and invasive medical procedures, often funded by predatory litigation loans, all to create the illusion of catastrophic injuries and drive-up

---

**COMPLAINT**                                                                 **PAGE 3 OF 92**

settlement values. These actions are not isolated.  Rather, they are part of a coordinated pattern designed to defraud FedEx through sham lawsuits and inflated medical bills.  Through coercion, misinformation, and predatory financial practices, Defendants have transformed the promise of legal redress into a trap, one that leaves claimants saddled with exorbitant debt, unnecessary surgeries, and shattered trust.

5.    Plaintiff seeks relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., to dismantle this enterprise and recover damages caused by its pattern of racketeering activity, including, but not limited to, mail fraud, wire fraud and violations of the U.S. Travel Act. Plaintiff requests, *inter alia*, treble damages, attorneys' fees, and injunctive relief to prevent further and repeated abuse of the judicial system.  Plaintiff is not bringing this action against Defendants for filing legitimate lawsuits.  Nor is Plaintiff asking the Court to unwind or re-adjudicate otherwise legitimate state claims.  Rather, this action affords Plaintiff a remedy and fair opportunity to target the ongoing racketeering conduct and recover Plaintiff's direct economic losses that are proximately caused by acts committed in furtherance of pursuing insurance claims and court filings that are fraudulent.

6.    The fraudulent scheme described herein weaponizes state courts and medical systems to extort settlements from companies, including Plaintiff, through fear of economic harm. Plaintiff brings this action to expose and dismantle that scheme. Defendants' conduct reflects a calculated effort to enrich themselves at the expense of justice, equity, and human dignity. The law does not and must not countenance such abuse.

## II.    JURISDICTION AND VENUE

7.    This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has subject matter jurisdiction

---

**COMPLAINT**

pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 because certain claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.    This Court has further subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity among the parties exists, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. FedEx is a citizen of the State of Tennessee. All defendants are citizens of the State of New York or other states other than Tennessee.

9.    Venue is proper in this District pursuant to 18 USC § 1965 and 28 USC § 1391 because numerous acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and many of the Defendants reside or conduct business in this District.

10.    Venue and personal jurisdiction are also proper in this District pursuant to 18 U.S.C. § 1965(b) because the ends of justice require that all defendants residing in any district be brought before this Court for a single RICO action. A substantial part of the events or omissions giving rise to the claims occurred in this District, and nationwide service of process is authorized for RICO claims. Proceeding in this single forum promotes judicial economy and avoids inconsistent results.

### III.    THE PARTIES

#### a.    Plaintiff

11.    Plaintiff FEDERAL EXPRESS CORPORATION is a corporation duly organized and existing under the laws of the State of Delaware with a principal place of business in Memphis, Tennessee.  At all times relevant herein, FedEx was authorized to conduct business in the State of New York.

b.    **Defendants**

i.    **Legal Services Defendants**

12.    Defendant IKHILOV LAW GROUP, P.C. d/b/a IKHILOV & ASSOCIATES (hereinafter "Ikhilov Law") is a professional corporation organized and existing under the laws of the State of New York.

13.    Defendant ZORIK "ERIK" IKHILOV (hereinafter "Ikhilov" and together with "Ikhilov Law" the "Legal Services Providers") is a citizen of the State of New York and the sole partner/owner of Ikhilov Law.  His principal place of business is located at 76 W Brighton Ave., Suite 212, Brooklyn, NY 11224.  Since 1993 and at all times relevant, Ikhilov was licensed or authorized to practice law in the State of New York and primarily represents claimants in personal injury lawsuits in the State of New York.  As such, he is familiar with prosecuting claims involving motor vehicle accidents in New York and is familiar with New York's No-Fault Laws, *infra*, and the claims processes involved therewith.

14.    At all times relevant, Ikhilov operated as a central coordinating attorney within an enterprise of accident participants, medical providers, and related professionals. He occupied a gatekeeping position, specifically, selecting which claims would be advanced, which providers would be used, and when and where litigation would be initiated, thereby directing the flow of fraudulent claims through such enterprise.

15.    At all times relevant, Ikhilov exercised decision-making authority over whether claims were pursued and controlled pleadings, discovery posture, and settlement demands. This authority allowed him to shape the enterprise's racketeering activity by determining the volume, timing, and jurisdiction of fraudulent filings, a hallmark of operation or management of the herein-described enterprise.

**COMPLAINT**                                                    **PAGE 6 OF 92**

16.    At all times relevant, Ikhilov repeatedly represented and coordinated with medical providers, specifically the Medical Services Defendants herein, operating in the no-fault space, having earlier represented medical providers later convicted of or linked to large-scale no-fault insurance fraud. For example, Ikhilov represented Novacare Medical PC, whose principal, Tatyana Gabinskaya, was convicted in the Southern District of New York for her role in what prosecutors described as the largest single no-fault automobile insurance fraud scheme ever charged.[1]

17.    Moreover, at one point, Ikhilov represented Clifton Burt Pain Physicians PC in several no-fault filings.  Interestingly, Clifton Burt Pain Physicians PC has been named in a pending lawsuit filed in the Eastern District of Pennsylvania by Uber Technologies, Inc.[2]  In that lawsuit, Clifton Burton Pain Physicians PC is alleged to have taken direction from Pennsylvania personal injury firm Simon & Simon P.C. and its attorney Marc Simon.  Specifically, Clifton Burton Pain Physicians PC allowed the firm to bulk schedule clients and instructed the clinic on the treatment to be administered.  The firm instructed the clinic to perform specific procedures on specific patients at specific times.  Thus, Ikhilov is known to have relationships with multiple medical providers who are either alleged to, and in at least one case convicted of, engaging in the same kind of fraud scheme as alleged herein.  He knew or should have known, therefore, that the scheme articulated herein was illegal.

18.    At all times relevant, Ikhilov's practice expanded strategically into different

---

[1]    https://www.fbi.gov/contact-us/field-offices/newyork/news/press-releases/brooklyn-doctor-found-guilty-in-manhattan-federal-court-in-connection-with-massive-no-fault-insurance-fraud-scheme.    Interestingly, Ikhilov dissolved his prior firm, Ikhilov & Associates P.C., in 2014 between Gabinskaya's 2013 mistrial in this matter and her 2015 conviction.  Ikhilov Law was organized in 2010 and, as such, Ikhilov was operating two professional corporations, both law firms, at the same time until the 2014 dissolution.

[2] *See* No. 2:25-cv-05365-MAK; *Uber Technologies, Inc. v. Simon & Simon P.C. et al; In the United States District Court for the Eastern District of Pennsylvania*. **Importantly, Plaintiff FedEx joined this lawsuit against the same defendants therein for the same reasons. The scheme alleged in that complaint is substantially similar to the scheme alleged here.  FedEx is a consistent target of these schemes because, like Uber, its deep pockets is a lucrative target.**

**COMPLAINT**                                                                                   **PAGE 7 OF 92**

claimant populations and venues, including coordinated filings in multiple counties and the representation of claimants and providers tied to distinct but overlapping communities. This expansion evidences enterprise-level planning and adaptation, consistent with an ongoing racketeering scheme rather than *ad hoc* legal work.

19. At all times relevant, Ikhilov leveraged longstanding trust relationships within cultural communities to facilitate the recruitment of claimants, referral of medical treatment, and coordination among enterprise participants.

### ii. Medical Services Defendants

#### a) *Radiology Providers*

20. Defendant STAND-UP MRI OF MANHATTAN, P.C. ("Stand-Up") is a professional corporation registered under the laws of the State of New York. At all times relevant herein, Stand-Up maintained its principal place of business and other offices in the State of New York and/or is authorized to and does conduct business in New York.

21. Non-party co-conspirator STAND-UP MRI OF BENSONHURST, P.C. ("Stand-Up Bensonhurst") is a professional corporation registered under the laws of the State of New York. At all times relevant herein, Stand-Up Bensonhurst maintained its principal place of business and other offices in the State of New York and/or is authorized to and does conduct business in New York.

22. Non-party co-conspirator LENOX HILL RADIOLOGY AND MEDICAL IMAGING ASSOCIATES, P.C. ("LHR") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, LHR maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

23.     Defendant NEXRAY MEDICAL IMAGING, P.C.[3] ("Nexray" or 'Soul") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Nexray/Soul maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

24.     In 2022, a case was filed in the Southern District of New York (*United States v. Pierre, et al.*) accusing Dr. William Weiner (nominal owner of Soul Radiology), Dr. Marvin Moy (nominal owner of Rutland Medical), and Bradley Pierre (Non-Physician Owner of Rutland Medical and Soul Radiology, providing medical & legal referrals, and financier) of committing insurance fraud from 2008 to 2021.

25.     Upon information and belief, Moy went missing in a purported boating accident during the pendency of *Pierre* and remains missing to date.

26.     Pierre and Weiner were subsequently convicted of healthcare fraud with Weiner pleading guilty on January 16, 2024 and Pierre pleading guilty on December 18, 2023.

27.     In the Statement of Facts given during Pierre's hearing where he pled guilty, Pierre specifically stipulated to this statement: "[t]he defendant agreed with William Weiner, the purported owner of Nexray, that Weiner would falsely report injuries in MRI reports."

28.     Furthermore, the Statement of Facts specifically cites a discussion between Pierre and an employee of Rutland Medical, stating that Pierre attempted to influence a then subpoenaed employee to not speak with the government.

29.     Dr. Alexios Apazidis also provided treatment to the Counterclaim Defendant. Although not charged in *Pierre*, there are links between Apazidis and Nexray/Soul Radiology with

---

[3] Nexray Medical Imaging, P.C. also does business as Soul Radiology.

a great number of documents filed on NYSECF reflecting shared treatment between Apazidis and Nexray/Soul Radiology. Of course, there are over 679 documents on NYSECF reflecting shared treatment of patients between Rutland Medical and Apazidis.

30.    The sentencing report in *Pierre* provided evidence of numerous messages that show Nexray was not a *bona fide* medical facility and was driven by profits and accounts.

| Date | Messages |
|---|---|
| 1/15/2017 | PIERRE: How's it going. This week, you'll see an increase in appointments. |
| 1/20/2017 | WEINER: We will finish up with total of 81 scans for the week. today alone we did 28 so it's climbing again<br><br>PIERRE: Did you doubt me?? |
| 2/3/2018 | PIERRE: Ok—FYI I got back 4 of the 6 accounts we lost. |
| 2/15/2018 | PIERRE: We lost 3 VERY good accounts. I'm scheduling for you to go see the doctor when your back. I'll take you myself. Numbers will be low for February.. |
| 2/27/2018 | PIERRE: I fixed the issue with 3 accounts. I'll call later to discuss. |
| 3/25/2018 | WEINER: We did 25 scans Friday Great number since close at 5 on Fridays<br><br>PIERRE: I'm pushing!!! I've been beating the pavement myself! |
| 4/13/2018 | PIERRE: Yes—I will write a stellar bio for you this weekend. During the week, I spend my time literally "begging" for work and crunching numbers. My creative juices are not running during those times. |
| 5/23/2018 | PIERRE: We need to arrange a meeting with this guy Saloman. I picked up 3 new busy accounts. I got a spine surgeon that's going to send you cases directly that will be paid by the PI attorney. |
| 5/23/2020 | PIERRE: Ok—has the volume of scans picked up? Lost 10 accounts, but I think we added 12 |
| 8/19/2020 | PIERRE: I need you to extend hours and give our refers priority with the appointments. We're losing accounts because of the scheduling.<br><br>As we all know, new players are trying to hit the market. We can't afford to loose [sic] are [sic] accounts.<br><br>WEINER: Full boat as before? Let's talk tomorrow.<br><br>PIERRE: Yes—even fuller. |

31.    In 2017, text messages were exchanged between Weiner and Pierre discussing issues Pierre found with the services provided by Nexray. In these texts, Pierre uses Soul Radiology's slogan: "it's not just the scan, it's the read."

32.     In 2018, Pierre attempted to exert control over Weiner's practice and did so successfully with complaints about the radiologists reading medical images. Upon information and belief, Pierre originated Soul Radiology's slogan "It's not just the scan, it's the read.:

| Pierre: | Reads are IMPORTANT!<br>It's not just the scan, it's the read..<br>You need to find a young radiology and train him/her to read like you. This is a big brand we're building!<br>No joke! |
| --- | --- |
| Weiner: | That's the plan[.] Will take awhile[.] My exact thoughts |
| | . . . . |
| | I'll keep looking by if Moriarty ok on spines I can handle most of the rest once Bronx online |
| | . . . . |
| | Problem solve[.] She won't say unremarkable[.] Will word it so build business as discussed |

| Pierre: | People are complaining about Moriarty |
| --- | --- |
| Weiner: | I'm doing all the reads today and will for as long as necessary I'd like to visit w the docs and get some input[.] I've told her to study my reads and she can continue to evolve[.] She understood that I may have to stop using her |
| Pierre: | No—stop using her now |
| | She's going to kill us. |
| Weiner: | Ok |

Pierre:     . . . We cannot continue to send a lot if Barbara keeps reading. Doctors keep complaining

. . . .

Weiner:    Spoke with Moriarty[.] Call me when free

Pierre:     Ok[.] Barbara reads are going to kill the business[.] I lost 6 accounts thus far[.] Moy's even pulling back on his referrals[.] For now, can you cover until we figure this out?

. . . .

Weiner:    Spoke to Moriarty[.] She gets it[.] I'll let her continue the current cases and I'll monitor[.] I'm confident it's be good

. . .

Like I said reports will be tweaked to please as reasonably as possible

Weiner:    All good w new readers reports?

Pierre:     You're going to have to read EVERYTHING over when you get back! Don't pay that ASSHOLE either..

Weiner:    From Novick

"What is the issue? Giving any and all pathology present. Not understanding." What do I say.

> He's texting and calling Please call me
>
> Weiner: "Let's talk. On train now. Would love feedback. I gave each report a Proper honest read with accurate findings. Pathology where valid. Nothing made up. Always reported to reflect accuracy that can be demonstrated in a courtroom.["]
>
> From Novick.
>
> Thanks[.] Saw a few of his reports[.] Too black and white[.] Won't use him[.] Hard to stiff him in pay. . . .

33.     Another doctor that Nexray and Weiner used sent an e-mail to Weiner stating, in part:

> your comments make absolutely no sense
>
> i ran them by several real radiologists whom all agreed this is ridiculous and the reports are detailed and complete
>
> . . . .
>
> if there was inflammation it would say inflammation
>
> i needed to do this because i felt like i was in the twilight zone looking at the cases you selected and the comments you made
>
> good luck in the future and i hope you find some plaintiff radiologists to help you moving forward
>
> may your sites flourish and best of luck on your new adventures

34.     Defendant FAST CARE MEDICAL DIAGNOSTICS, PLLC ("Fast Care") is a professional limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, Fast Care maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

35.     Stand-Up, LHR, Nexray/Soul, and Fast Care are collectively referred to herein as the "Radiology Providers".

b) *Gatekeeper Facilities*

36.    Defendant NYC CARE PT, P.C. ("NYCPT") is and was a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, NYCPT maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

37.    Defendant GRAIG GRANOVSKY CHIROPRACTIC P.C. ("GGC") is and was a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, GGC maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

38.    Defendant APEX MEDICAL P.C. ("Apex") is and was a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, Apex maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

39.    NYC Care PT, PC, Graig Granovsky Chiropractic, PC, Dr. Graig V. Granovsky, Dr. Conrad Cean, and Apex Medical, P.C., among other non-party medical providers, all operate out of an office located at 632 Utica Avenue in Brooklyn, NY.

40.    Defendant COMPLETE CARE CHIROPRACTIC OF HARTSDALE P.C. d/b/a COMPLETE CARE CHIROPRACTIC ("Complete Care Chiro") is and was a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, Apex maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

41.    Defendant MACINTOSH MEDICAL, P.C. ("Mac Med") is and was a professional corporation organized and existing under the laws of the State of New York. At all times relevant

herein, Mac Med maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

42.    Defendant RUTLAND MEDICAL, P.C. ("Rutland") is and was a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, Rutland maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

43.    Defendants NYCPT, GGC, Apex, Complete Care Chiro, Mac Med and Rutland and are collectively referred to herein as the "Gatekeeper Providers".

c)    *Pain Management Providers*

44.    Defendant NEW YORK PAIN MANAGEMENT GROUP, PLLC ("NYPMG") is and was a professional limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, NYPMG maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

45.    Defendant CONRAD F. CEAN, M.D. ("Cean") resides in and is a citizen of the State of New York. At all relevant times herein, Cean has been licensed or otherwise authorized to practice medicine in the State of New York. At all times relevant, Cean was an operator, officer, director and/or employee of NYPMG.

46.    At all times relevant, Cean was not an orthopedic surgeon.  Rather, he specializes in pain management and anesthesiology.[4]

47.    Upon information and belief, Defendant Cean routinely and unlawfully self-referred, or caused to be referred, Claimants to Cean MD PLLC, 5 Borough, or PM Associates for

---

[4] *See* https://nopainny.com/dr-cean/ (last accessed February 23, 2026). *See also* https://www.sheenmagazine.com/dr-conrad-f-cean-strives-to-educate-black-community-about-pain/ (last accessed February 23, 2026).

trigger point and pain management injections provided under anesthesia, and which were performed by Cean, rather than the practitioner who provided the referral.

48. Defendant ARDEN M. KAISMAN, M.D. ("Kaisman") resides in and is a citizen of the State of New York. At all relevant times herein, Kaisman has been licensed or otherwise authorized to practice medicine in the State of New York.

49. Defendant NEW YORK PM ASSOCIATES, INC. ("NYPMA") is and was a corporation organized and existing under the laws of the State of New York. At all times relevant herein, NYPMA maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

50. Defendant ROCKLAND PAIN MANAGEMENT OF SPRING VALLEY, P.C. ("Rockland") is and was a corporation organized and existing under the laws of the State of New York. At all times relevant herein, NYPMA maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

51. Defendants NYPMG, Cean, Kaisman, NYPMA and Rockland are collectively referred to herein as the "Pain Management Providers".

d) *Surgical Providers*

52. Defendant ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC d/b/a TOTAL ORTHOPAEDICS & SPORTS MEDICINE ("Total Ortho") is and was a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, Total Ortho maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

53. Total Ortho has had a contract with Nassau University Medical Center ("NUMC") to operate its Orthopedics Department since 2007. The entirety of Total Ortho's current spinal

surgeon staff and their spinal surgeries are currently under internal investigation at NUMC, and Total Ortho's involvement in the Orthopedics Department is being, at minimum, reduced.

54.    Defendant ALEXIOS APAZIDIS, M.D. ("Apazidis") resides in and is a citizen of the State of New York. At all relevant times herein, Apazidis has been licensed or otherwise authorized to practice medicine in the State of New York. From 2020 through 2023, Apazidis was an operator, officer, director and/or employee of Total Ortho.

55.    Apazidis was previously disciplined by the licensing board for failure to keep proper records and having insufficient controls in place regarding over 200 prescriptions for ketamine which resulted in a thirty-six (36) month license suspension. Apazidis is currently a defendant in RICO claims in New York State Court for allegedly utilizing verbatim operative reports, just like he has done as demonstrated below, purporting to detail individualized findings and intraoperative decision making, in at least 43 anterior cervical discectomy and fusion procedures and 14 posterolateral fusion surgeries (indeed, copies of those same verbatim operative reports surface herein as well), many of which the proffered identical justifications were flatly inconsistent with clinical and diagnostic findings.

56.    Defendant BAY RIDGE ORTHOPEDIC ASSOCIATES, P.C. ("Bay Ridge") is and was a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, Bay Ridge maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

57.    Defendant MICHAEL MURRAY, M.D. ("Murray") resides in and is a citizen of the State of New York. At all relevant times herein, Murray has been licensed or otherwise authorized to practice medicine in the State of New York. At all times relevant, Murray was an operator, officer, director and/or employee of Bay Ridge.

**COMPLAINT**                                                    **PAGE 17 OF 92**

58.    Defendant WILLIAM L. KING, M.D., P.C. d/b/a NYC Orthopedic Group ("NYC Ortho") is and was a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, NYC Ortho maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

59.    Defendant WILLIAM L. KING, M.D. ("King") resides in and is a citizen of the State of New York. At all relevant times herein, King has been licensed or otherwise authorized to practice medicine in the State of New York. At all times relevant, King was doing business as NYC Orthopedic Group.

60.    Non-party co-conspirator THOMPSON MEDICAL, P.C. ("Thompson Medical") is and was a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, Thompson Medical maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

61.    Non-party co-conspirator L. SEAN THOMPSON, M.D. ("Thompson") resides in and is a citizen of the State of New York. At all relevant times herein, Thompson has been licensed or otherwise authorized to practice medicine in the State of New York. At all times relevant, Thompson was an operator, officer, director and/or employee of Thompson Medical.

62.    Non-party co-conspirator HOWARD BAUM, M.D. ("Baum") resides in and is a citizen of the State of New York. At all relevant times herein, Baum has been licensed or otherwise authorized to practice medicine in the State of New York. At all times relevant, Baum was an operator, officer, director and/or employee of Bay Ridge.

63.    Non-party co-conspirator JASON M. GALLINA, M.D., PC ("Gallina PC") is and was a professional corporation organized and existing under the laws of the State of New York.

At all times relevant herein, Gallina PC maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

64. Non-party co-conspirator JASON M. GALLINA, M.D. ("Gallina") resides in and is a citizen of the State of New York. At all relevant times herein, Gallina has been a licensed or otherwise authorized to practice medicine in the State of New York. At all relevant times herein, Gallina has been an owner, operator, officer, director and/or employee of Gallina PC.

65. Non-party co-conspirator ADVANCED ORTHOPAEDICS, P.L.L.C. ("Advanced Ortho") is and was a professional limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, Advanced Ortho maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

66. Non-party co-conspirator DOV BERKOWITZ, M.D. ("Berkowitz") is a licensed physician practicing in the State of New York. At all relevant times herein, Berkowitz has been an owner, operator, officer, director and/or employee of Advanced Ortho.

67. Non-party co-conspirator ASHLEY SIMELA, DO ("Simela") resides in and is a citizen of the State of New York. At all relevant times herein, Simela has been a licensed or otherwise authorized to practice medicine in the State of New York.

68. Non-party co-conspirator DMITRY DVOSKIN, M.D. ("Dvoksin") resides in and is a citizen of the State of New York. At all relevant times herein, Dvoksin has been a licensed or otherwise authorized to practice medicine in the State of New York.

69. Non-party co-conspirator PAIN PHYSICIANS NY, P.L.L.C. ("Pain Physicians") is a professional service limited liability company duly organized and existing under the laws of

the State of New York. At all times relevant herein, Pain Physicians maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

70.     Non-party co-conspirator BOLESLAV KOSHARSKYY, M.D. ("Kosharskyy") resides in and is a citizen of the State of New York. At all relevant times herein, Kosharskyy has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Pain Physicians.

71.     Non-party co-conspirator CROSS BAY ORTHOPEDIC SURGERY P.C. ("Cross Bay") is a professional corporation duly organized and existing under the laws of the State of New York.  At all times relevant herein, Cross Bay Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

72.     Non-party co-conspirator PETER TOMASELLO, JR., D.O. ("Tomasello") resides in and is a citizen of the State of New York. At all relevant times herein, Tomasello has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Cross Bay Practice.

73.     Defendants Total Ortho, Apazidis, Bay Ridge, Murray, NYC Ortho, King, Dvoskin, Pain Physicians, Koutsospyrous and Cross Bay are collectively referred to herein as the "Surgical Providers".

e) *Ambulatory Surgical Centers*

74.     Defendant INTEGRATED SPECIALTY ASC LLC ("Integrated ASC") is and was a limited liability company organized and existing under the laws of the State of New Jersey. At all times relevant herein, Integrated maintained its principal place of business in the State of New Jersey and is ostensibly authorized to and does conduct business in New Jersey.  Integrated ASC was the surgical site for treatment performed across state lines as more detailed herein.

75.     Defendant ALL CITY FAMILY HEALTHCARE CENTER, INC. ("ACFH") is and was a corporation organized and existing under the laws of the State of New York. At all times relevant herein, ACFH maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

76.     Non-party Co-Conspirator ISLAND AMBULATORY SURGERY CENTER, L.L.C. ("Island ASC") is and was a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, IASC maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

77.     Non-party Co-Conspirator SURGICARE LLC ("SurgiCare") is and was a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, SurgiCare maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

78.     Defendants Integrated ASC, ACFH and SurgiCare are collectively referred to herein as the "ASC Providers".

79.     Upon information and belief, in addition to the named Defendants, John Does 1-50 are individuals, medical providers or other persons and entities (including litigation funding companies) whose level of participation and/or identities are currently unknown but who, through their actions and omissions, conspired with the named Defendants to violate 18 U.S.C. § 1962 by participating in the affairs of the RICO enterprise through a pattern of racketeering activity or otherwise engaged in the activities described herein that constitute actionable conduct as well as violating various state and federal laws.

## IV.    RELEVANT STATUTES AND REGULATIONS

80.    Statutes and provisions that are relevant to the finding of fraud through submissions and transmissions by all defendants of insurance claims and lawsuits containing materially false and misleading information as attached here as Exhibit "A", such statutes and provisions being incorporated herein by referenced as if set out in full verbatim. The statutes and provisions in the attached Exhibit "A" are not an exhaustive list.

## V.    FACTUAL BACKGROUND

### a.    Common Facts (Scheme and Fraudulent Treatment Protocol)

81.    Since at least 2017, Defendants collectively operated a scheme targeting FedEx who is a national commercial carrier with predictable routes and higher liability limits.  They do so by staging or exploiting low-impact collisions and converting them into high-value bodily-injury claims. The scheme used standardized playbooks, e.g. "swoop-and-squat," "drive-down," and side-swipe mechanics, and relied on rapid post-incident funneling of claimants to a tightly connected set of clinics, imaging centers, pain-management practices, and surgical providers.

82.    These motor vehicle accidents are governed by New York's Comprehensive Motor Vehicle Insurance Reparations Act ("No-Fault"), New York Insurance Law §§ 5101–5108.  Under New York's No-Fault Insurance Law, a claimant injured in a motor vehicle accident is generally barred from filing a personal-injury lawsuit for non-economic damages, e.g. pain and suffering, unless the claimant first satisfies one of two statutory threshold requirements: (1) demonstrating a "serious injury" as defined in Insurance Law § 5102(d); or (2) demonstrating economic loss in excess of "basic economic loss" as defined in Insurance Law § 5102(a). These threshold requirements form the gateway between claims that must remain within the No-Fault system and those that may proceed into civil litigation seeking substantial damages.

83.     New York's No-Fault system was designed to ensure prompt payment of medical bills and lost earnings following automobile accidents, while simultaneously reducing the volume of litigation arising from minor or low-impact collisions. To effect this policy, pursuant to 11 NYCRR §65-1, all insurance policies issued in the State of New York must contain prescribed policy endorsements that include basic economic loss in the form of Personal Injury Protection (PIP) benefits in the amount of $50,000 per person for necessary medical expenses, lost earnings, and certain other reasonable and necessary out-of-pocket costs. Entities like Plaintiff that self-insure their vehicles are obligated to provide $50,000 in PIP coverage pursuant to 11 NYCRR § 65-2.2.

84.     Because the law limits automobile-related personal injury lawsuits to cases involving significant or permanent injuries, claimants seeking to pursue third party tort lawsuits must typically establish that they suffered a "serious injury." The statute provides an enumerated list of categories that qualify as "serious injury" including death, dismemberment, significant disfigurement, fracture, loss of a fetus, permanent loss or consequential limitation of use of a body organ or member, or a medically determined non-permanent injury that prevents the claimant from performing substantially all of their usual daily activities for at least 90 of the 180 days immediately following the accident. Only if one of these categories is met may the claimant pursue pain-and-suffering damages through a tort lawsuit.  But for the conduct of the Defendants, none of the tort actions referenced herein could exist because none of the claimants could have met one of the thresholds otherwise.

85.     This statutory structure creates a powerful financial incentive for individuals seeking large payouts and settlements to manufacture, exaggerate, or escalate injuries beyond what the accident objectively produced. The entry point is applying for No-Fault benefits, through filing

**COMPLAINT**                                                                    **PAGE 23 OF 92**

NF-2 applications often with the assistance of legal counsel, and obtaining reimbursement for medical expenses, through filing NF-3 forms often by the medical providers.

86.    Accidents and injuries are then artificially inflated to pursue tort actions. Once a threshold is met, the claimants and their representatives can file lawsuits against the vehicle owner or operator, in this case FedEx and its employees, and pursue significantly larger damages. These lawsuits open the door to six- or seven-figure demands, vastly exceeding anything payable under the No-Fault system. Thus, under the fraudulent scheme described herein, the staged accidents, coordinated medical referrals, and rapid escalation to injections or surgeries all serve a single purpose which is manufacturing the statutory prerequisites necessary to commence a personal injury action. Filing such a suit is the only path to the substantial recoveries the enterprise seeks to extract.

87.    Across the exemplars below, emergency-room findings were negative for acute traumatic injury, or diagnostics were not even ordered due to the minor nature of the incident. Notwithstanding a clear lack of injury or need for treatment, claimants were immediately placed into a predetermined treatment protocol (the "Fraudulent Treatment Protocol") of physical therapy, chiropractic manipulation and acupuncture that necessarily escalated to interventional injections and ultimately surgery. The escalation often ignored contrary findings or imaging that failed to corroborate the alleged injury or need for treatment and was intended to create the basis for seeking six- or seven-figure recovery via personal injury action.

88.    To effectuate the Fraudulent Treatment Protocol, the same providers, addresses, and referral networks reappeared across claims, e.g., common therapy locations; recurring imaging centers; repeated orthopedic surgeons, evidencing a closed-loop referral system. Documentation practices were uniform and templated with duplicative therapy notes, MRI reads inconsistent with

films and operative reports reciting identical intraoperative "findings" across patients. This documentation was transmitted by mail and electronic means to advance the fraudulent claims.

89.     Legal orchestration by Ikhilov and Ikhilov Law comprised an important component of the Fraud Scheme by coordinating initial intake; selecting providers, timing and filing of pleadings; transmitting no fault documentation, medical records, HIPAA authorizations, and litigation filings to Plaintiff and others for the purpose of supporting insurance claims and obtaining insurance proceeds. This control over the volume, timing, and forum of suits demonstrates operation or management of the enterprise's affairs.

90.     Litigation funding, which is structured as high-interest, non-recourse advances, was used to finance or time invasive procedures, increasing the purported severity of claims and exerting economic pressure to settle. Upon information and belief, funding proceeds were obtained through the assistance and opinions of the Legal Services Providers and Medical Providers and secured by liens or otherwise recouped through settlements and judgments, rewarding repetition of the protocol.

91.     Defendants transmitted, and caused to be transmitted, by means of mail and wire communications in violation of 18 U.S.C. §§ 1341 and 1343.

92.     The mail communications were transmitted through the US postal system or other national courier. Such communications contained numerous materially false and misleading documents such as NF-forms, medical records, imaging reports, operative reports, and litigation filings. Each such transmission constitutes a predicate act of mail fraud in violation of 18 U.S.C. § 1341.

93.     The wire communications were transmitted in interstate commerce, including through the NYSCEF e-filings internet portal, secure insurer portals, email, and/or facsimile. The

wire communications contained numerous materially false and misleading documents such as NF-forms, medical records, imaging reports, operative reports, and litigation filings. These transmissions traveled over the internet and/or telephone networks, facilities of interstate commerce, and, upon information and belief, were routed to, from, and/or through servers located outside New York, including those used by FedEx's claims-handling operations. Each such transmission constitutes a predicate act of wire fraud in violation of 18 U.S.C. § 1343.

94.     Moreover, some of the treatment rendered, as identified below, was not medically necessary but performed to obtain insurance benefits in violation of New York Insurance Law § 403.  Defendants traveled across state lines or caused claimants to cross state lines to render such treatment in violation of the U.S. Travel Act (18 U.S.C. § 1952).

95.     The Fraud Scheme caused FedEx to incur damages, as more particularly set forth hereinbelow. These damages were the intended and foreseeable result of Defendants' scheme.

**b.  <u>Specific Claim Facts (Accident, Injury, Treatment and Operation of Fraudulent Treatment Protocol)</u>**

96.     In furtherance of the Fraud Scheme, and since at least April 2017, the Defendants engaged in the following activities, which are examples of other claims against FedEx and others which are substantial similar:

**<u>August 6, 2019 Motor Vehicle Accident (Claimants A, B and C)</u>**

*<u>Claimant A</u>*

97.     On or around August 6, 2019, Claimant A was the belted, front seat passenger in a vehicle occupied by co-passengers Claimant B and Claimant C on Linden Boulevard, near the intersection of Hinsdale Street in Brooklyn, New York, when it was allegedly side swiped on the

left side by a FedEx vehicle. The responding police officer recorded that each driver accused the other of improperly entering the center lane immediately before the impact.

98.     Though photos at the scene depicted only minor damage to the vehicles involved, Claimant A was taken to the emergency department of Brookdale University Hospital by the FDNY with the sole complaint of right shoulder pain, *expressly denying headaches, neck, and back pain.*



Patient is a 28 y.o. male presenting with motor vehicle accident and shoulder injury. The history is provided by the patient. No language interpreter was used.
Motor Vehicle Crash
Injury location: **Shoulder/arm**
Shoulder/arm injury location: **R shoulder**
Pain details:
  Quality: **Aching**
  Onset quality: **Gradual**
  Timing: **Intermittent**
  Progression: **Unchanged**
Patient position: **Front passenger's seat**

Associated symptoms: no abdominal pain, no altered mental status, no back pain, no bruising, no chest pain, no dizziness, no extremity pain, no headaches, no immovable extremity, no loss of consciousness, no nausea, no neck pain, no numbness, no shortness of breath and no vomiting

99.     A right-shoulder X-ray showed no dislocation and no discrete fracture, identifying only a contour irregularity of the inferior humeral head extending into the humeral neck of uncertain chronicity (chronic bony spurring versus incomplete fracture). Claimant A was treated with anti-inflammatories and a muscle relaxer and was discharged home in stable condition with only a prescription for pain meds and instructions to follow up with a local family practice provider. No hardware, collar, sling, or other immobilization device was provided by emergency department personnel after, upon information and belief, finding no evidence of acute trauma.

Performed: 08/06/19 2241 – 08/06/19 2249          Accession number: 7000111
Resulting lab: RADIOLOGY
Narrative:
STUDY:   X-RAY – RIGHT SHOULDER

REASON FOR EXAM:   Male, 28 years old.  Injured in motor vehicle accident.

TECHNIQUE:   3 view(s) of the right shoulder.

COMPARISON:   None.

FINDINGS:
Contour irregularity of the inferior humeral head extending into the humeral neck of uncertain chronicity.  No discrete fracture line is identified. No dislocation is appreciated on these views.

Impression:
Contour irregularity of the inferior humeral head extending into the humeral neck of uncertain chronicity.    No discrete fracture line appreciated.  Chronic bony spurring versus incomplete fracture.

Electronically Signed:
Esther Lee,
2019/08/06 at 23:03 EDT

100.    On August 8, 2019, two days after the accident, Claimant A visited NYC Care PT at 632 Utica Avenue in Brooklyn, for an initial physical therapy evaluation, with a complaint of pain to his right shoulder in addition to new complaints of pain in his neck and mid-back. Upon examination, Claimant A was prescribed a regimen of physical therapy for his right shoulder, cervical, and thoracic paraspinals, consisting of therapeutic massage, manual therapy, ultrasound therapy, cold packs, and electrical stimulation, 2-3 times per week for 6 weeks.

101.    In addition to NYC Care PT, Claimant A reported to Defendants GGC and Apex, all also operating out of 632 Utica Avenue in Brooklyn, for an array of services, including physical therapy, acupuncture, and chiropractic treatments. In all, Claimant A was seen at these facilities over one hundred and twenty times through January 2020.

102.    The repeated, high-cadence encounters all funneled through the same address (632 Utica Ave.) across multiple weeks and providers evidence a closed-loop referral model that generated baseline diagnoses and serial modality billing before fast-tracking to interventional/surgical care—a pattern consistent with a gatekeeper clinic rather than individualized, symptom-driven care.

103.    On August 20, 2019, six days after engaging the Ikhilov firm, as evidenced by the HIPAA authorization executed on August 14, 2019, Claimant A visited Defendant NY Pain Management.  During the encounter, Claimant A expressed the same symptoms communicated during his visit with NYC Care PT, the pain for which he rated as 9/10 on the pain scale.  After the examination, physical therapy was reiterated, and Claimant A was immediately referred to an orthopedic specialist.

104.    For three consecutive weeks in October of 2019, Claimant A returned to NY Pain Management for follow-up appointments, during which he received trigger point and epidural

steroid injections to his right shoulder and thoracic spine, despite a right shoulder MRI without a

labral tear on August 23, 2019, and a normal thoracic MRI on September 4, 2019.

FINDINGS: There is no fracture or dislocation. There is no bone marrow edema. There is no joint effusion. There is a small Hill-Sachs deformity, without evidence of a labral tear. The distal supraspinatus tendon is intact. The biceps and infraspinatus tendons are normal. The visualized muscle groups are normal. No significant osteoarthritic changes are seen.

105.    Despite the negative imaging results (X-ray at Brookdale University Hospital and

MRI at Eclipse Medical Imaging *that revealed no evidence of a labrum tear*), Claimant A reported

to the office of Dr. L. Sean Thompson with Thompson Medical PC for an orthopedic evaluation

of his right shoulder on October 31, 2019.

106.    At the exam's conclusion, Thompson diagnosed Claimant A with anterior

dislocation of the *left* humerus and opined further that Claimant A was indicated for right shoulder

arthroscopy **with labrum repair** as seen in the snippet from Thompson's report below.

Assessment/Plan:
    Anterior dislocation of left humerus, initial enco:
        Patient has failed conservative management for RIGHT SHOULDER injuries associated with labrum tear. The patient is
        indicated for arthroscopic surgery of the RIGHT SHOULDER with labrum repair.

107.    Thompson's assertions not only ran counter to the negative X-ray and MRI results

but to the opinion of FAOOS and ABOS board-certified independent medical examiner Dr.

Anthony J. Spataros, who examined Claimant A the month before, on September 30th.

108.    Dr. Spataros' examination documented full, normal ROM of the cervical spine,

thoracic spine, and right shoulder, with no tenderness, no impingement, and no neurologic deficits.

Dr. Spataros diagnosed Claimant A with only sprains/strains of his cervical spine, thoracic spine,

right shoulder, and right elbow; all of which resolved without residual disability or need for further

treatment.

> **DIAGNOSIS:**
>
> - Status post cervical spine sprain/strain and contusion, resolved.
> - Status post thoracic spine sprain/strain and contusion, resolved.
> - Status post right shoulder sprain/strain, resolved.
> - Status post right elbow sprain/strain, resolved.

109.    Despite all indicators to the contrary, Thompson performed a right shoulder arthroscopy on Claimant A on November 8, 2019, a little more than a week after their initial encounter, and barely ninety days post-accident.  Upon information and belief, there was no injury to repair, nor was there a failure of conservative treatment before the right shoulder surgery.

110.    On November 1, 2019, Claimant A reported to the office of Defendant Dr. Alexios Apazidis with complaints of lower back pain, which he rated as 9/10 on the pain scale. Apazidis is currently a defendant in RICO claims in New York State Court for allegedly utilizing verbatim operative reports, purporting to detail individualized findings and intraoperative decision making, in at least 43 anterior cervical discectomies and fusion procedures and 14 posterolateral fusion surgeries.

111.    Despite there being no complaint of lower back pain to the FDNY, emergency department personnel at Brookdale University Hospital, or during Claimant A's IME with Spataros the month before, Apazidis concluded that Claimant A's lower back pain was causally related to the August 6th accident, as depicted in the encounter's snippet below.

PLAN:
Procedures: 1) 99243; Consult referral Evaluation level 3
Care Plan: Treatment Plan: Therapeutic Exercise and discectomy with likely need for fusion if there is instability
A long discussion was held with the patient about the risks and benefits of surgery of the lumbar spine. This discussion utilized models and the imaging was reviewed with the patient. We discussed the surgical approach in detail and reviewed the risks which include but are not limited to death, bleeding, infection, dural tear, dural leak, nerve damage, paralysis, the need for repeat surgery failure to heal, to fuse and failure of hardware.
Disability: Patient has difficulties lifting, prolonged sitting, reaching overhead, repetitive bending, and carrying. These activities are required at work; therefore, patient is unable to work and is temporarily totally disabled.
Causality: If the events described above are correct, then based on the patient's history, nature of symptoms, computerized range of motion studies and physical exam; these injuries are causally related to the herein mentioned accident.

112. On March 17, 2020, Claimant A underwent a L5-S1 laminectomy, performed by Apazidis at Nassau University Medical Center.

Operative Procedures:
 Undefined Procedure Code:
 • Is your procedure not listed above? Yes...
 • Procedure (ICD Procedure Code Not Found Above) L5-S1 laminectomy, L5-S1 posterior spinal fusion, nonsegmental instrumentation lumbar spine, use of intraoperative microscope and fluoroscopy

113. Despite having previously seen Claimant A on November 1, 2019, Apazidis' March 17, 2020 surgical report indicates that Claimant A presented to the emergency room in acute pain, and that Apazidis came to perform the surgery on Claimant A simply because he was the on-call surgeon. At no time did the operative report indicate that Claimant A was previously known to or treated by Apazidis.

• Condition On Discharge From OR Critical, But Stable
Procedure Details:
• Indications for Procedure The patient presented to the hospital emergency room with acute deterioration in back pain and lumbar radiculopathy. As the orthopedic spine surgeon on call I was called to see the patient. Patient informed us that he had been treated for low back pain and radiculopathy for almost a year. He had undergone physical therapy and injections but nothing helped him for more than a few days at a time. We reviewed the patient's imaging studies which demonstrated

114. On July 27, 2023, Claimant A reported to Defendant Stand Up MRI of Manhattan, where he underwent an MRI of his cervical spine, which purportedly revealed:

**IMPRESSION:**

- Lobulated focus of soft tissue signal partly seen surrounding the proximal left common carotid artery and abutting the apical region of the aortic arch, nonspecific, possibly prominent lymph nodes or ectopic thyroid rest but other soft tissue foci not excluded. Followup as necessary is suggested which include further evaluation with a dedicated imaging of this region inclusive of ultrasound and dedicated cross-sectional imaging.

- Relative preservation of the cervical lordosis with dextroangulation.

- C2-C3 shallow posterior disc bulge abutting the thecal sac. Narrowing of both proximal neural foramina, right slightly greater than left.

- C3-C4 slight grade I retrolisthesis. Narrowing of both lateral recesses and proximal neural foramina, right greater than left.

- C4-C5 slight grade I retrolisthesis. Shallow annular disc bulge abutting the anterior thecal sac. Narrowing of both lateral recesses and proximal neural foramina, right greater than left.

- C5-C6 shallow posterior disc bulge abutting the thecal sac. Narrowing of both lateral recesses and proximal neural foramina, right greater than left.

- C6-C7 shallow right posterolateral broad-based disc herniation abutting the right anterior thecal sac. Narrowing of both lateral recesses and proximal neural foramina but with likely room for the exiting nerve roots.

115.    Despite there being no indication of neck pain during Claimant A's visit to the emergency department, Claimant A underwent an anterior discectomy and fusion surgery performed by Apazidis on September 14, 2023. The MRI relied upon by Apazidis reported findings that were not causally related to the August 6, 2019, sideswipe in light of a normal cervical IME performed by Ji Hoon Kim, a NBCE-certified chiropractor four weeks later, on September 25, 2019,and a lack of clinical correlation (persistent radiculopathy, progressive neurological deficit after sustained conservative care) necessary to justify fusion.

**EXAMINATION OF THE CERVICAL SPINE**: Examination of the cervical spine revealed no spasm. There was minimal tenderness to palpation. There was evidence of altered alignment. Motor strength was normal, 5/5 in all major muscle groups of the upper extremities. Sensory examination of the upper extremities was intact. Reflexes were 2+, symmetrical and normal bilaterally in the biceps, triceps and brachioradialis. Cervical compression and cervical distraction tests were negative for radiculopathy.

116.    Claimant A's operative report is one of the verbatim operative reports for which Apazidis is currently being sued for in New York State Court.

**COMPLAINT**                                                                              **PAGE 33 OF 92**

**Procedure Details:**
| | |
|---|---|
| • **Indications for Procedure** | This patient presented to the office having failed months of nonsurgical management with worsening neck pain and cervical radiculopathy. He demonstrated understanding of the surgical risks which included but are not limited to, death, bleeding, infection, dural tear, nerve damage, paralysis, pseudoarthrosis, hardware failure, need for revision surgery, hoarseness temporary or permanent, swallowing issues temporary or permanent, ongoing disability dysfunction and pain. He demonstrated understanding, asked appropriate questions and consented to the surgical procedure. Of note he had failed months of nonsurgical care and had worsening neck pain and cervical radiculopathy progressing to numbness and weakness. |

117.    Both the indications for procedure and description of procedure are identical to the operative reports generated for cervical procedures performed on patients in the New York State Court action.

| | |
|---|---|
| • **Description of Procedure** | Patient was taken to the operating room underwent general endotracheal intubation in the supine position. All bony prominences were well padded. A pillow was placed under his knees. The shoulders and arms were gently tucked at the sides and the shoulders were held down with tape. We needle localized the level of the incision under fluoroscopic guidance and this was marked out. The patient was then prepped and draped in sterile fashion. Surgical time-out procedure was carried out in accordance with hospital policy verifying antibiotics given 60 minutes of incision. The wound was then infiltrated with Marcaine with epinephrine. The skin was then incised and we encounter the superficial fat layer. We dissected through the fat encounter the platysma muscle which was elevated and divided. We then raised platysmal muscle flaps superiorly and inferiorly in order to create a mobile window from the small incision. We then encounter the sternocleidomastoid muscle and dissected medial to it by elevating and dividing the fascial sheath of the sternocleidomastoid. We then dissected in an intermuscular plane down onto the anterior cervical spine. Utilizing blunt dissection we identified the longus coli muscles bilaterally. At this point I brought in the fluoroscope and identified the C6-7 level utilizing fluoroscopic guidance. This level was clearly marked out. We then raised longus coli muscle flaps bilaterally and placed a deep Trimline retractor in order to hold these muscle flaps to the side. We then placed Caspar pins into the vertebral bodies of C7 and C6 and distracted through this level. |

118.    Under the direction of Ikhilov, with the agreement of the Medical Provider Defendants, *initial complaints of right shoulder pain that had resolved on its own within two months resulted in months of physical therapy, acupuncture and chiropractic treatments, trigger*

*point and epidural steroid injections, and surgeries to Claimant A's right shoulder, cervical, and lumbar spines.* The diagnoses given and treatments received from Clamant A's respective medical providers were not the result of objective clinical observations but were made with the specific intent to exhaust no-fault benefits that satisfy the threshold of "more than basic economic loss", *supra*, or establish a "serious injury" required to file the lawsuit necessary to obtain an inflated settlement on Claimant A's personal injury claim in furtherance of the fraud scheme.

### Claimant B

119.    Claimant B did not go to the hospital following the accident. Instead, he presented to NYC Care PT, PC and Graig Granovsky Chiropractic, P.C. on August 8, 2019, and August 12, 2019, for initial evaluation. He complained of pain to his left shoulder, neck, and left foot.

120.    On August 20, 2019, Claimant B presented to Defendant New York PM Associates, Inc. for initial evaluation with new complaints of headache, neck pain, left shoulder pain, low back pain, and left knee pain.

121.    On June 23, 2020, Claimant B, despite claiming to have debilitating physical injuries from the August 6 accident preventing him from working, was riding his motorcycle when he was involved in a head on collision with a vehicle. Importantly, he complained to EMS of severe left leg pain. EMS evaluation revealed left knee pain with inability to move left toes, and headaches.

122.    On January 29, 2020, Claimant B underwent an L5-S1 discectomy performed by Conrad F. Cean, M.D., MBA, at Integrated Specialty ASC, LLC in New Jersey. Importantly, Dr. Cean holds himself out as a pain management specialist, yet performed spinal surgery on Claimant B.

---

**COMPLAINT**                                                                 **PAGE 35 OF 92**

123. On March 4, 2020, Claimant B presented to Jason Gallina, M.D., with complaints of neck and low back pain and was recommended for a C6-C7 anterior cervical discectomy and fusion.

124. On March 7, 2020, Claimant B underwent a left shoulder arthroscopic repair performed by Peter Tomasello, D.O., at AllCity Family Healthcare Center.

125. Claimant B presented to Stand-Up MRI of Bensonhurst on January 31, 2023, for a cervical MRI which revealed a disc herniation at C6-C7, and bulges at C3-C4, C4-C5, and C5-C6.

126. Only two weeks later, Claimant B underwent an anterior discectomy and fusion surgery at C6-7 performed by Apazidis on February 16, 2023, performed by Apazidis at Bayonne Hospital Medical Center in New Jersey.

**Procedure Details:**
- **Indications for Procedure**

This patient presented to the office having failed months of nonsurgical management with worsening neck pain and cervical radiculopathy. He demonstrated understanding of the surgical risks which included but are not limited to, death, bleeding, infection, dural tear, nerve damage, paralysis, pseudoarthrosis, hardware failure, need for revision surgery, hoarseness temporary or permanent, swallowing issues temporary or permanent, ongoing disability dysfunction and pain. He demonstrated understanding, asked appropriate questions and consented to the surgical procedure. Of note he had failed months of nonsurgical care and had worsening neck pain and cervical radiculopathy progressing to numbness and weakness.

127. This is the exact surgery Apazidis later performed on Claimant A, who was in the same vehicle as Claimant B.

128. Moreover, the operative reports for Claimant A and Claimant B are identical, down to the inconsistent spacing and grammatical errors.

---

**COMPLAINT**                                                    **PAGE 36 OF 92**

| • Description of Procedure | Patient was taken to the operating room underwent general endotracheal intubation in the supine position. All bony prominences were well padded. A pillow was placed under his knees. The shoulders and arms were gently tucked at the sides and the shoulders were held down with tape. We needle localized the level of the incision under fluoroscopic guidance and this was marked out. The patient was then prepped and draped in sterile fashion. Surgical time-out procedure was carried out in accordance with hospital policy verifying antibiotics given 60 minutes of incision. The wound was then infiltrated with Marcaine with epinephrine. The skin was then incised and we encounter the superficial fat layer. We dissected through the fat encounter the platysma muscle which was elevated and divided. We then raised platysmal muscle flaps superiorly and inferiorly in order to create a mobile window from the small incision. We then encounter the sternocleidomastoid muscle and dissected medial to it by elevating and dividing the fascial sheath of the sternocleidomastoid. We then dissected in an intermuscular plane down onto the anterior cervical spine. Utilizing blunt dissection we identified the longus coli muscles bilaterally. At this point I brought in the fluoroscope and identified the C6-7 level utilizing fluoroscopic guidance. This level was clearly marked out. We then raised longus coli muscle flaps bilaterally and placed a deep Trimline retractor in order to hold these muscle flaps to the side. We then placed Caspar pins into the vertebral bodies of C7 and C6 and distracted through this level. |
|---|---|

129.    Despite being in different locations in the vehicle, Apazidis performed identical cervical procedures on both Claimant A and Claimant B, and authored copy and pasted reports of the operative reports.[5]

***Claimant C***

130.    Claimant C also did not go to the hospital following the accident. Exactly like Claimant B, he presented to NYC PT and GGC two days later on August 8, 2019, for initial evaluation and treatment.

---

[5] The cervical operative reports are identical to those submitted for other patients treated by Apazidis between 2020 and 2024. Those operative reports can be found in the Kings County New York Supreme Court case *Toribio, et. al v. 1936 Bath Avenue, LLC,* Index No.: 517968/2021, Doc. No. 79.

131. On November 11, 2019, Claimant C presented to Advanced Orthopaedics, PLLC for initial evaluation with complaints of right knee pain. *Claimant C reported that he had "occasional" discomfort in his right knee and a sprained MCL at the time of the accident.* Despite knowing this information, Dov Berkowitz, M.D., reported that Claimant C had no relevant past medical history.

> PAST MEDICAL HISTORY:
> None.

132. On November 19, 2019, Claimant C presented to Defendant New York PM Associates, Inc. for initial evaluation with complaints of neck, upper back, mid back, low back, and right knee pain. Claimant C was scheduled for cervical injections and a lumbar facet block despite no indication of a cervical or lumbar MRI having been ordered or completed.

133. On October 25, 2021, approximately two years after the car accident, Claimant C presented to Defendant William L. King, M.D., for an initial orthopedic evaluation of his right knee. Claimant C reported that he was the driver of the vehicle and that the impact occurred on the driver's side of the vehicle, and post-accident had pain in his neck, mid back, lower back and right knee. He reported no new injuries since the accident.

134. Defendant King's records from the initial visit note that *a prior right knee MRI taken in 2018 showed evidence of prior injury to the medial collateral ligament with early scar remodeling of its proximal substance, degeneration of the anterior cruciate ligament, and joint effusion, among other issues.*

135. Defendant King similarly reviewed a right knee MRI taken on November 29, 2019, which revealed no meniscal tear. Defendant King diagnosed Claimant C with right knee joint effusion, right knee chondral injury, and recommended that surgery be performed.

**CAUSAL RELATIONSHIP:**

It is my expert opinion that the patient's current pain symptoms are a direct result of the accident that occurred on 08/06/2019. Based on the history and physical examination, the patient had no complaints of right knee pain prior to the accident.

**PRE-EXISTING CONDITONS:**

There is no evidence of any contributing pre-existing or subsequent conditions.

136.   Despite noting the prior injury, Defendant King determined that Claimant C's right knee injury was related to the accident and that there was no record of prior injury to the right knee.

137.   Defendant King performed a right knee surgery including, but not limited to, partial medial and lateral meniscectomies, extensive synovectomy, and abrasion arthroplasty patellofemoral compartment on November 8, 2021.

138.   In a November 8, 2021 NF-3, Defendant King submitted billing for the right knee surgery charging for a medical and lateral meniscectomy/meniscal tear repairs.

139.   Claimant C was diagnosed with right knee derangement with a possible meniscus tear based on clinical examination and was referred for physical therapy.

140.   Ikhilov also provided by mail or by electronic service to the Kings County Supreme Court and to all parties in the Kings County proceedings fraudulent documents containing false assertions regarding Claimant A's motor vehicle accident, the existence, extent and causality of Claimant A's injuries, and the necessity of medical treatment, to bolster and add value to Claimant A's personal injury lawsuit, thereby inflating settlement value and ultimately, Ikhilov's financial gain.

141.   By transmitting (via mail and e-service) NF-3s, bills, and medical records that misstate or overstate diagnosis, causation, and medical necessity, the Legal Services and Medical

Services Defendants used the mails and wires to further a scheme to defraud, constituting predicate acts under 18 U.S.C. §§ 1341, 1343, a pattern under § 1961(5), and violations of § 1962(c)–(d), as well as N.Y. Ins. Law § 403, N.Y. Penal Law § 176.05, and applicable Rules of Professional Conduct and Education Law § 6530. At the time of this submission, Claimant A's lawsuit is still pending.

**November 12, 2021 Motor Vehicle Accident (Claimants D, E and F)**

*Claimant D*

142.    On or about November 12, 2021, Claimant D was the driver of a vehicle that was allegedly rear-ended by a FedEx truck while waiting at a stoplight at the intersection of Westchester Avenue and Glover Street in Bronx, New York. Claimant E was a backseat passenger in Claimant D's vehicle.  Claimant F was also a passenger in the vehicle

143.    According to deposition testimony given by the FedEx employee, the FedEx vehicle was double-parked on Westchester when he felt an impact as he and a co-worker were in the back organizing packages.  The employee testified further that the force was significant enough to cause the packages to fall on top of him and the co-worker.

```
Q.      How did you become aware that
a truck was involved in an accident?
     A.     So me and the helper are in
the back of the truck.  The door that
leads to the back of the truck was
closed.  So we were organizing the
packages for the next following street
until we felt something hit us.  That's
when packages started falling on us and
we liked bumped heads and stuff and, you
know, asking if he was okay and he's
asking me if I'm okay, and we proceeded
to head out.
```

144.    The police report paints a different picture, as Claimant D advised that she was traveling westbound on Westchester Avenue when she stopped at a red light. While at a complete stop, Claimant D reported that she was rear-ended by the FedEx truck. The police report further noted that "the driver of the FedEx truck exited the truck abruptly and fled the scene without providing any follow-up information."



145.    Claimant D was taken to the emergency department at Montefiore-Einstein Hospital by the FDNY with complaints of neck and lower back pain. Notably, the FDNY found no trauma to Claimant D's back as shown in the snippet from the pre-hospital care summary below.

Chief Complaint (Primary): "My back hurts"   Duration: 40 Minutes
Anatomic Location: Back
Provider Impression: Back Pain (No Trauma)
Was this event weather related?: No
Mechanism of Injury: MVA To MV
Personal Protective Equipment: Safety Belts, lifelines, and lanyards*
Trauma Information - Type of Injury:   None

146.    Following Claimant D's evaluation at the emergency room, Montefiore emergency department personnel confirmed the lack of trauma, and Claimant D was discharged with Toradol, lidocaine patches, and advised to follow up with her primary care physician if her condition worsened.

A/P
31F denies medical history here with neck and low back pain status post MVC. Does not meet criteria for CT imaging of head or C-spine. No sign of neurovascular compromise. Discussed with patient return precautions including neurovascular red flags. Also discussed appropriate

147.    Four days later, on November 16, 2021, after retaining the Ikhilov firm, as evidenced by the durable power of attorney executed on November 15, 2021, Claimant D reported to the office of non-party chiropractor provider, Marc Habif of Complete Care Chiropractic, with complaints of neck pain, lower back pain, and previously unreported bilateral shoulder pain. At the conclusion of the examination, Habif diagnosed Claimant D with cervical sprain/strain, bilateral shoulder strain/sprain, and a differential diagnosis of lumbar and cervical radiculopathy, despite not having imaging results to support the diagnosis.

148.    On November 18, 2021, Claimant D visited family practice provider, Dr. M.L. Sobin, whose 1 Pearlman Drive, Spring Valley address was the same as Habif's, and that of other non-party providers, affiliated with Rockland Pain Management, (Dr. Billy Ford, Dr. Conrad Cean, Dr. Daniel Yoo, and Acupuncturist Christine Lee), all of whom subsequently treated Claimant D.



149.    On December 4, 2021, Claimant D visited non-party imaging provider, Ramapo Radiology Associates, where an MRI was conducted of her lumbar spine, the results of which revealed the following.

> IMPRESSION:
> 1. No vertebral compression deformity or subluxation.
> 2. Multilevel facet arthrosis, possible contributor to mechanical back pain.
> 3. Multilevel degenerative changes, as described, most significant at L4-5 on the right.

150. On December 11, 2021, Claimant D returned to Ramapo Radiology Associates, where an MRI was conducted of her cervical spine, whose results were similarly negative for acute injury.

> IMPRESSION:
>
> No evidence of disc herniation or spinal canal stenosis. Straightening of the cervical lordosis.

The MRI report of Claimant D's right shoulder, taken the same day, revealed the following.

> IMPRESSION:
>
> Minimal supraspinatus tendinosis with peritendinitis
>
> Minimal AC joint arthrosis

151. On June 14, 2022, Claimant D visited the office of Defendant Kaisman for an initial evaluation. Tellingly, Kaisman's report erroneously stated that Claimant D was treated at Saint Barnabas Medical Center in the Bronx, conflating her emergency room encounter at Montefiore with that of another individual in her car, that actually sought emergency care at Saint Barnabas.

> ██████████ is a 31-year-old female who was injured as a driver in an automobile involved in an accident on November 12, 2021, sustaining injuries to her neck and low back. The patient was treated at Saint Barnabas Medical Center in the Bronx.

152. Kaisman reviewed the report of Claimant D's December 4, 2021 MRI and diagnosed the claimant with protruding discs at L3-4, L4-5 with lumbar radiculopathy and myofascial pain syndrome. Kaisman further concluded that Claimant D's injuries were causally

related to the November 12, 2021 accident. Notably, there is no mention of the degenerative findings, which were indicated as being most significant at L4-5 on the right, and Kaisman recommended that Claimant D undergo a lumbar discectomy, which he performed one week later on June 20, 2022.

153.    On August 17, 2022, Claimant D reported to Defendant Dr. Michael Murray of Bay Ridge Orthopedic Associates, who interpreted Claimant D's December 4, 2021 lumbar spine MRI to reveal a broad-based disc herniation at L4-5 and a left disc protrusion at L3-4. Again, no mention was made of the report's degenerative findings, and Claimant D underwent a right-sided L4-5 hemilaminectomy performed by Murray at Bayonne Medical Center in Bayonne, New Jersey, on October 31, 2022.

154.    Notably, an independent Orthopedic Surgery examination conducted by Dr. Regina Hillsman on December 8, 2022, found that the lumbar surgery performed by Defendant Murray on October 31, 2022, was not medically necessary.

> In this case, on 10/31/2022 the claimant underwent right-sided L4-L5 hemilaminectomy, laminotomy, foraminotomy, and discectomy and neurolysis under general endotracheal anesthesia by Michael Murray, M.D. However, the revision lumbar surgery performed was not medically necessary. Hence, the anesthesia infused during the surgery was also not medically necessary.

155.    Under the direction of Ikhilov, with the agreement of the Medical Provider Defendants, *initial complaints of neck and lower back pain, which didn't even warrant imaging during her emergency room encounter, resulted in months of physical therapy, acupuncture and chiropractic treatments, trigger point injections, a discectomy and hemilaminectomy to Claimant D's lumbar spine*. The diagnoses given and treatments received from Claimant D's respective medical providers were not the result of objective clinical observations, but were made

with the specific intent to exhaust no-fault benefits that satisfy the threshold of "more than basic economic loss", *supra*, or establish a "serious injury" required to file the lawsuit necessary to obtain an inflated settlement on Claimant D's personal injury claim in furtherance of the fraud scheme.

156.    Upon information and belief, the Funding Defendants provided a high-interest litigation funding loan to Claimant D, the proceeds of which, upon information and belief, were then redistributed to Claimant D, the Runner Defendants who recruited Claimant D, the Medical Provider Defendants who treated Claimant D, and the Legal Service Defendants. These details are within the Defendants' exclusive possession and will be obtained through UCC filings, funding agreements, provider liens, ASC ledgers, and attorney trust-account records in discovery.

### Claimant E

157.    Claimant E was a backseat passenger in Claimant D's vehicle on November 12, 2021.

158.    On February 14, 2022, Claimant E had his initial evaluation with Dr. Arden Kaisman who assessed him with herniated discs at C3-C6 with cervical radiculopathy and myofascial pain syndrome and bulging discs at L2-L3, L3-L4, herniated discs at L4-L5, L5-S1 with lumbar radiculopathy and myofascial pain syndrome.

159.    On February 21, 2022, Dr. Arden Kaisman performed a 1) Lumbar Discectomy at the L4-L5 level, 2) Lumbar Discectomy at the L5-S1 level, 3) Multiplanar fluoroscopy, 4) Annuloplasty at the L4-L5 level, 5) Annuloplasty at the L5-S1 level, 6) Lumbar discogram, 7) Transforaminal Lumbar Epidural Steroid Injection L4-L5 and 8) Transforaminal Lumbar Epidural Steroid Injection L5-S1 at Triborough Ambulatory Surgery Center.

160.    On April 4, 2022, Dr. Arden Kaisman performed a cervical discectomy of the C4-C5 and C5-C6 discs at Triborough Ambulatory Surgery Center.

161.    On July 28, 2022, he was examined by Michael T. Murray of Bay Ridge Orthopedic Associates, P.C. who recommended that he consider anterior cervical decompression fusion with instrumentation as he continued to have 9-10/10 pain that was persistent and debilitating.

162.    On August 26, 2022, Dr. Murray performed the anterior cervical decompression surgery at All City Surgical Center.

### Claimant F

163.    Claimant F went to St. Barnabas Hospital in the Bronx, New York complaining of neck and back pain from the impact.  He claimed to be the driver or the passenger in varying reports to emergency room staff.  He was subsequently discharged with ibuprofen and Tylenol.

164.    On February 7, 2022, Claimant F had an initial evaluation with Dr. Arden Kaisman. He was assessed with bulging discs at C3-C7 with cervical radiculopathy and myofascial pain syndrome and herniated discs at L5-S1 with lumbar radiculopathy and myofascial pain syndrome.

165.    On March 14, 2022, Dr. Kaisman performed a 1) Lumbar Discectomy at the L5-S1 level, 2) Multiplanar fluoroscopy, 3) Annuloplasty at the L5-S1 level, 4) Lumbar Discogram and 5) Transforaminal Lumbar Epidural Steroid.

166.    On March 28, 2022, Dr. Kaisman performed a 1. Cervical discectomy of the C4-C5 disc, 2) Cervical discectomy of the C5-C6 disc, 3) Fluoroscopy, 4) Annuloplasty at the C4-C5 level and 5) Annuloplasty at the C5-C6 level.

---

**April 8, 2017 Motor Vehicle Accident (Claimant G)**

*Claimant G*

167.     On or around April 8, 2017, Exemplar Claimant G was the driver of a vehicle stopped at a red light at the intersection of Avenue D and Rockaway Avenue in Brooklyn, New York, when his vehicle was allegedly struck from behind by a U-Haul Truck driven by a FedEx employee.

168.     According to the accident report, the FedEx employee advised that while traveling westbound on Avenue D, he slowed for the traffic signal, which had turned red. While doing so, he received a message on his work tablet, lost sight of his location, and collided with the rear of Claimant G, as shown in this snippet from the report below.

Notably, no injuries were indicated in the incident report, and first responders were not summoned to the scene. Additionally, photographs taken immediately thereafter reveal only minimal damage to the parties' vehicles, as depicted in the images below.



169.    Approximately two hours later, Claimant G reported to Brookdale University Hospital by private car, where he was examined by emergency department personnel after arriving with complaints of lower back and left knee pain as a result of what emergency room records categorized as a "low-speed collision" earlier that day.

Chief Complaint
Patient presents with
 - Motor Vehicle Crash
        rear ended at the stop sign

Patient is a 39 y.o. male presenting with motor vehicle accident. The history is provided by the patient. No language interpreter was used.
Motor Vehicle Crash
Injury location:  Torso and leg
Torso injury location:  Back
Leg injury location:  L knee
Time since incident:  2 hours
Pain details:
   Quality:  Sharp
   Severity:  Moderate
   Onset quality:  Sudden
   Duration:  2 hours
   Timing:  Constant
   Progression:  Worsening
Collision type:  Rear-end
Arrived directly from scene:  yes
Patient position:  Driver's seat
Patient's vehicle type:  SUV
Objects struck:  Large vehicle
Compartment intrusion:  no
Speed of patient's vehicle:  Stopped
Speed of other vehicle:  Low

170.   Claimant G's physical examination revealed no neck pain, dizziness, loss of consciousness, weakness, light-headedness, numbness, or headaches, and diagnostics were not even ordered, given the minor nature of the accident.

> Associated symptoms: no abdominal pain, no altered mental status, no bruising, no chest pain, no dizziness, no headaches, no immovable extremity, no loss of consciousness, no nausea, no neck pain, no numbness, no shortness of breath and no vomiting

171.   Claimant G was prescribed pain meds and released within a couple of hours of arrival with instructions to report to Dr. Sultana Y. Rahman, a primary care provider at the internal medicine clinic, if his condition worsened.

172.   Two days later, on April 10, 2017, Claimant G reported to defendant Moy at Rutland Medical for an initial evaluation. During this visit, Claimant G's complaints expanded significantly as Moy's intake reflects multi-region complaints involving the neck, lower back, and left knee, with pain scores escalating to 7–8/10, and allegations of headaches, anxiety, and insomnia.

173.   Having misrepresented the body parts injured and the extent of those injuries, Claimant G next omitted material facts which would cast aspersions on the causal relationship between his injuries and the April 8, 2017 motor vehicle accident.

174.   In the "Past Medical History" section of Claimant G's initial examination with Dr. Moy, it indicates that he denied any past medical history but admitted a motor vehicle accident in 2014 and a left shoulder arthroscopy in 2014.  Such omissions were knowingly made in an effort to conceal the injuries he obtained during a November 13, 2007 motor vehicle accident and a December 25, 2013 motor vehicle accident.

175.    Dr. Moy diagnosed Claimant G with muscle spasm, tightness, and tenderness in the cervical paraspinal muscles, lumbosacral paraspinal muscles, and trapezius muscles. Notably,

left knee pain was omitted as a chief complaint on separate portions of Claimant G's intake form, though Moy would request MRI imaging of the same.

176. Claimant G returned to Rutland Medical for physical therapy and chiropractic treatments for approximately three years. Notably, records of these encounters were largely duplicative in terms of the treatments administered and reported results, save for the dates. The records also revealed a tightly interconnected provider network, with Moy serving as the central referral hub, directing Claimant G to physical therapy, acupuncture, chiropractic care, radiological facilities, pain management specialists, orthopedic surgeons, and neurologists.

177. On April 14, 2017, Claimant G underwent a left knee MRI at defendant Nexray/Soul, upon Moy's referral, which purportedly revealed a medial meniscus tear and partial tear/sprain of the medial collateral ligament.

178. On April 21, 2017, Claimant G reported to MetroCare for an initial psychiatric evaluation. Intake notes from the encounter, which described the place of the interview as

---

"Rutland," also indicated that Claimant G was in a dazed and frightened state, neither of which had been reported to emergency room personnel. Claimant G was diagnosed with adjustment disorder with anxiety, acute stress disorder, brief somatic symptom disorder, mood disorder, anxiety, and insomnia due to pain.

179.    On May 9, 2017, Claimant G underwent an MRI of his cervical spine, at Moy's request, which purportedly revealed left lateral disc herniation at C5-6 with disc material abutting the nerve root. Claimant G also underwent an MRI of his lumbar spine, which purportedly revealed left lateral disc herniation encroaching into the foramen and abutting nerve root at L3-4.

180.    On May 12, 2017, Claimant G reported to Metro Pain. During the encounter, Claimant G advised that he was involved in a motor vehicle accident and was immediately taken to the emergency room, which varied from the initial account (that he arrived by private car a couple of hours later). Claimant G also failed to disclose his alleged anxiety and mood disorders, as the provider notes only reflect that some of Claimant G's sleep habits had changed, as reflected in the screenshots from the encounter below.

> **HPI:**
> This is a 39 year old patient with a history of injuries as a result of a motor vehicle accident, involved as a driver and the accident is described as a rear end collision.
> Patient was taken immediately to the ER.

> Psychiatric: No depressive symptoms, some changes in sleep habits, no changes in thought content.

181.    Within weeks of his initial evaluation at Metro Pain Specialists, Claimant G began aggressive pain management interventions, including epidural steroid injections, facet blocks, discography, and ultimately percutaneous discectomy procedures, despite only mild emergency room findings. These invasive modalities were implemented after only a short course of

**COMPLAINT**                                              **PAGE 51 OF 92**

conservative care and were based largely on subjective pain reports rather than progressive neurological deficit or emergent imaging findings.

182.    Orthopedic treatment of Claimant G's left knee followed a similar pattern. Initial complaints of left knee pain were treated conservatively with injections and therapy under Defendant Apazidis, but treatment escalated quickly, culminating in arthroscopic surgery on June 28, 2017. Claimant G was referred to Apazidis by Moy as revealed in the following excerpt from Claimant G's December 5, 2019 deposition.

```
     Q.    So, at some point you said you
saw a specialist for your knee,
Dr. Alexios?
     A.    Yes.
     Q.    Do you remember what month you
went to see Dr. Alexios for the first time
     A.    2017.  I think it was maybe
June or July.
     Q.    What prompted you to see
Dr. Alexios?
     A.    I was still having problems
with my knees.
     Q.    What kind of problems?
     A.    Bending, walking.
     Q.    How did you know to go see
Dr. Alexios?
     A.    From when I did the MRI.  He
was -- excuse me.  He was -- he was, um,
referred to me by Dr. Moy.
```

183.    When left knee symptoms persisted, Claimant G transitioned to Baum, of Defendant Bay Ridge, who performed a second left knee surgery on August 30, 2019.

184.    On March 5, 2020, Claimant G sought treatment with another orthopedic surgeon, Thompson, for pain in his bilateral knees, moderate in the left and severe in the right.  Based on the results of February 22, 2020 diagnostic imaging performed by Lenox Hill Radiology, Dr.

Thompson found Chondromalacia patellae in the right knee and indicated him for right knee arthroscopic surgery.   Claimant G did not, however, ultimately have this surgery with Dr. Thompson as he was simultaneously seeking spinal fusion surgery in early 2020.

185.   On January 3, 2020, during a follow-up evaluation with Dr. Moy at Rutland, Claimant G claimed he felt pain in his lumbar spine due to a fall in the snow about a month prior.

186.   On March 4, 2020, Claimant G sought medical treatment with Dr. Ashley Simela. Repeating his pattern of making material misrepresentations and omitting material facts from his medical providers, he did not disclose his prior motor vehicle accidents, his prior spinal conditions, or his fall from standing in or around December 2019.

187.   "The patient indicated that he was in his usual state of health with no active neck, back nor extremity symptoms until a motor vehicle accident which occurred on April 8, 2017."

188.   Claimant G complained that since the accident, he has had worsening back pain. He further stated that the epidural injections and nerve blocks did not remove his pain and the pain relief from the percutaneous discectomy was only temporary.   As a direct result of his misrepresentations and omissions, Dr. Simela found that:

> **CAUSATION:**
>
> Within a reasonable degree of medical certainty the motor vehicle collision which occurred on or about April 8, 2017 is the competent cause of injuries sustained to Mr. Stanford's lumbar spine and left knee requiring surgical intervention.

189.   He also opined that "he will continue to experience disability at this point in time as a result of the injuries sustained. Based on the foregoing, it is my opinion within a reasonable degree of medical certainty that he has sustained significant impairment or disability as a direct result of the injury from April 08, 2017."

190.   Dr. Simela sent Claimant G for an updated MRI and on March 19, 2020, he underwent an MRI of the Lumbar Spine at Stand-Up MRI of Manhattan, P.C.  Id.  This MRI indicated that he was suffering from: 1) L2/3 posterior subligamentous disc bulge which increases peripherally with proximal left foraminal extension below the level of the exiting nerve root, 2) L3/4 posterior annular disc bulge deforms the ventral thecal sac and broad right foramina) disc herniation and right foraminal narrowing with encroachment upon the exiting right L3 nerve root, 3) L4/5 posterior annular disc bulge deforms the ventral thecal sac and extends peripherally with proximal right foraminal extension approaching the exiting right L4 nerve root, 4) L5/S1 posterior subligamentous disc bulge deforms the ventral epidural space, 5) Mild facet hypertrophic changes also noted at L3/4 through L5/S1 and 6) Curvature of the lumbar spine, convex to the left.  Id.

191.   On April 15, 2020, Dr. Simela conducted a tele-health visit stating that he was waiting for authorization for surgery.  The surgery was subsequently scheduled for May 29, 2020, at SurgiCore of Jersey City.  Despite only having one in-person consultation with Dr. Simela, Claimant G proceeded with the open lumbar discectomy for decompression with an instrumented lumbar fusion of L3-4.

192.   However, Claimant G continued to complain of pain after this surgery, as he had done with his left knee surgery from 2017.  Dr. Simela continued treating him through December of 2023, when he administered a lumbar epidural injection and performed a fluoroscopy with interpretation.

193.   Baum also performed a right knee arthroscopy on March 10, 2023, nearly six years post-accident.

194.    Baum's follow-up reports consistently note quadriceps atrophy and inadequate rehabilitation, suggesting that Claimant G's post-surgical outcomes were influenced as much by deconditioning and noncompliance as by traumatic pathology attributable to the accident.

> The patient presents still complaining of aches and pains to the left knee and left lower extremity.  He is status post a spinal fusion and he still has the 2.5 cm VMO quad atrophy.   He does have EMGs which do show left L2, L3, and L4 radiculopathy and he is status post an L3-L4 spinal fusion.  So at this point I do believe this knee will not get better.  He will have this permanent atrophy and instability partly related to the arthroscopy and failure to properly rehab the quads and partly due to the spinal fusion and the residual L2, L3, and L4 nerve damage on that left lower extremity which is the nerve supply to the quadriceps muscle.

195.    Under the direction of Ikhilov, with the agreement of the Medical Provider Defendants, initial complaints of neck, left knee, and lower back pain, which by all accounts emanated from a low impact/low speed collision that required only minor, non-emergent care at Brookdale University Hospital, resulted in years of physical therapy, acupuncture and chiropractic treatments, epidural steroid injections, facet blocks, percutaneous discectomy procedures, two arthroscopic surgeries to Claimant G's left knee, lumbar fusion surgery performed by Thompson in May 2020, over three years post-accident, and internal derangement of his right knee, nearly six years post-accident. The diagnoses provided, and treatments received from Claimant G's respective medical providers, were not the result of objective clinical observations but were made with the specific intent to exhaust no-fault benefits that satisfy the threshold of "more than basic economic loss", *supra*, or establish a "serious injury" required to file the lawsuit necessary to obtain an inflated settlement on Claimant G's personal injury claim in furtherance of the fraud scheme.

196.    Upon information and belief, the Funding Defendants provided a high-interest litigation funding loan to Claimant G, the proceeds of which, upon information and belief, were

**COMPLAINT**                                                                        **PAGE 55 OF 92**

then redistributed to Claimant G, the Runner Defendants who recruited Claimant G, the Medical Provider Defendants who treated Claimant G, and Ikhilov.

197.   Ikhilov also provided by mail or by electronic service to the Kings County Supreme Court and to all parties in the Kings County proceedings fraudulent documents containing false assertions regarding Claimant G's motor vehicle accident, the existence, extent and causality of Claimant G's injuries, and the necessity of medical treatment, to bolster and add value to Claimant G's personal injury lawsuit, thereby inflating settlement value and ultimately, Ikhilov's financial gain.

198.   By transmitting (via mail and e-service) NF-3s, bills, and medical records that misstate or overstate diagnosis, causation, and medical necessity, the Legal Services and Medical Services Defendants used the mails and wires to further a scheme to defraud, constituting predicate acts under 18 U.S.C. §§ 1341, 1343, a pattern of racketeering under § 1961(5), and violations of § 1962(c)–(d), as well as N.Y. Ins. Law § 403, N.Y. Penal Law § 176.05, and applicable Rules of Professional Conduct and Education Law § 6530. At the time of this submission, Claimant G's lawsuit is still pending.

### February 7, 2022 Motor Vehicle Accident (Claimant H)

*Claimant H*

199.   On February 7, 2022, between 1:00 and 2:00 a.m., Claimant H was a rear-seat passenger in a vehicle involved in a collision with a 45-foot Express tractor-trailer operated by a FedEx employee while traveling westbound on the Long Island Expressway at or near the Maurice Avenue exit.

200.   The police report described a sideswipe on the left driver's side of the vehicle in which Claimant D was an occupant, driven by Claimant H's friend who is one of the defendants

in the subject lawsuit, and who pursued his own lawsuit, happening to treat entirely with the same providers.

201.  According to the police report, the friend's vehicle was attempting to exit the expressway when it was allegedly cut off by the Express vehicle, which had entered into its lane. As a result, the driver's side of the friend's vehicle made impact with the rear passenger's side of the tractor-trailer. The FedEx driver was alleged to have left the scene without exchanging information or waiting for the police. According to a statement provided by the Express vehicle's driver, Louis DeStefano, this was not the case at all, as set forth in the screenshot below.

**EMPLOYEE STATEMENT FORM**

You are being asked to write this statement to clarify the situation in question. This is your chance to give your side of the story. It is important to include in your statement all relevant facts or any details that could have any influence on the outcome or final management decision in this matter. Please explain clearly and be complete.

Name (print): *Louis DeStefano*   EE #: *160423*

*ON MONDAY FEB 7 2022 I was on Route to LGA AND I have NO KNOWLEDGE of ANY ACCIDENT OR INCIDENT IN Route. I was in the Right Lane to Exit off At Maurice Ave. Also I NEVER Felt ANY Sort of Bump or Feeling that I hit or ANY Vehicle hit my Trailer. If there was any INCIDENT OR ACCIDENT I would have stopped to see & check on ANY Person or Persons IF ANY INJURY occured.*

202.  A video taken by an unknown third party who happened to be trailing the friend's vehicle while simultaneously recording on what appears to be a mobile phone captured the collision. The video, which is approximately 12 seconds long, depicts claimants' vehicle swerving

near the FedEx vehicle's back passenger side with no indication of contact between the two. Thereafter, claimants' vehicle pulled over to the shoulder while the FedEx vehicle, whose driver was not aware of an accident because one never occurred, continued, not fled, along its normal route. Though the friend positively identified the vehicle in the video as his, he was unable to identify the driver of the Express vehicle or the individual who captured the footage. *He later stated that Claimant H provided him with the information*, as shown in excerpts from his deposition testimony below.

```
    Q.      Based on your review of this video,
what do you recognize it to be, if you recognize
it at all?
    A.      If I recognize what?
    Q.      Well, do you see the accident that
occurred within the video involving a FedEx truck
and a motor vehicle?
    A.      Of course, yes.
    Q.      Okay.  Do you recognize that video to
be a video of your vehicle and the accident that
you have been testifying about today?
    A.      That's my car, yes.
```

```
    Q.      Did you speak to the person that was
behind your vehicle in a different vehicle that
might have witnessed the accident after this
accident occurred?
    A.      Of course not.
    Q.      Did anybody approach you after this
accident saying that they witnessed the accident
```

```
occurring?
     A.      I haven't talked to anybody about any
accident with respect to the accident.
     Q.      Do you know if any of the passengers
in your vehicle spoke to anybody at the accident
scene that was not involved in this accident?
     A.      I wouldn't know if they did, if
anybody talked to them.
     Q.      Did you speak to the driver the FedEx
vehicle at all?
     A.      I don't even know who he is.
     Q.      How were you able to identify that
truck that was involved in this accident?
     A.      I didn't identify.  ████ gave me the
information.
     Q.      ████ is a passenger in your vehicle;
correct?
     A.      Correct.
```

203.    Remarkably, none of the occupants of the friend's vehicle claimed to have spoken with the individual who captured the video and allegedly took down the Express vehicle's license plate. Yet the front seat passenger testified during her deposition that the individual interacted with Claimant H. This testimony was contradicted by Claimant H, as shown in excerpts from their respective depositions below.

---

Q.    How long after the accident did that other vehicle stop to speak with you?

A.    I don't know.  I'm not aware of it.

Q.    I know you testified that you didn't speak to any of the people who stopped, but did anybody else from your vehicle speak with them?

A.    I know that ███ did speak with one of them, but I'm not sure if the other guy spoke to any of them.

Q.    And do you know if ███ got any contact information for any of those people who stopped?

A.    No, I wouldn't be able to tell you. I don't know.

---

Q.  Who took down the license plate number of the FedEx vehicle?

A.  Someone that was driving by took the information and handed it over to us.

Q.  And do you know the name of this person?

A.  No.

Q.  Did you have any conversation with this person?

A.  Not me.

---

204.    While there was minimal damage to the rear passenger's side of the Express vehicle, the friend's vehicle sustained noticeable damage to the driver's side, due in large part to the removal of the driver's side door by the fire department.



205.   Claimant H was taken via ambulance to Elmhurst Hospital's emergency department

with chief complaints of neck pain, right shoulder pain, and right knee/leg pain.



206.   Imaging taken (CT cervical spine; X-rays of both clavicles, chest, right femur, and

right knee) showed no acute fracture or dislocation. ***It is further noted that Claimant H was able***

***to ambulate without difficulty, with mild pain, but tolerable.*** He was discharged with instructions

to follow up with his primary care provider as needed, as reflected in the snapshot below.

> CT neck and XRs of knee, femur, chest, and clavicles all normal. Patient able to ambulate without difficulty. Mild pain but tolerable to patient. Discharged home with anticipatory guidance on signs and symptoms to return to care for. To follow up with primary care provider as needed.

*207.*   Claimant H reported to the office of defendant Mac Med the following day with

complaints of headaches, bilateral shoulder, neck, mid/lower back, and right knee pain, which he

rated as 7-10 on the pain scale.

**COMPLAINT**                                                                                              **PAGE 61 OF 92**

*208.*    Claimant H was examined by Physician's Assistant Joseph Martone, who immediately administered trigger point injections to Claimant H's bilateral trapezius. ***Trigger point injections ensued despite negative imaging results during his emergency room visit and despite no prior effort to manage Claimant H's alleged neck pain conservatively.***

209.    Notes from the encounter also erroneously stated that the friend's vehicle suffered a front impact while stopped at a red light. This error was repeated in subsequent reports, including the report of his May 31, 2022, encounter, in which not only pertinent details of the accident were misstated, but Claimant H's age and occupation were incorrectly reported.

**Motor Vehicle Accident**
▉▉▉▉ is a 35 year old male who was involved in an accident on 02-07-2022. Patient current employment status is Construction worker. The accident occurred at queens . At the time of accident patient was wearing seatbelt. Patient was a back seat passenger. Patient was in the car. Three other people were in the vehicle. he suffered a front impact to the vehicle. The accident occurred while stopped at a stoplight. he suffered no loss of consciousness.
He was immediately admitted to the ER. Ambulance came and check him out In the ER, a physical exam, CT scan and pain killers was done. was then sent home

**Motor Vehicle Accident**
▉▉▉▉ is a 60 year old male who was involved in an accident on 02/07/2022. Patient current employment status is Delivery. The accident occurred at queens. At the time of accident patient was wearing seatbelt. Patient was a driver. Patient was in the car. Three other people were in the vehicle. he suffered a front impact to the vehicle. The accident occurred while stopped at a stoplight. he suffered no loss of consciousness.
He was not admitted to the ER In the ER, a physical exam, CT scan and pain killers was done. was then sent home

210.    At the conclusion of the examination, Martone referred Claimant H to defendant Fast Care for MRIs of his right knee, right shoulder, cervical, lumbar, and thoracic spines, and to defendant FSPT, which operated out of the same 130th Street address in Richmond Hill as Mac Med.

211.    Upon information and belief, Mac Med served as the referral hub for multiple providers at the same location, including a non-party provider that also treated the front seat

passenger (Atlantic Medical and Diagnostic PC). The referral scheme was articulated by Claimant H in the excerpt from his deposition below.

> A. For example, if I go for physical therapy, let's just say on a given day like Tuesday, that Tuesday a back doctor will see me and then that doctor recommends that I go to that other place.
>
> Q. Okay. But do you remember the -- the doctor that would recommend that you go to other places?
>
> A. He wasn't a specific doctor. Like, for example, if I would see a doctor for a specific part of my body, after that, that doctor will recommend that I go to that place and subsequently like that.

212. The MRI reports of Claimant H's cervical and thoracic spines revealed no abnormalities. Yet injections had already been administered to Claimant H's cervical spine when, in actuality, there were no injuries to treat. The MRI report of Claimant H's right knee purportedly revealed a sprained ACL. Yet this imaging was deemed unnecessary by Independent Medical Examiner Dante Brittis, who opined as follows in his April 11, 2022, report.

> In my opinion, the MRI study of the right knee is not medically necessary and should not be recommended for payment. This procedure was ordered upon completion of the initial examination and before conservative management had any possible chance to show full effect. Very clearly, the treatment plan and expected outcomes would have been the same whether the MRI study was ordered or not. There were no clinical findings suggesting acute internal derangement injuries to the knee at the time of the subject incident. If all conservative treatment measures have been attempted and failed and the claimant had persistent orthopedic findings suggesting ligamentous instability, mechanical derangement or serious pathology of the knee that may require an immediate surgical consult, then advanced diagnostic imaging might have been considered. That very clearly was not the case here.

213.    The MRI report of Claimant H's right shoulder purportedly revealed a SLAP tear, and the MRI report of Claimant H's lumbar spine purportedly revealed a disc bulge at L5-S1.

214.    At the conclusion of his examination at Four Square Physical Therapy, Claimant H began a treatment regimen (physical therapy, chiropractic, and acupuncture treatments to his upper back, both shoulders, right knee and lower back) which, when coupled with Fast Care Medical's MRI findings, set the stage for multiple surgeries, despite negative findings of any acute injury during his emergency room visit at Elmhurst Hospital on the date of the accident.

215.    Claimant H acknowledged the significance that his therapy appointments played in the Fraudulent Treatment Protocol, and their relationship to subsequent surgeries, as set forth in the following exchange during his deposition testimony.

> A. I always went to therapy.
> Q. What do you -- what do you mean by you always went to therapy?
> A. After the accident, I went to therapy all the time.  I went to see a doctor once a week or every 15 days and that's how the surgery was determined.

*216.*    On March 9, 2022, Claimant H returned to 89-25 130th Street, again with exaggerated pain complaints, where he was examined by Defendant King, who diagnosed Claimant H with cervical and lumbar sprains/strains, right shoulder labral tear/tendinitis, and right knee derangement. ***Though Claimant H had arguably received only one month of conservative right shoulder treatment, King immediately recommended surgery.***

217.    Nine days later, on March 18, 2022, King performed a right shoulder arthroscopy on Claimant H. This surgery was deemed premature and medically unnecessary by Independent Medical Examiner Ronald Mann, as shown in the following excerpt from his March 31, 2022, report.

> The right shoulder surgery was not medically necessary. There was an inadequate attempt at conservative care. Therefore, the shoulder surgery was not medically necessary at that stage of the claimant's injuries. There was no evidence that the claimant completed a full proper course of conservative management prior to considering shoulder arthroscopy. The doctor should have provided the claimant with proper conservative therapy consisting of physical therapy for at least 3-6 months and steroid injections before considering alternative treatment options. Less than three months of conservative care was documented before surgery was prescribed. Therefore, surgery was not an appropriate treatment option for this claimant.

218.    Six weeks later, King performed a right knee arthroscopy on Claimant H on May 1, 2022, based largely upon MRI results, the efficacy of which was called into question by Independent Medical Examiner Brittis.

219.    Claimant H reported to the office of Kosharskyy of Pain Physicians on June 9, 2022, with complaints of neck and mid/lower back pain. Claimant H was diagnosed with lumbar intervertebral disc displacement at L5-S1, cervical disc disease/cervicalgia, and back muscle spasm. A course of physical therapy with activity modification was continued, and outcome measure testing (Oswestry/Neck Disability Index) was ordered to track response.

220.   Merely four days later, on June 13, 2022, after just advocating for continued physical therapy and outcome measuring, Claimant H returned to Pain Physicians where defendant Koutsospyros performed an interlaminar epidural steroid injection at L5–S1.

221.   Claimant H's alleged persistent lower back pain led to surgical discussion, despite no indication of the same during his emergency room encounter at Elmhurst Hospital. Approximately one month later, Claimant H underwent an L5–S1 discectomy performed by defendant Dvoskin on July 19, 2022.

222.   Claimant H reported to the office of Defendant Michael Murray of Bay Ridge Orthopedic Associates on September 15, 2022, with complaints of neck and lower back pain. Despite this being their first encounter, Murray immediately discussed surgical options and recommended an L5–S1 decompression and fusion, which Claimant H underwent less than a month later on October 14, 2022.

223.   ***Despite the lack of objective evidence of any injury or limitation whatsoever on the date of the accident, Claimant H underwent no less than four (4) surgeries***: arthroscopic right shoulder surgery on March 18, 2022; arthroscopic right knee surgery on May 1, 2022, both performed by Defendant King; L5–S1 discectomy on July 19, 2022, performed by Dvoskin; and an L5–S1 posterolateral fusion on October 14, 2022, performed by Defendant Murray (Bay Ridge) at Bayonne Medical Center in New Jersey.

224.   Under the direction of Ikhilov, with the agreement of the Medical Provider Defendants, initial complaints of neck, right knee/leg, and right shoulder pain, which required only minor, non-emergent care at Elmhurst Hospital, resulted in months of physical therapy, acupuncture and chiropractic treatments, epidural steroid injections, arthroscopic surgeries to Claimant H's right knee and right shoulder and two surgeries to his lumbar spine.

**COMPLAINT**                                                                                    **PAGE 66 OF 92**

225. The diagnoses provided, and treatments received from Claimant H's respective medical providers, were not the result of objective clinical observations but were made with the specific intent to exhaust no-fault benefits that satisfy the threshold of "more than basic economic loss", *supra*, or establish a "serious injury" required to file the lawsuit necessary to obtain an inflated settlement on Claimant H's personal injury claim in furtherance of the fraud scheme.

226. Upon information and belief, the Funding Defendants provided a high-interest litigation funding loan to Claimant H, the proceeds of which, upon information and belief, were then redistributed to Claimant H, the Runner Defendants who recruited Claimant H, the Medical Provider Defendants who treated Claimant H, and Ikhilov.

227. Ikhilov also provided by mail or by electronic service to the Queens County Supreme Court and to all parties in the Queens County proceedings fraudulent documents containing false assertions regarding Claimant H's motor vehicle accident, the existence, extent and causality of Claimant H's injuries, and the necessity of medical treatment, to bolster and add value to Claimant H's personal injury lawsuit, thereby inflating settlement value and ultimately, Ikhilov's financial gain.

228. By transmitting (via mail and e-service) NF-3s, bills, and medical records that misstate or overstate diagnosis, causation, and medical necessity, the Legal Services and Medical Services Defendants used the mails and wires to further a scheme to defraud, constituting predicate acts under 18 U.S.C. §§ 1341, 1343, a pattern of racketeering under § 1961(5), and violations of § 1962(c)–(d), as well as N.Y. Ins. Law § 403, N.Y. Penal Law § 176.05, and applicable Rules of Professional Conduct and Education Law § 6530. At the time of this submission, Claimant H's lawsuit is still pending.

## VI.   PATTERN OF RACKETEERING

### a.   The RICO Enterprise

229.   As demonstrated by the Defendants' conduct in furtherance of the Fraud Scheme, Plaintiff alleges an association-in-fact enterprise (the "Enterprise") comprised of legal services providers, gatekeeper clinics, imaging facilities, pain-management practices, orthopedic and spine surgeons, and litigation-funding entities that acted together with the common purpose of converting staged or low-impact collisions involving FedEx vehicles into high-value lawsuits by manufacturing serious injuries and economic loss greater than basic-economic-loss.

230.   At all times relevant each member of the Enterprise knew and agreed to engage in the conduct described herein.  Further, each member of the Enterprise understood the role they played in the Fraud Scheme and that their contribution to the Fraud Scheme was necessary for it to work.  Upon information and belief, the relationship and agreement between the defendants were on going and more than mere referral pipelines.  The legal services defendants remained engaged in the claims throughout their entirety because the scheme's objective is only achieved once the claim is resolved, e.g. settlement or obtaining a money judgment in the lawsuit.  The medical provider defendants were likewise engaged in the claims throughout their entirety because not only were they to provide medical services in accordance with their respective roles, but, upon information and belief, they agreed and remain(ed) committed to testify as treating experts for which they are paid a substantial sum from the proceeds of the claim.  This agreement is not routine medical care, but an additional service provided beyond mere treatment and diagnosis.  Upon further information and belief, the medical provider defendants earn their "expert fee" regardless of whether the claim proceeds to trial because they are paid for making themselves available in addition to providing testimony.  The success of the scheme required coordination of the testimony

among the enterprise members to ensure consistency and to maintain the lies of the claim. The specific dates and circumstances around these agreements and coordination are peculiarly within the possession of the defendants and will be obtained during the discovery period of this litigation.

231.   Defendants had a common purpose, which was to inflate claims beyond the actual realities of the auto accidents and associated injuries. The Defendants are related to each other in that there are repeat provider clusters at the same addresses, recurring radiologist, surgeons and pain management, and Ikhilov's central coordination. Moreover, these defendants have provided professional services together to multiple personal injury claimants and have done so since at least 2017 to the present. This relationship and conduct are likely to continue into the future unless stopped.

232.   Importantly, the Enterprise functioned through a predictable and repeatable operational cycle that ensured fraudulent claims moved seamlessly from inception to litigation to settlement. Claimants were first funneled through an intake process controlled by the Legal Services Defendants, who collected NF-2 applications, initiated first-party benefit claims, and immediately routed claimants to preselected Gatekeeper Defendants. These Gatekeeper entities implemented templated conservative-care protocols regardless of clinical presentation generating uniform therapy records that laid the groundwork for escalation.

233.   As an example of the inner workings of the enterprise, Claimants E and F, who were involved in the same motor vehicle accident, received essentially the same course of medical treatment by the same providers in the same time period. Both claimants allegedly did not improve with conservative care and were "routed" to the same surgeons for surgery on an accelerated timeline.

234.   On November 17, 2021, Claimants E and F initially sought treatment at the same

non-party co-conspirator, Pelham Parkway Medical PC (Dr. Hong Pak), where they were both evaluated and provided with physical therapy referrals.  They both received physical therapy and chiropractic therapy from the same providers beginning on the same dates.  At least one of these providers shared an address with Dr. Pak.

235.    Dr. Hong Pak then referred the claimants to non-party co-conspirator, Ironbound MRI, on January 13, 2022, for the same MRIs: cervical spine, lumbar spine and left knee.  Claimant F also had an MRI performed on his right ankle.

236.    On February 7, 2022, Claimant F had his initial evaluation with Defendant Kaisman, where he reviewed the January 13, 2022 MRIs and recommended a lumbar discectomy and a cervical discectomy out of alleged medical necessity.  On February 14, 2022, Claimant E had his initial evaluation with Defendant Kaisman, which resulted in the same recommendations. These surgeries were performed on February 21, 2022, and April 4, 2022, for Claimant E and March 14, 2022, and March 28, 2022, for Claimant F.

237.    Both claimants also had left knee arthroscopic surgery performed by non-party co-conspirator, Dr. Mark Kramer of Cohen and Kramer, M.D. one day apart (February 20 and 21, 2022) after having their initial consultations on the same date (February 9, 2022).

238.    Claimant E also had an anterior cervical decompression performed by Defendant Murray on August 26, 2022 and Claimant F had another lumbar spinal surgery performed by non-party Dr. Gary Gonya on June 27, 2022.

239.    Further, Radiology Defendants then produced MRI and diagnostic reports that regularly overstated or mischaracterized findings, omitting degenerative conditions or identifying injuries unsupported by films, allowing the Enterprise to make decisions justifying injections, repeat imaging, or surgical consultations.

240.    Pain Management Defendants relied on these records to administer injections early and often, documenting "failed conservative treatment" to justify surgical referrals. Surgical Defendants, in turn, operated as the final step in this pipeline, performing invasive procedures on compressed timelines, frequently in conflict with negative emergency-room findings or normal imaging.

241.    Throughout this process, escalation triggers such as persistent high pain scores, non-responsive therapy notes, or boilerplate MRI language were intentionally manufactured to move claimants deeper into the treatment path. At each stage, Defendants generated and transmitted, *inter alia*, standardized records, NF-3 billing forms, and litigation-support documents via mail or wire, ensuring the production of a fully curated evidentiary package designed to survive claim verification, satisfy statutory thresholds for tort actions, and inflate settlement value.

242.    Specifically, Ikhilov and Ikhilov Law served as central coordinating attorneys, selecting which claims would be advanced, which providers would be used, and when and where tort litigation would be initiated.

243.    Ikhilov exercised decision-making authority over whether claims were pursued and controlled pleadings, discovery posture, and settlement demands, thereby directing the Enterprise's affairs.

244.    The Radiology Defendants served as the central diagnostic component of the Fraudulent Treatment Protocol.  It was their role to create reports that identified injuries that did not exist or refuse to disclose chronic/degenerative findings that would negate causal links to the subject accidents.  The Radiology Defendants exercised decision-making authority over whether to report a non-existing injury or omit findings of chronic and degenerative disease.

245.    The Gatekeeper Defendants served as the "conservative treatment" arm of the

Fraud Scheme. It was their role and decision to engage in different treatments of physical, chiropractic and acupuncture therapy. Once armed with radiology reports, the treatments were then administered with reported indications that the treatment was not effective. These reports provided cover for more aggressive treatment, e.g. injections and surgery.

246. The Pain Management Defendants served as the "injection treatment" arm of the Fraud Scheme. The role of the Pain Management Defendants was to overlap with the Gatekeeper Defendants or continue more aggressive treatment following the end of "conservative care". The Pain Management Defendants would create reports indicating that the physical, chiropractic and acupuncture therapy failed and, as a result, more aggressive treatment was warranted such as trigger point and epidural steroid injections. Because these injections were more aggressive and invasive, unlike earlier conservative therapy, settlement demands and recoveries rise. It was the Pain Management Defendants' decisions on what kind and the number of injections to administer such that the planned failure of care would provide support for the ultimate treatment of surgical intervention.

247. The Surgical Defendants provided the surgeries needed to maximum tort recoveries. They often utilized the alleged failure of conservative treatment, e.g. physical therapy, injections, etc., as the basis for reporting that a surgery was necessary. Once a claimant had surgery or surgeries, the settlement demands and recovery in a tort action reached its maximum potential. The Surgical Defendants would base reasonableness and medical necessity on the underlying medical documentation generated by the Radiology, Gatekeeper and Pain Management Defendants. The Surgical Defendants had the decision-making authority selecting which surgeries to perform, whether to perform it based upon a failure of conservative care or deem it a medical emergency and operate without engaging in conservative treatment notwithstanding objective

negatives findings of the emergency room and/or the low impact of the alleged collision.

248.     The Enterprise's structure is evidenced by stable referral pipelines to recurring addresses and providers, including, but not limited to, the 632 Utica Avenue cluster (e.g. NYC Care PT) for Claimant A, the Rockland Pain Management network centered at 1 Pearlman Drive for Claimant D, and the Macintosh Medical/Four Square Physical Therapy hub at 89-25 130th Street for Claimant H.

249.     Within this network, imaging and surgical indications were repeatedly generated despite contrary to emergency-department findings or degenerative studies.   For example, Claimant A's right-shoulder MRI reported no labral tear but was followed by right-shoulder arthroscopy, Claimant D's rapid discectomy recommendation one week after her consultation, and Claimant H's two spine surgeries within seven months after negative ER imaging.

250.     Enterprise participants used the mails and wires to transmit NF-forms, medical records, imaging reports, operative reports, and litigation documents that misrepresented causation, severity, and medical necessity across Claimants A–H, reflecting repeated acts with the same purposes, participants, victims, and methods.

251.     The Enterprise operated continuously for years from at least April 2017 (Claimant G) through at least October 2025 (stipulation in Claimant B) demonstrating closed-ended continuity and an ongoing threat of repetition into the future unless stopped.

252.     As designed, the scheme proximately caused FedEx to incur SIR payments, investigative and claims-handling expenses, defense (i.e., litigation) costs, expert fees, and inflated settlements.

**b.     Defendants' Participation in the Fraud Scheme**

253.     Ikhilov and Ikhilov Law functioned as one of the Enterprise's managers wherein

they decided which claims to advance, routed claimants to preferred providers, and controlled pleadings, discovery posture, and settlement demands. Their conduct constituted operation or management of the Enterprise. They maintained relationships with no-fault providers implicated in large-scale fraud schemes, further evidencing a central role.

254. The Gatekeeper Defendants claimants to high-cadence therapy settings that served as referral hubs. For example, Claimant A went to the 632 Utica Avenue cluster, Claimant D to 1 Pearlman Drive, and Claimant H to Macintosh Medical and Four Square Physical Therapy at 89-25 130th Street. There templated records were generated to justify escalation.

255. The Radiology Defendants generated reads that were leveraged to recommend invasive procedures despite negative or degenerative findings as with Claimant A's shoulder MRI reporting no labral tear followed by arthroscopy and Claimant D's studies downplaying degeneration before discectomy and hemilaminectomy.

256. The Pain Management Defendants administered early injections to create a record of refractory pain and failed conservative care including Claimant D's Rockland network course and Claimant D's immediate trigger-point injections notwithstanding negative ER imaging.

257. The Surgeon Defendants advanced to arthroscopies and spinal operations on compressed timelines despite limited conservative care or inconsistent diagnostics. For example, Thompson's arthroscopy on Claimant A within roughly a week of consultation despite a negative labrum MRI, Kaisman's discectomy recommendation executed one week later for Claimant D, Murray's hemilaminectomy on Claimant D, and Claimant H's discectomy and subsequent L5–S1 fusion within roughly three months.

258. Again, each participant transmitted NF-3s, medical bills, MRI reports, operative reports, authorizations, and litigation filings by mail and electronic means as necessary steps in the

scheme thereby committing repeated violations of 18 U.S.C. §§ 1341 and 1343. Moreover, surgeries were performed across state lines constituting violations of the U.S. Travel Act, 18 U.S.C. §1952[6].

259.    Additional predicate acts constituting Defendants' participation and pattern of racketeering in the Fraud Scheme may be found in the attached **Exhibit "B"**.  Such exhibit is incorporated herein by reference as if set out in full verbatim.

260.    Defendants' coordinated roles produced the intended result which was to generate, transmit and perpetuate threshold-satisfying records and procedures enabling litigation against FedEx and causing SIR payments, defense and expert-related costs, and inflated settlements.

## VII.    JUSTIFIABLE RELIANCE

261.    FedEx's reliance on Defendants' misrepresentations was reasonable and justifiable under the circumstances.

262.    Defendants affirmatively misrepresented that staged collisions were *bona fide* accidents and that claimed injuries were genuine, accidental, and medically necessary. These misrepresentations were embodied in sworn and unsworn statements, accident reports, medical records, billing submissions, no-fault applications and forms, and litigation filings.  Under No-Fault, materials that appear facially valid are customarily relied upon by claims professionals and self-insured entities in the ordinary course of claims handling. FedEx was entitled to presume the truth of such representations absent clear indicia of fraud.

---

[6] Claimant D underwent a right-sided L4-5 hemilaminectomy performed by Murray at Bayonne Medical Center in Bayonne, New Jersey, on October 31, 2022.  Claimant H underwent an L5–S1 posterolateral fusion performed by Murray at Bayonne Medical Center in Bayonne, New Jersey, on October 14, 2022.  Claimant B underwent a cervical diskectomy and fusion, device implantation, insertion of plate and screws and a partial corpectomy at C6-7 performed by Apazidis at Bayonne Medical Center in Bayonne, New Jersey, on February 16, 2023. Upon information and belief, Claimants B, D and H were all residents of the State of New York at all times relevant and were induced by Defendants to receive treatment in the State of New Jersey, in violation of New York Insurance Law § 403.

---

**COMPLAINT**

263. FedEx's status as a sophisticated commercial entity and self-insured operator does not defeat justifiable reliance under New York law. New York courts reject the notion that sophistication negates reliance where, as here, the facts misrepresented were peculiarly within Defendants' knowledge, including the intentional staging of collisions, coordination among claimants, and fabrication of injuries. Further, the facts were not discoverable through reasonable diligence at the time payment decisions were required and expenses were paid.

264. Moreover, FedEx's insurance program requires it to pay an SIR for bodily-injury and no-fault claims before any insurance carrier assumes responsibility. As a result, and in light of No-Fault, FedEx must promptly investigate and make payments (within forty-five days) based on the information submitted by claimants and their representatives. Defendants executed the Fraud Scheme with full knowledge that fraudulent claims would immediately trigger FedEx's SIR obligations, forcing FedEx to rely on Defendants' representations to avoid default, statutory penalties, or litigation consequences. Reliance under such circumstances is not only justifiable, but also foreseeable and intended.

265. The existence of investigative or verification procedures also does not negate reliance. Justifiable reliance does not require FedEx to independently audit or conclusively verify Defendants' representations before making payment decisions, nor is reliance defeated merely because FedEx undertook reasonable investigative steps. Defendants' fraud was sophisticated, deep, and engineered to avoid detection by using coordinated participants, facially legitimate medical providers, and documentation appearing compliant with statutory and regulatory requirements.

266. FedEx's reliance resulted in direct economic injury, including out-of-pocket payments within its self-insured retention, investigative and claim-handling expenses, litigation

costs, and adverse loss experience. These damages flow directly from FedEx's reliance on Defendants' false representations and were the precise object of the Fraud Scheme.

267.    Accordingly, FedEx has adequately alleged justifiable reliance as required to state a claim for common law fraud under New York law.  FedEx's reliance, however, is not a requisite to state a claim under RICO.

## VIII.  DAMAGES

268.    As a direct and proximate result of Defendants' wrongful conduct, FedEx has sustained substantial damages arising from fraudulent staged motor vehicle accidents and the improperly prosecuted civil lawsuits and claims that flowed from them.

269.    As a direct and proximate result of Defendants' racketeering conduct, including repeated acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 as set forth in Exhibit B, FedEx suffered concrete and quantifiable injury to its business and property. By way of example, FedEx paid **$302.50 on or about October 22, 2025** pursuant to **Morrison Mahoney LLP Invoice No. 1233795 (dated September 22, 2025)** for legal services incurred in reviewing and analyzing fraudulent NF-3 forms and radiological submissions transmitted by interstate wires; paid **$3,782.00 on or about March 12, 2026** pursuant to **Invoice No. 1252257 (dated February 23, 2026)** for investigation and analysis of fraudulent medical treatment patterns; and paid **$4,524.00 on or about February 23, 2026** pursuant to **Invoice No. 1248009 (dated January 13, 2026)** for review and evaluation of operative, anesthesia, and ambulatory surgery center records submitted in furtherance of Defendants' scheme.

270.    In recoverable RICO damages under **18 U.S.C. § 1964(c)** in addition to attorneys' fees, FedEx incurred substantial **out-of-pocket, non-legal expenses** that would not have been incurred absent Defendants' fraudulent submissions, including by way of example payments to

**ExamWorks, Inc. in the amount of $1,260.00 pursuant to Invoice No. 120-3465466 (dated September 30, 2025)** for professional medical records review and analysis directly tied to the fraudulent injuries and treatments alleged, as well as payment to **Prestige Investigations in the amount of $8,879.85** pursuant to **Invoice No. 250253 (dated March 18, 2026)** for surveillance and investigative services, to **The Pride Consulting Co. in the amount of $5,000.00** pursuant to Invoice No. P-2541 (**dated September 25, 2025**) for bio-mechanical and claim-related investigative and consulting services, and to Progressive Casualty Insurance Company **in the amount of $49,806.86 (dated December 16, 2022)** for, upon information and belief, indemnity payments and payments made for some of the medical treatment alleged herein.  These expenses were all undertaken solely to investigate, respond to, and mitigate losses arising from Defendants' racketeering acts. These payments were the foreseeable and natural consequence of Defendants' repeated fraudulent submissions through the mails and wires and constitute.

271.    FedEx has also suffered damages in the form of business-interruption costs, diversion of internal resources, increased claim reserves, adverse loss experience, and administrative burden resulting from repeated fraudulent claims and lawsuits. Each of these categories of loss represents concrete injury to FedEx's business and property.

272.    Under these circumstances, there is no more immediate victim than FedEx better suited to sue for these damages.

273.    The precise amount of FedEx's damages will be determined at trial or through discovery. However, based on claims paid, expenses already incurred, and litigation costs already sustained, the amount in controversy exceeds $75,000, exclusive of interest and costs.

## IX.   CAUSES OF ACTION

### COUNT I - 18 U.S.C. 1962(c) – RICO ENTERPRISE(S)
**(NYCPT, GGC, Apex, NYPMG, Cean, Integrated ASC, Apazidis, Ikhilov Law, Ikhilov, Complete Care Chiro, Rockland, Kaisman, Murray, Nexray/Soul, Rutland, Fast Care, Mac Med, King, NYC Ortho)**

274.   Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

275.   Each of the Defendants participated in the conduct outlined herein as set forth above, by, among others, engaging in transactions constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

276.   The pattern of racketeering activity in which the Defendants engaged involved numerous specific transactions as described in detail in this Complaint constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) and US Travel Act violations (18 U.S.C. 1952), all of which are "racketeering activity" as defined in 18 U.S.C. § 1961(1)(B).  *See* **Exhibit "B"**.

277.   The pattern of racketeering activity spanned at least April 2017 through October 2025, across multiple claimants and identical methods, demonstrating closed-ended continuity and posing an ongoing threat of repetition.

278.   As a result of the pattern of racketeering activity, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, and each of them, jointly and severally, for:

(a) An award of Plaintiff's actual and consequential damages to be established at trial and trebling of such damages pursuant to 18 U.S.C. § 1964(a) *et. seq.*;

(b) Plaintiff's reasonable attorneys' fees, expenses, costs, and interest pursuant to 18 U.S.C. § 1964(a) *et. seq.*;

(c) Equitable relief pursuant to 18 U.S.C. § 1964(a); and

(d) Such other relief as the Court deems just and proper.

## COUNT II - 18 *U.S.C. 1962(d) – RICO CONSPIRACY*
### *(All Defendants)*

279.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

280.    Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

281.    The pattern of racketeering activity in which the Defendants engaged involved numerous specific transactions as described in detail in this Complaint constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) and US Travel Act violations (18 U.S.C. 1952), all of which are "racketeering activity" as defined in 18 U.S.C. § 1961(1)(B).  *See* Exhibit "B".

282.    As a result of the pattern of racketeering activity, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, and each of them, jointly and severally, for:

(a) An award of Plaintiff's actual and consequential damages to be established at trial and trebling of such damages pursuant to 18 U.S.C. § 1964(a) *et. seq.*;

(b) Plaintiff's reasonable attorneys' fees, expenses, costs, and interest pursuant to 18 U.S.C. § 1964(a) *et. seq.*;

(c) Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint pursuant to 18 U.S.C. § 1964(a); and

(d) Such other relief as the Court deems just and proper.

## COUNT III - *COMMON LAW FRAUD*
### (All Defendants)

283.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

284.    Defendants conspired to defraud Plaintiff through their conduct.

285.    The scheme to defraud Plaintiff was reliant upon a succession of material misrepresentations of fact that Defendants were entitled to receive reimbursement and/or payments under New York law.

286.    These misrepresentations of fact by Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence of injuries and the necessity of treatment.

287.    Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

288.    These misrepresentations were intentionally made by Defendants in furtherance of the scheme to defraud Plaintiff by submitting claims for payment of no-fault and insurance benefits and pursuing such claims through personal injury tort actions.

289.    Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiff to make payments for claims that were not legitimate.

290.    Plaintiff reasonably relied, to their detriment, upon Defendants' material misrepresentations.  In fact, FedEx's reliance on Defendants' misrepresentations was not only reasonable, but it was also compelled. Once Defendants filed no-fault submissions, NF-forms, medical records, litigation pleadings, and sworn allegations asserting injury, causation, and medical necessity, FedEx was required to process, evaluate, and respond to those filings. Under

New York's No-Fault regime, FedEx faced mandatory deadlines to pay legitimate claims, and once Defendants commenced tort litigation, FedEx had no choice but to defend itself.  Failure to do so would have resulted in default judgments, adverse rulings, and significant shareholder, regulatory, and fiduciary exposure given FedEx's status as a publicly traded entity. Defendants' fraudulent submissions therefore forced FedEx to incur claims-handling expenses, SIR payments, legal fees, expert costs, and other litigation-related expenditures that would not have occurred but for Defendants' deceit. New York law recognizes this form of compelled reliance as actionable when a party is sued based on false statements, the opposing party is forced to rely on those misrepresentations by defending the action and incurring the resulting expenses. The injuries FedEx sustained are the direct, intended, and foreseeable consequence of Defendants' fraudulent scheme.

291.    Plaintiff damages were paid by Plaintiff to Defendants or caused by them, even though Defendants were, at all relevant times, ineligible to assert such claims or receive reimbursement under New York law.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, and each of them, jointly and severally, for:

(a) An award of Plaintiff's actual and consequential damages to be established at trial;

(b) Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of Defendant's illegal conduct; and

(c) Such other relief as the Court deems just and proper.

## COUNT IV - *UNJUST ENRICHMENT*
### *(All Defendants)*

292.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

293.    As alleged herein, Defendants conspired to induce Plaintiff to make or expend numerous and substantial payments to them or others.

294.    As alleged herein, Defendants were never eligible to make claims or seek reimbursement under New York law because, at all relevant times, because the accidents, injuries and treatment were fraudulent.

295.    When Plaintiff paid Defendants and others, Plaintiff reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Defendants, or those persons working under their control, made concerning Defendants eligibility to make claims or seek reimbursement under New York law.

296.    Each and every payment that Plaintiff made or was caused to make to Defendants and others during the course of the scheme constitutes a benefit that Defendants sought and voluntarily accepted.

297.    Throughout the course of their scheme, Defendants wrongfully obtained from Plaintiff benefit payments as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

298.    Retention of those benefits by Defendants would violate fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Plaintiff demands judgment against Defendants, and each of them, jointly and severally, for:

a.   An award of Plaintiff's actual and consequential damages to be established at trial; and

b.   Such other relief as the Court deems just and proper.

## COUNT V - *AIDING AND ABETTING COMMON LAW FRAUD*
### (*All Defendants*)

299.   Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

300.   All Defendants named herein had actual knowledge of the Fraud Scheme, and the common law fraud as set forth in Count III.

301.   As set forth in detail, *supra*, each Defendant engaged in overt acts in furtherance of the fraud or otherwise provided substantial assistance to advance such fraud's commission.

302.   But for the substantial assistance of each Defendant, such Fraud Scheme would not have been possible.

303.   As a direct and proximate cause of Defendants' aiding and abetting of the Fraud Scheme, Plaintiff has been damaged.

304.   Because Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, and each of them, jointly and severally, for:

(b)  An award of Plaintiff's actual and consequential damages to be established at trial;

(c)  Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of Defendants' illegal conduct; and

(d)  Such other relief as the Court deems just and proper.

## COUNT VI – *DECEPTIVE TRADE PRACTICE*
## *(NEW YORK GENERAL BUSINESS LAW § 349)*
### *(All Defendants)*

305.   Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

306.   New York State General Business Law ("GBL") § 349 provides that (a) "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful," and (h) "any person who has been injured by reason of any violation of this section may bring an action … to recover his actual damages... [and t]he Court may award reasonable attorney's fees to a prevailing plaintiff."

307.   It is well-established that virtually all commercial activity which involves goods or services rendered to public consumers, including rendering legal and medical services, and providing loans and/or advances, are subject to the provisions of GBL § 349.

308.   It is equally well-established that a deceptive practice need not reach the level of common-law fraud to be actionable under § 349, and intent to defraud and justifiable reliance are not elements of a statutory claim.

309.   As set throughout this Complaint, *supra*, each of the Count VI Defendants have engaged in deceptive acts and practices in the conduct of their businesses, particularly in furtherance of the Fraud Scheme.

310.   GBL § 349 provides that any party which has been injured by such deceptive acts and practices may recover their actual damages thereto, and the Court may award reasonable attorney's fees to a prevailing plaintiff.

311.   The alleged conduct of Defendants as set forth above and herein has dramatic and widespread effects on consumers extending far beyond the direct damages caused by their

deceptive acts and practices in furtherance of the Fraud Scheme. The Fraud Scheme itself has a broader impact on consumers at large.

312.    The Fraud Scheme, and its various permutations amongst similar schemes and overlapping actors, have an impact locally, e.g. clogged Court dockets, needless investigative, legal, other claims and defense-related spend, and fraudulently obtained settlements and awards, and nationally, e.g. wrongfully driving up the cost of legitimate insurance business operations, resulting in needlessly escalating premiums to the ultimate consumers of liability insurance and the cost of healthcare (i.e., everyone).

313.    This phenomenon and its effects have recently begun to attract state government and media attention.  New York Department of Financial Services ("DFS"), July 30, 2025: (Defendants, Acting Together, Allegedly Orchestrated Scheme to Stage Three Accidents Including October 2024 Collision on Belt Parkway); NBC New York 4, November 8, 2024 https://www.nbcnewyork.com/news/local/crime-and-courts/nyc-crash-staged-apparent-insurance-fraud-scheme-caught-dash-cam-belt-parkway-rosedale/5966959/ (NYC Man charged for staging crash in insurance fraud scheme caught on dash cam); New York State Governor's Office, last accessed January 23, 2026: https://www.governor.ny.gov/news/money-your-pockets-governor-hochul-highlights-proposals-bring-down-costs-vehicle-insurance ("'Since taking office, my top priorities have been to make New York more affordable and protect New Yorkers — and that's why I proposed measures to bring down auto insurance costs and battle fraudulent claims that are driving up costs for everyone,' Governor Hochul said. 'These common-sense proposals will not only increase auto insurance transparency for New Yorkers, but they will also put money back into people's pockets, especially during a time when the cost of living is just too high.'").

314.    In a March 15, 2026 report, the DFS said the department's Insurance Fraud Bureau ("IFB") received 39, 676 suspected healthcare fraud reports with 36,835 of them related to no-fault automobile insurance fraud.  That is approximately 93% of all suspected reports.

*See*        https://www.dfs.ny.gov/system/files/documents/2026/03/2025-Annual-Health-Insurance-Fraud-Report_0.pdf*; last access April 2, 2026.

315.    The DFS report further said:

> "IFB partnered with the New York City Police Department on several staged motor vehicle accident investigations throughout 2025. Notably, IFB partnered with the Queens County District Attorney's Office and the New York City Police Department's Fraudulent Collision Investigation Squad on an investigation that uncovered a conspiracy among several individuals to stage numerous motor vehicle accidents in and around Queens County for fraudulent insurance payouts.
>
> The investigation determined that during one incident in October 2024, a conspirator promised a group of individuals several thousand dollars for their participation in a staged car accident. The conspirator met with the group in Brooklyn, New York, and provided detailed instructions in staging car collisions. Thereafter, the individuals traveled to Queens County and using four cars, targeted an unsuspecting vehicle and intentionally caused a collision. The incident was recorded by front and rear dashboard cameras mounted in the victim's vehicle. Investigators later arrested four individuals for conspiracy to stage several motor vehicle accidents and engage in insurance fraud. The individuals were also charged with reckless endangerment for creating public safety hazards."

*See id.*

316.    The deceptive trade practices of the Count VI Defendants, which is the Fraud Scheme, occurred and is continuing to occur in New York, Count VI Defendants maintain a business presence in New York, and the effects are felt by consumers at large in New York.

317.     Under these circumstances, an entity such as Plaintiff has standing to pursue claims for violations of GBL § 349. Count VI Defendants are liable to Plaintiff for actual and punitive damages and the attorneys' fees incurred in bringing and prosecuting this action.

**WHEREFORE**, Plaintiff demands judgment against Count VI Defendants for:

(a) An award of Plaintiff's actual damages to be established at trial;

(b) Treble damages up to $1,000 as permitted by GBL § 349(h);

(c) Plaintiff's attorneys' fees incurred in the preparation and prosecution of this Action; and

(d) Such other relief as the Court deems just and proper.

## COUNT VII – *ATTORNEY MISCONDUCT*
### *(NEW YORK JUDICIARY LAW § 487)*
### *(Ikhilov Law and Ikhilov)*

318.    New York State Judiciary Law § 487 provides that:

> An attorney or counselor who:
>
> 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,
>
> 2. Willfully delays his client's suit with a view to his own gain…
> … in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

319.    Judiciary Law § 487 is a statute that has its "ancient origins" in the penal law and its "intent is to enforce an attorney's special obligation to protect the integrity of the courts and foster their truth-seeking function."

320.     Unlike common law provisions, its statute's intent is not to make a Plaintiff whole. The statute is to punish and deter. It is particularly well-suited to chronic patterns of violative conduct as alleged here.

321.    Judiciary Law § 487 does not encompass the filing of a pleading or brief containing non-meritorious legal arguments, noting that lawyers are permitted to zealously advocate on behalf of their clients. It does, however, encompass "[w]hen a party commences an action grounded in a

material misrepresentation of fact," as "the opposing party is obligated to defend or default and necessarily incurs legal expenses."

322.   Each and all of the underlying Claimant matters took place within State Courts in the State of New York Unified Court System which commonly hold vicarious liability may attach to a firm for the conduct of its attorneys.

323.   The Ikhilov Defendants' alleged misrepresentations, as set forth herein and summarized under Count I, were made in the course of litigation.  For example, on March 4, 2022, Erik Ikhilov filed a Verified Complaint with the Court representing Claimant B's alleged accident as having occurred and that Claimant B sustained injuries as a result.  This was false.  As another example, on June 8, 2022, and March 4, 2025, Erik Ikhilov filed a Verified Complaint and Amended Verified Complaint representing Claimant D's alleged accident as having occurred and that Claimant D sustained injuries as a result.  These too were false.  These court filings, *inter alia*, were false because the subject accidents and injuries did not exist as represented.  Specifically, the accidents did not occur the way they were alleged and the injuries were either not sustained or the treatment of same were not necessary, reasonable or casually connected to the subject accident. The Ikhilov Defendant's knew the falsity of what they were filing because of the filings were a part of the Fraud Scheme yet such defendants filed them anyways.

324.   The Ikhilov Defendants engaged in pervasive deceit and colluded with Claimants, Runners, Medical Service Defendants, and others with the intent to deceive both the Court, the named adversarial parties, and the Plaintiff herein as the true party in interest in each underlying Claimant matter.

325.   The Ikhilov Defendants further willfully delayed their clients' suits to their own gain, through intentionally prolonged litigation to render unwarranted medical services, accrue

interest on the part of litigation funding companies, and to buttress their inventory-based credit lines.

326.    Under Judiciary Law § 487, FedEx's reliance was compelled by the judicial process itself. By filing Verified Complaints, Bills of Particulars, and other litigation documents containing material misrepresentations of accident mechanics, injury, and medical necessity and causation, the Ikhilov Defendants forced FedEx to defend lawsuits that would not have existed but for their deceit. New York courts hold that when an attorney's false filings require an adversary to defend or risk default, the adversary's litigation expenditures constitute compensable reliance and injury under § 487. Here, FedEx had no ability to avoid reliance because failing to answer fraudulent pleadings would expose FedEx to judgments, regulatory consequences, and shareholder actions. Defendants' deceit therefore directly caused FedEx's defense costs, expert fees, and litigation expenses, *inter alia*, entitling FedEx to treble damages under § 487.

**WHEREFORE**, Plaintiff demands judgment against the Ikhilov Defendants for:

(a) An award of treble Plaintiff's actual damages to be established at trial; and

(b) Such other relief as the Court deems just and proper.

**COUNT VIII - *DECLARATORY JUDGMENT***
***(28 U.S.C. 2201/2202)***
***(All Defendants)***

327.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

328.    There is an actual case and controversy between Plaintiff on the one hand, and the Defendants on the other hand, as to all charges for examinations, treatments, testing, injections, and surgeries that have not been paid to date and through the pendency of this litigation. Plaintiff contends these Defendants are not entitled to reimbursement for any of these charges.

329.    Because these Defendants have made false and fraudulent statements and otherwise engaged in the fraudulent conduct described in this complaint with the intent to conceal, mislead and misrepresent material facts and circumstances regarding each claim submitted, these Defendants are not entitled to any reimbursement for alleged services relating to any of the claims at issue.

330.    By virtue of a declaratory judgment stating that the provider defendants are not entitled to any reimbursement for alleged services relating to any of the claims at issue, any and all fees purportedly or proximately otherwise recoverable by the attorney Defendants are necessarily rendered a nullity.

**WHEREFORE**, Plaintiff demand judgment against Defendants for:

(a) A declaration that defendants, at all times relevant, have submitted claims and bills to Plaintiff for staged accidents and unnecessary healthcare services in violation of New York law authorizing such claims and medical treatment;

(b) Declare that Defendants' activities are unlawful;

(c) Declare that Plaintiff has no obligation to pay any pending, previously denied, and/or future general liability insurance claims submitted by Defendants; and

(d) Such other relief as the Court deems just and proper.

## X.    JURY TRIAL DEMAND

331.    Pursuant to Fed. R. Civ. P. 38(b), FedEx demands trial by jury on all claims.

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**


By: **/s/ William J. Clay**
    **WILLIAM J. CLAY**
    **ADAM K. GALLAGHER**
    **MICHAEL A. GRAVES**
    **AARON E. MEYER**
    1985 Forest Lane
    Garland, Texas 75042
    Telephone: 214-736-9433
    Facsimile: 214-736-9994
    Service Email: service@thewillislawgroup.com

    *ATTORNEYS FOR THE PLAINTIFF*
    **FEDERAL EXPRESS CORPORATION**