**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**FEDERAL EXPRESS CORPORATION,**

**Plaintiff,**

**v.**

**IKHILOV LAW GROUP, P.C. d/b/a IKHILOV ASSOCIATES, *et al.*,**

**Defendants.**

**Case No.**
**26-CV-02859 (JPO)**

**ORAL ARGUMENT REQUESTED**

---

**PLAINTIFF'S OPPOSITION**
**TO MEDICAL DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

---

Plaintiff Federal Express Corporation ("Plaintiff" or "FedEx") files this Opposition to Medical Defendants' Joint Memorandum of Law in Support of Motion to Dismiss the Complaint [ECF 89-1] (the "Memo").[1] Part I of this Opposition Responds to Medical-Defendants Joint Brief (the "Opposition"). Part II of this Opposition Responds to Medical-Defendants' Individual Supplemental Briefs.

Dated: October 30, 2026

---

[1] The movant Medical Defendants, Stand-Up MRI of Manhattan, P.C.; Nexray Medical Imaging, P.C. d/b/a Soul Radiology; Complete Care Chiropractic of Hartsdale, P.C.; Rockland Pain Management of Spring Valley, P.C.; New York PM Associates, Inc.; New York Pain Management Group, PLLC; Conrad F. Cean, M.D.; Orthopaedics Spine & Sports Medicine, LLC d/b/a Total Orthopaedics & Sports Medicine; Alexios Apazidis, M.D.; All City Family Healthcare Center, Inc.; Arden M. Kaisman, M.D.; FastCare Medical Diagnostics, PLLC; and Bay Ridge Orthopedic Associates, P.C. are collectively referred to as ("Medical-Defendants").

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**

By: */s/ William J. Clay*
**WILLIAM J. CLAY**
**ADAM K. GALLAGHER**
**MICHAEL A. GRAVES**
**AARON E. MEYER**
1985 Forest Lane
Garland, Texas 75042
Telephone: 214-736-9433
Facsimile: 214-736-9994
Service Email: service@thewillislawgroup.com
***ATTORNEYS FOR PLAINTIFF***
***FEDERAL EXPRESS CORPORATION***

cc: All parties and counsel of record (electronic)

# TABLE OF CONTENTS

**Page**


Table of Contents ..... iii

Table of Authorities ..... v

**PART I: RESPONSE TO JOINT BRIEF** ..... 1

I. Introduction and Summary ..... 1

II. Argument & Authorities ..... 2

A. The History and Purpose of RICO ..... 3

B. FedEx has Standing to Assert its RICO Claims ..... 4

1. FedEx's Alleged Damages ..... 4

2. FedEx Alleged Direct Harm From Defendants' Conduct ..... 4

3. Reliance is not Required Under RICO ..... 5

C. The Complaint Sufficiently Pleads Substantive RICO Violations ..... 6

1. The Complaint Sufficiently Alleges an Association-in-Fact Enterprise ..... 6

a. The Enterprise is Primarily Engaged in Illegal and Illegitimate Conduct – Not "Ordinary Business Activities." ..... 6

b. The Association-in-Fact is Properly Pled ..... 8

2. The Complaint Properly Alleges Racketeering ..... 17

a. Mail and Wire Fraud are Properly Pled ..... 18

b. The Litigation Activities Support FedEx's RICO Claims ..... 20

c. Travel Act Violations Are Adequately Alleged ..... 21

3. The Complaint Pleads a Pattern of Racketeering Activity ..... 21

a. Relatedness and Continuity are Satisfied Because the Enterprise was Primarily Illegitimate ..... 22

b. Alternatively, the Complaint Sufficiently Pleads a Racketeering Pattern Even if the Enterprise were Primarily Legitimate ..... 22

i. The Predicates are Vertically Related ..... 23

ii. The Predicates are Horizontally Related........24

iii. The Complaint Alleges Open-Ended Continuity........26

iv. The Complaint Alleges Closed-Ended Continuity........27

D. The Complaint Properly Alleges a RICO Conspiracy........29

E. FedEx's RICO, Common Law Fraud, Aiding-and-Abetting Fraud, Unjust Enrichment, and Section 349 Claims are not Time-Barred........31

F. The Court Should Exercise Supplemental Jurisdiction Over FedEx's State Law Claims.35

G. FedEx Sufficiently Pled Its State-Law Claims........37

1. The Fraud Claim is Adequately Pled........37

2. The Aiding-and-Abetting Fraud Claim is Adequately Pled........37

3. The Unjust Enrichment Claim is Not Duplicative........39

4. FedEx Pled a Viable Section 349 Claim........40

III. Conclusion........41

Word Count Certification........42

**PART II: RESPONSES TO INDIVIDUAL DEFENDANTS' SUPPLEMENTAL ARGUMENTS**........43

**INDIVIDUAL SECTION I – STAND UP MRI OF MANHATTAN, P.C.**........43

A. The Complaint is not Required to Satisfy Rule 9(b) or Plead a Pattern of Racketeering Activity Against Stand Up, a Conspirator........43

B. The Complaint Properly Alleges Stand-Up Participated in the Enterprise........46

C. FedEx has Standing to Assert its RICO Claims........47

**INDIVIDUAL SECTION II – NEW YORK PM ASSOCIATES, INC., NEW YORK PAIN MANAGEMENT GROUP, PLLC, AND CONRAD F. CEAN, M.D.**........48

A. The Complaint Sufficiently Alleges Cean Defendants' Participation........48

B. The Complaint Sufficiently Pled Cean Defendants Committed Predicate Acts of Mail and Wire Fraud and With a Strong Inference of Fraudulent Intent........50

C. The Complaint Sufficiently Pled Cean Defendants Conspired to Violate RICO........51

D. The Complaint Sufficiently Pled Cean Defendants Aided and Abetted Fraud ..................52

E. The Complaint Pled an Unjust Enrichment Claim ..........................................................55

**INDIVIDUAL SECTION III – NEXRAY MEDICAL IMAGING, P.C. D/B/A SOUL RADIOLOGY** ......................................................................................................................56

A. FedEx's Claims are Not Time-Barred ..................................................................56

B. The Complaint Sufficiently Alleges Nexray's Participation ............................................56

C. The Complaint Sufficiently Pled Nexray Committed Travel Act Violations and Mail and Wire Fraud With a Strong Inference of Fraudulent Intent.................................................57

D. The Complaint Sufficiently Pled Nexray Conspired to Violate RICO..............................61

E. The Complaint Sufficiently Alleges Plaintiff's State Law Claims Against Nexray..........62

**INDIVIDUAL SECTION IV – ARDEN M. KAISMAN, M.D.** ...............................................63

A. Kaisman's Motion Rests on Facts Outside the Complaint ...............................................63

B. The Complaint Pleads Kaisman's Specific Conduct, Not Group Allegations..................64

C. Kaisman Misstates the Elements and Standard of § 1962(c) and § 1962(d) .....................65

D. Underlying Settlement Does Not Defeat Causation or Injury ..........................................67

E. The Remaining State-Law Claims Are Adequately Pled .................................................68

**INDIVIDUAL SECTION V – BAY RIDGE ORTHOPEDIC ASSOCIATES, P.C.** .............70

A. FedEx has Standing to Assert its RICO Claims..............................................................70

B. The Complaint is not Required to Satisfy Rule 9(b) or Plead a Pattern of Racketeering Activity Against Bay Ridge, a Conspirator ..........................................................70

C. The Complaint Properly Pled an Association-in-Fact Enterprise....................................72

D. The Complaint Properly Pled State Law Claims ............................................................73

E. The Complaint Adequately Pled a Declaratory Judgment Claim.....................................76

**INDIVIDUAL SECTION VI – FAST CARE MEDICAL DIAGNOSTICS, PLLC**..............77

A. FedEx has Standing to Assert its RICO Claims..............................................................77

B. The Complaint Adequately Pled a Pattern of Racketeering Activity ...............................78

C. The Noerr-Pennington Doctrine does not Apply ..... 78

D. The Litigation Activities Pled in the Complaint Support FedEx's RICO Claims ..... 81

E. The Complaint Properly Alleges a RICO Conspiracy Claim ..... 81

F. The Fraud Claim Satisfies Rule 9(b) ..... 81

Word Count Certification ..... 82

# TABLE OF AUTHORITIES

**Cases**

*360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC*
No. 19 Civ. 8760, 2020 U.S. Dist. LEXIS 161531 (S.D.N.Y. Sept. 3, 2020) .......................... 79

*Aghaeepour v. Northern Leasing Sys., Inc.*
763 F.Supp.3d 580 (S.D.N.Y. 2025) .......................... 31

*AIU Ins. Co. v. Olmecs Med. Supply Co., Inc.*
No. 04-cv-2934, 2005 U.S. Dist. LEXIS 29666 (E.D.N.Y. Feb. 22, 2005) .......................... passim

*Alix v. McKinsey & Co.*
23 F.4th 196 (2d Cir. 2022) .......................... 5

*Allstate Ins. Co. v. Advanced Health Pros., P.C.*
256 F.R.D. 49 (Conn. 2008) .......................... 19

*Allstate Ins. Co. v. Halima*
No. 06-CV-1316, 2009 U.S. Dist. LEXIS 22443 (E.D.N.Y. Mar. 19, 2009) .......................... 5, 15, 33

*Allstate Ins. Co. v. Kumar*
No. 1.10 Civ. 8166, 2013 U.S. Dist. LEXIS 77850 (S.D.N.Y. June 3, 2013) .......................... 1

*Allstate Ins. Co. v. Lyons*
843 F.Supp.2d 358, 370 (E.D.N.Y. 2012) .......................... 8, 41, 59

*Allstate Ins. Co. v. New Century Pharm. Inc.*
No. 19 Civ. 5702, 2021 U.S. Dist. LEXIS 155361 (E.D.N.Y. Aug. 13, 2021) .......................... 37

*Allstate Ins. Co. v. Valley Physical Med. & Rehab.*
475 F.Supp.2d 213 (E.D.N.Y. 2007), *rev'd on other grounds*, 555 F.Supp.2d 235 (E.D.N.Y. 2008) .......................... 33

*Amusement Indus., Inc. v. Stern*
721 F.App'x 9 (2d Cir. 2018) .......................... 38

*Anderson News, L.L.C. v. Am. Media, Inc.*
680 F.3d 162 (2d Cir. 2012) .......................... 2, 3

*Angermeir v. Cohen*
14 F.Supp.3d 134 (S.D.N.Y. 2014) .......................... 30, 44, 61, 71

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) .......................... 2

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) .......................... 3, 63

*Bingham v. Zolt*
66 F.3d 553 (2d Cir. 1995) .......................... 31

*Black v. Ganieva*
619 F.Supp.3d 309, 343 (S.D.N.Y. 2022) .......................... 20

*Boyle v. United States*
556 U.S. 938, (2009) .......... passim

*Bridge v. Phoenix Bond & Indem. Co.*
553 U.S. 639 (2008) .......... 4, 5, 68

*Campos v. Lavinsky*
No. 22-CV-1278, 2022 U.S. Dist. LEXIS 206208 (E.D.N.Y. Nov. 14, 2022) .......... 30, 31

*Capital 7 Funding v. Wingfield Capital Corp.*
No. 17-CV-2374, 2020 U.S. Dist. LEXIS 95654 (E.D.N.Y. May 29, 2020) .......... 7, 8, 22

Carbon Inv. Partners, LLC v. Bressler
No. 20 Civ 3617, 2021 U.S. Dist. LEXIS 166293 (S.D.N.Y. Sept. 1, 2021) .......... 54, 76

*Carter v. HealthPort Techs., LLC*
822 F.3d 47 (2d Cir. 2016) .......... 77

*Cedar Swamp Holdings, Inc. v. Zaman*
487 F.Supp.2d 444 (S.D.N.Y. 2007) .......... 10

*CMG Holdings Grp. v. Wagner*
No. 15-CV-5814 (JPO), 2016 U.S. Dist. LEXIS 121135 (S.D.N.Y. 2016) .......... 23, 28, 65

*Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*
187 F.3d 229 (2d Cir. 1999) .......... 21, 28

*Congregacion de la Mision Provincia de Venezuela v. Curi*
978 F.Supp. 435 (E.D.N.Y. 1997) .......... 32

*Cooper v. Anheuser-Busch, LLC*
553 F.Supp.3d (S.D.N.Y. 2021) .......... 39

*Corsello v. Verizon, N.Y., Inc.*
18 N.Y.3d 777 (2012) .......... 39

*CT Espresso LLC v. Lavazza Coffees Corp.*
No. 22cv377, 2022 U.S. Dist. LEXIS 211760 (E.D.N.Y. Nov. 22, 2022) .......... 79

*Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*
758 F.Supp.2d 153 (E.D.N.Y. 2010) .......... 50, 58

*DeFalco v. Bernas*
244 F.3d 286 (2d Cir. 2001) .......... 17, 18, 43, 70

*E-Distributors, Inc. v. Woitkowski*
No. 25-CV-02337, 2026 U.S. Dist. LEXIS 74768 (E.D.N.Y. Apr. 6, 2026) .......... 37

*F3Ea Funding, LLC v. Rapid Realty Franchise LLC*
No. 18-CV-01734, 2019 U.S. Dist. LEXIS 243118 (E.D.N.Y. 2019) .......... 44, 61, 71

*Faison v. Lewis*
25 N.Y.3d 220 (2015) .......... 34

*First Capital Asset Mgmt. v. Satinwood, Inc.*
385 F.3d 159 (2d Cir. 2004) .......... 16

*Forefront Mgmt., LLC v. Vergilis-Kalner*
No. 24-cv-8189, 2025 U.S. Dist. LEXIS 79337 (S.D.N.Y. Apr. 24, 2025) ................................ 4

*GICC Capital Corp. v. Technology Finance Group, Inc.*
67 F.3d 463 (2d Cir. 1995) ................................................................................................ 27

*Gov't Emps. Ins. Co. v. Landow*
No. 21-cv-1440, 2022 U.S. Dist. LEXIS 57715 (E.D.N.Y. Mar. 29, 2022) ............................... 1

*Gov't Emps. Ins. Co. v. Spectrum Neurology Grp., LLC*
No. 14-CV-5277, 2016 U.S. Dist. LEXIS 19960 (E.D.N.Y. Feb. 17, 2016) .............................. 6

*Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*
No. 19-CV-4414, 2022 U.S. Dist. LEXIS 112274 (E.D.N.Y. June 24, 2022) .................. passim

*Government Emps. Ins. Co. v. Advanced Comprehensive Lab'y, LLC*
No. 20-CV-2391, 2020 U.S. Dist. LEXIS 224868 (E.D.N.Y. Dec 1, 2020) ............................. 74

*Government Emps. Ins. Co. v. Li-Elle Serv., Inc.*
No. 12-CV-2157, 2013 U.S. Dist. LEXIS 31630 (E.D.N.Y. Feb. 11, 2013) ............................ 59

*H.J. Inc. v. Northwestern Bell Tel. Co.*
492 U.S. 229 (1989) ........................................................................................ 3, 21, 24, 27

*Haraden Motorcar Corp. v. Bonarrigo*
No. 1:19-cv-01079, 2020 U.S. Dist. LEXIS 68666 (N.D.N.Y. Apr. 20, 2020) ........................ 40

*In re Trilegiant Corp., Inc.*
11 F.Supp.3d 82 (D. Conn. 2014) ........................................................................................ 31

*ITG Brands, LLC v. Yellowstone Cap., LLC*
No. 23-cv-5345, 2024 U.S. Dist. LEXIS 157187 (S.D.N.Y. Aug. 29, 2024) ............................ 2

JPMorgan Chase Bank v. Winnick
406 F.Supp.2d 247 (S.D.N.Y. 2005) .............................................................................. 54, 75

*Koch v. Christie's Int'l PLC*
699 F.3d 141 (2d Cir. 2012) ................................................................................................ 31

*Krog Corp. v. Vanner Group, Inc.*
158 A.D.3d 914 (3d Dept 2018) .......................................................................................... 34

Krys v. Pigott
749 F.3d 117 (2d Cir. 2014) ........................................................................................ 53, 74, 75

*Leifer v. Doe*
No. 22-cv-1770, 2025 U.S. Dist. LEXIS 224662 (E.D.N.Y. Nov. 14, 2025) .......................... 36

Lerner v. Fleet Bank, N.A.
459 F.3d 273 (2d Cir. 2006) ........................................................................................... 54, 75

*Liberty Ins. Corp. v. Brenman*
No. 14-CV-5892, 2016 U.S. Dist. LEXIS 26360 (E.D.N.Y. Feb. 29, 2016) ...................... 32, 34

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*
797 F.3d 160 (2d Cir. 2015) ................................................................................................ 41

*M&T Bank Corp. v. McGraw-Hill Cos., Inc.*
126 A.D.3d 1414 (4th Dept. 2015) ........ 51, 73

*Malek v. AXA Equit. Life Ins. Co.*
No. 20-CV-04885, 2023 U.S. Dist. LEXIS 54123 (E.D.N.Y. Mar. 29, 2023) ........ 14

*McCracken v. Verisma Sys.*
No. 6:14-cv-06248, 2017 LEXIS 73666 (W.D.N.Y. May 15, 2017) ........ 39

*McLaughlin v. Anderson*
962 F.2d 187 (2d Cir. 1992) ........ 18

*Merhej v. I.C.S. Int'l Custody Sys.*
No. 13 Civ. 869, 2014 U.S. Dist. LEXIS 5504 (S.D.N.Y. Jan. 9, 2014) ........ 36

*Mills v. Polar Molecular Corp.*
12 F.3d 1170 (2d Cir. 1993) ........ 19, 58, 65

*MMS Trading Co. PTY Ltd. v. Hutton Toys, LLC*
No. 20-CV-1360, 2021 U.S. Dist. LEXIS 60376 (E.D.N.Y. Mar. 29, 2021) ........ 80

*Moss v. First Premier Bank*
No. 13-cv-5438, 2024 U.S. Dist. LEXIS 174341 (E.D.N.Y. Aug. 2, 2024) ........ 29, 44

*Moss v. Morgan Stanley Inc.*
719 F.2d 5 (2d Cir. 1983) ........ 65

*Nachman v. Tesla, Inc.*
No. 22-CV-5976, 2023 U.S. Dist. LEXIS 176468 (E.D.N.Y. Sept. 30, 2023) ........ 40

*Nat. Res. Defense Council, Inc. v. U.S. Food and Drug Admin.*
710 F.3d 71 (2d Cir. 2013) ........ 77

*North State Autobahn, Inc. v. Progressive Ins. Group Co.*
102 A.D.3d 5 (A.D. 2d Dept. 2012) ........ 40, 41

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*
572 U.S. 545 (2014) ........ 80

*Ostano Commerzanstalt v. Telewide Systems, Inc.*
794 F.2d 763 (2d Cir. 1986) ........ 38, 39

Oster v. Kirschner
77 A.D.3d 51 (1st Dept. 2010) ........ 53, 54, 75

*Pasternack v. Lab. Corp. of Am. Holdings*
27 N.Y.3d 817 (2016) ........ 38

*Pereira v. United States*
347 U.S. 1 (1954) ........ 29

*Plavin v. Grp. Health Inc.*
35 N.Y.3d 1 (2020) ........ 40

*Poulard v. Delphin*
No. 24-30152025, U.S. App. LEXIS 11887 (2d Cir. May 16, 2025) ........ 34

*Primetime 24 Joint Venture v. NBC*
219 F.3d 92 (2d Cir. 2000) .......... 79, 80

Rao v. BP Prods. N. Am., Inc.,
589 F.3d 389 (7th Cir. 2009). .......... 14

*Reich v. Lopez*
858 F.3d 55 (2d Cir. 2017) .......... passim

*Reves v. Ernst & Young*
507 U.S. 170 (1993) .......... passim

*Roosevelt Rd. Re, Ltd. v. Haggar*
No. 24-CV-1549, 2026 U.S. Dist. LEXIS 50451 (Mar. 11, 2026) .......... 78

*Ross v. Bank of America, N.A.(USA)*
524 F.3d 217 (2d Cir. 2008) .......... 77

*Rotella v. Wood*
528 U.S. 549 (2000) .......... 3, 32

*Rothstein v. UBS AG*
708 F.3d 82 (2d Cir. 2013) .......... 77

*Salinas v. United States*
522 U.S. 52 (1997) .......... passim

*Salinger v. Projectavision, Inc.*
934 F.Supp. 1402 (S.D.N.Y. 1996) .......... 32

*Schmidt v. Fleet Bank*
No. 96 Civ. 5030, 1998 U.S. Dist. LEXIS 1041 (S.D.N.Y. Feb. 4, 1998) .......... 36

*Schmuck v. United States*
489 U.S. 705 (1989) .......... 29

*Securiton Magnalock Corp. v. Schnabolk*
65 F.3d 256 (2d Cir. 1995) .......... 40, 41

*Sedima v. Imrex Co.*
473 U.S. 479 (1985) .......... 3

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis United States LLP*
806 F.3d 71 (2d Cir. 2015) .......... 5

*Shapiro v. Goldman*
No. 14-Civ-100119, 2016 U.S. Dist. LEXIS 107947 (S.D.N.Y. Aug. 15, 2016) .......... 1

*Singh v. NYCTL 2009-A Trust*
683 F.App'x 76 (2d Cir. 2017) .......... 78

*SKS Constructors, Inc. v. Drinkwine*
458 F.Supp.2d 68 (E.D.N.Y. 2006) .......... 22, 27, 31

*Sky Med. Supply, Inc. v. SCS Support Claims, Servs., Inc.*
17 F.Supp.3d 207 (E.D.N.Y. 2014) .......... passim

*Spokeo, Inc. v. Robins*
578 U.S. 330 (2016) .......... 77

*Spool v. World Child Int'l. Adoption Agency*
520 F.3d 178 (2d Cir. 2008) .......... 22, 23, 27

*Staehr v. Hartford Fin. Servs. Grp., Inc.*
547 F.3d 406 (2d Cir. 2008) .......... 32

*State Farm Mut. Auto. Ins. Co. v. Accurate Medical, P.C.*
No. 07-CV-0051, 2007 U.S. Dist. LEXIS 74459 (E.D.N.Y. Oct. 4, 2007) .......... 34

*State Farm Mut. Auto. Ins. Co. v. Cohan*
No. 09-CV-2990, 2009 U.S. Dist. LEXIS 125653 (E.D.N.Y. Dec. 30, 2009) .......... 8

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*
375 F.Supp.2d 141 (E.D.N.Y. 2005) .......... passim

*State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*
No. 04 CV 5045, 2008 U.S. Dist. LEXIS 71156 (E.D.N.Y. Sept. 3, 2008) .......... 1, 34

*State Farm Mut. Auto. Ins. Co. v. Fayda*
No. 14-cv-9792, 2015 U.S. Dist. LEXIS 86795 (S.D.N.Y. June 18, 2015) .......... 1

*State Farm Mut. Auto. Ins. Co. v. Grafman*
655 F.Supp.2d 212 (E.D.N.Y. 2009) .......... 1, 21

*Styleline Studios Int'l Ltd. v. Litvack*
No. 24-cv-01192, 2025 U.S. Dist. LEXIS 76711 (E.D.N.Y. Apr. 22, 2025) .......... 79

*Taylor v. Doe*
No. 1:20-cv-03398, 2021 U.S. Dist. LEXIS 129358 (S.D.N.Y. July 12, 2021) .......... 36

*TransUnion LLC v. Ramirez*
594 U.S. 413 (2021) .......... 77

*Uber Techs., Inc. v. Simon & Simon, P.C.*
No. 25-5365, 2026 U.S. Dist. LEXIS 103792 (E.D. Pa. May 11, 2026) .......... passim

*United Mine Workers v. Gibbs*
383 U.S. 715 (1966) .......... 35

*United States v. Aleskerova,*
300 F.3d 286 (2d Cir. 2002) .......... 44, 45, 61, 71

*United States v. Applins*
637 F.3d 59 (2d Cir. 2011) .......... 10, 31, 44

*United States v. Burden*
600 F.3d 204 (2d Cir. 2010) .......... 22, 24

*United States v. Daidone*
471 F.3d 371 (2d Cir. 2006) .......... 24

*United States v. Fertides*
No. 22-2291-cr, 2024 U.S. App. LEXIS 16546 (2d Cir. 2024) .......... 45

*United States v. Indelicato*
865 F.2d 1370 (2d Cir. 1989) (en banc) ........ 24

*United States v. Kelly*
128 F.4th 387 (2d Cir. 2025) ........ 16, 17

*United States v. Livecchi*
711 F.3d 345 (2d Cir. 2013) ........ 32

*United States v. Mazzei*
700 F.2d 85 (2d Cir. 1983) ........ 17

*United States v. Panza*
750 F.2d 1141 (2d Cir. 1984) ........ 13

*United States v. Persico*
832 F.2d 705 (2d Cir. 1987), *cert. denied,* 486 U.S. 1022 (1988) ........ 43, 70

*United States v. Pierre*
2023 U.S. Dist. LEXIS 119742 (July 11, 2023) ........ 1

*United States v. Pizzonia*
577 F.3d 455 (2d Cir. 2009) ........ 30

*United States v. Polanco*
145 F.3d 536 (2d Cir. 1998) ........ 23

*United States v. Rastelli*
870 F.2d 822 (2d Cir. 1989) ........ 12

*United States v. Turkette*
452 U.S. 576 (1981) ........ 4, 17

*Woods v. Maytag Co.*
807 F.Supp.2d 112 (E.D.N.Y. 2011) ........ 40

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*
425 F.Supp.2d 484 (S.D.N.Y. 2006) ........ 17, 32

*Yes I Can Licensed Behavior Analyst PLLC v. Green Tree Capital LLC*
No. 24 Civ. 7360, 2025 U.S. Dist. LEXIS 264961 (S.D.N.Y. Dec. 23, 2025) ........ 20

**Statutes**

18 U.S.C. § 1341 ........ 28

18 U.S.C. § 1343 ........ 28

18 U.S.C. § 1961(4) ........ 18

18 U.S.C. § 1961(5) ........ 18

18 U.S.C. § 1961, *et seq* ........ passim

18 U.S.C. § 1962(c) ........ passim

18 U.S.C. § 1962(d) ........ 1, 29, 43, 61

28 U.S.C. § 1332 .......... 36
28 U.S.C. § 1367(a) .......... 35
FED. R. CIV. P. 8(a) .......... passim
FED. R. CIV. P. 9(b) .......... passim
N.Y. GEN. BUS. LAW § 349 .......... passim
N.Y. INS. LAW § 403 .......... 3, 59
N.Y. PEN. LAW § 215.00 .......... 59, 60
U.S. CONST. art. III .......... 35, 77
U.S. DISTRICT COURTS FOR THE SOUTHERN AND EASTERN DISTRICTS OF N.Y., LOCAL CIVIL RULE 7.1 .......... 42, 82

## PART I: RESPONSE TO JOINT BRIEF

## I. <u>INTRODUCTION AND SUMMARY</u>

This lawsuit accuses Defendants – a law firm and a cadre of medical providers – of associating together to implement and orchestrate a scheme to stage and exploit low-impact automobile accidents and fraudulently convert them into high-value bodily-injury claims (the "Fraud Scheme") [Compl. ¶ 81]. FedEx and its commercial fleet of 100,000 vehicles has been the target of the Fraud Scheme since at least 2017 [Compl. ¶¶ 2-3, 18]. FedEx's operation of predictable driving routes, higher policy limits, and deep pockets made it an appealing target for Defendants, who sought to enrich themselves at FedEx's expense [Compl. ¶ 3].

RICO-worthy no-fault insurance fraud schemes that abuse New York's No-Fault Laws are not a new or novel phenomena.[2] No-fault fraud schemes targeting commercial fleets such as FedEx's are a growing nationwide problem that costs businesses, insurers, and the public billions of dollars annually [Compl. ¶¶ 3, 312-14]. Here, FedEx is not only the direct target of the Fraud Scheme, it has paid claims expenses and litigation costs as a direct result of the Fraud Scheme and filed this lawsuit to recover these damages.

This lawsuit alleges the following causes of action against some or all Defendants: (1) violations of Sections 1962(c) and (d) of the Racketeer Influenced Corrupt Organizations Act ("RICO") (collectively, the "RICO Claims"); (2) common law fraud; (3) aiding and abetting fraud; (4) unjust enrichment; (5) a violation of Section 349 of New York General Business Law (the

[2] *E.g., State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14-cv-9792, 2015 U.S. Dist. LEXIS 86795 (S.D.N.Y. June 18, 2015); *United States v. Pierre*, 2023 U.S. Dist. LEXIS 119742 (July 11, 2023); *Shapiro v. Goldman*, No. 14-Civ-100119, 2016 U.S. Dist. LEXIS 107947 (S.D.N.Y. Aug. 15, 2016); *Allstate Ins. Co. v. Kumar,* No. 1.10 Civ. 8166, 2013 U.S. Dist. LEXIS 77850 (S.D.N.Y. June 3, 2013); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, No. 04 CV 5045, 2008 U.S. Dist. LEXIS 71156 (E.D.N.Y. Sept. 3, 2008); *State Farm Mut. Auto. Ins. Co. v. Grafman*, 655 F.Supp.2d 212 (E.D.N.Y. 2009); *Gov't Emps. Ins. Co. v. Landow*, No. 21-cv-1440, 2022 U.S. Dist. LEXIS 57715 (E.D.N.Y. Mar. 29, 2022).

"Section 349 Claim"); (6) violation of Section 487 of the New York Judiciary Law; and (7) declaratory relief.

In Part I of the Memo, Medical-Defendants seek to dismiss the RICO Claims for: (1) lack of standing; (2) failure to plead a RICO enterprise; (3) insufficient allegations of predicate acts or a pattern of racketeering; (4) failure to plead a RICO conspiracy; and (5) failure to be timely filed. Additionally, the Memo seeks to dismiss the state law claims as a matter of law and requests that the Court decline to exercise supplemental jurisdiction over them.

For the reasons stated below, the Court should deny the Motion to Dismiss in its entirety.

## II. ARGUMENT & AUTHORITIES

"When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *ITG Brands, LLC v. Yellowstone Cap., LLC*, No. 23-cv-5345, 2024 U.S. Dist. LEXIS 157187, at *16 (S.D.N.Y. Aug. 29, 2024).[3] A motion to dismiss must fail where "a complaint contains sufficient factual matter to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"Because plausibility is a standard lower than probability," allegations in a complaint may well be subject to diverging, but equally plausible interpretations. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012). The choice between or among plausible inferences or scenarios is one for the factfinder to make, not a court ruling on 12(b)(6) motion. *Id.* "A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the

[3] Unless otherwise specified, all internal quotations and citations for case citations are omitted.

events merely because the court finds a different version more plausible." *Id.* at 185. Nor does Rule 12(b)(6) "countenance dismissals based on a judge's disbelief of a complaint's factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (cleaned up). Rather, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (explaining there is no "probability requirement at the pleading stage"). A plaintiff need only plead "enough fact to raise a reasonable expectation that discovery will reveal evidence" of actionable conduct. *Id.*

### *A. History and Purpose of RICO.*

"Congress drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 248-49 (1989). "The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." *Rotella v. Wood*, 528 U.S. 549, 557 (2000). Today, civil RICO has found widespread "for everyday fraud cases" against enterprises engaged in wire and mail fraud, which aligns with congressional intent to combat racketeering committed by both illegitimate and legitimate enterprises and demonstrates the breadth of the Act rather than a defect. *Sedima v. Imrex Co.*, 473 U.S. 479, 499 (1985).

Defendants nevertheless attempt to minimize the breadth of RICO and evade responsibility for their actions by blaming New York's no-fault insurance system for their illegal behavior [Memo at 1-2]. Yet New York's insurance laws seek to prevent the type of fraud that Defendants committed here and make it unambiguously clear that presenting false claims for the purpose of obtaining insurance benefits is statutory fraud punishable as a class E felony. N.Y. INS. LAW § 403. In short, the "culprit" for FedEx's damages is Defendants' own fraudulent behavior, and this lawsuit

satisfies civil RICO's purpose: it strikes at Defendants' fraudulent conduct, which has injured Plaintiff, harmed the judicial system, and poses a threat to the availability and affordability of commercial insurance and New York's no-fault automobile insurance system if left unchecked.

### *B. FedEx has Standing to Assert its RICO Claims.*

Medical-Defendants assert that Plaintiff lacks "RICO standing" for failing to: (1) allege clear and definite damages; (2) "establish" direct harm; and (3) allege reasonable reliance. Each lacks merit.[4]

#### 1. **FedEx's Alleged Damages Suffice.**

As stated in Section II.E of Plaintiff's Opposition to Ikhilov Defendants' Motion to Dismiss (the "Ikhilov Response"), Fed Ex's damages are ripe.

#### 2. **FedEx Alleged Direct Harm From Defendants' Conduct.**

As stated in Section II.D of the Ikhilov Response, Defendants' racketeering proximately caused FedEx's damages.

Medical-Defendants argue the harm alleged by FedEx is a "multi-step, derivative causal chain," asserting that "[b]etween the alleged fraud and Plaintiff's injuries stand multiple independent actors," such as claimants, their attorneys, courts, and FedEx itself. This argument is based on Medical-Defendants' speculation outside of the Complaint's allegations. As such, it is improper and should be rejected on that basis alone. Furthermore, "[t]he mere fact that a party's injury was contingent on the actions of third parties does not render that injury indirect." *Forefront Mgmt., LLC v. Vergilis-Kalner*, No. 24-cv-8189, 2025 U.S. Dist. LEXIS 79337, at *10 (S.D.N.Y. Apr. 24, 2025); *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008) (holding

[4] Congress and the Supreme Court have declared that RICO statutes, particularly in civil actions, are to be construed liberally to accomplish their remedial objectives. Pub.L. 91-452, § 904(a), 84 Stat. 947; *United States v. Turkette*, 452 U.S. 576, 586-87 (1981); *Boyle v. United States*, 556 U.S. 938, 944 (2009).

a plaintiff's injury was direct despite being contingent on the actions of third parties); *Alix v. McKinsey & Co.,* 23 F.4th 196 (2d Cir. 2022) (holding a plaintiff's injury was direct even though it was contingent upon the Bankruptcy Court awarding consulting assignments to the defendants). Thus, as a matter of law, Medical-Defendants' argument fails.

### 3. **Reliance is not Required Under RICO.**

Contrary to Medical-Defendants' suggestion, Supreme Court and Second Circuit case law is clear: reliance is not an element of a civil RICO claim predicated on mail and wire fraud. *Bridge*, 553 U.S. at 655; *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis United States LLP*, 806 F.3d 71, 87 (2d Cir. 2015). Moreover, the Complaint *does* allege FedEx, its defense counsel, and the New York state courts relied on and were entitled to presume that the representations made in Defendants' legal filings and medical documentation were true [Compl. ¶¶ 261-67, Ex. B]. It alleges FedEx made payments and incurred expenses in reliance upon the misrepresentations in Defendants' legal and medical documents that "appeared facially valid." [Compl. ¶¶ 261-67]. It also details how the Fraud Scheme obtained Personal Injury Protection ("PIP") payments from FedEx under the no-fault system and then fraudulently inflate the "injuries" so that personal injury lawsuits could be brought, and how FedEx was required to make no-fault payments on an expedited (45-day) schedule [Compl. ¶¶ 81-86, 263-65]. It alleges "FedEx's reliance resulted in direct economic injury, including out-of-pocket payments within its self-insured retention, investigative and claims-handling expenses, litigation costs, and adverse loss experience." [Compl. ¶ 266]. This is sufficient to satisfy any alleged reliance requirement for RICO standing. *See Allstate Ins. Co. v. Halima*, No. 06-CV-1316, 2009 U.S. Dist. LEXIS 22443, at *24 (E.D.N.Y. Mar. 19, 2009) (holding reliance was satisfied by insurers' allegations that they relied on facially valid claims submitted by a licensed professional corporation and accompanied by

reports from licensed physicians); *AIU Ins. Co. v. Olmecs Med. Supply, Inc.*, No. CV-04-2934, 2005 U.S. Dist. LEXIS 29666, at *46-47 (E.D.N.Y. Feb. 22, 2005) (holding reliance was satisfied by an insurer's allegations that it relied on "facially valid" insurance claims submitted to it by defendants).

The fact that FedEx eventually engaged medical experts with regard to three of the eight of the exemplar claimants (A, D, H) does not negate the amounts paid with regard to those claims (whether PIP payments, investigative payments, legal, etc.) because of Defendants' fraudulent activities, including their fabrication of accidents and injuries and active concealment of the fraud [Compl. ¶¶ 262-65]. Further, Defendants' active concealment of the fraudulent scheme coupled with the 45-day deadline provided limited ability and opportunity to investigate the legitimacy of apparently valid vehicle accident claims, such that it was reasonable for FedEx to rely on the invoices and documentation containing misrepresentations. *Gov't Emps. Ins. Co. v. Spectrum Neurology Grp., LLC*, No. 14-CV-5277, 2016 U.S. Dist. LEXIS 19960, at *18 (E.D.N.Y. Feb. 17, 2016). The Complaint's allegations make clear FedEx relied on Defendants' misrepresentations and was damaged thereby. FedEx's RICO standing is not a close call – it is clear.

### *C. The Complaint Sufficiently Pleads Substantive RICO Violations.*

#### 1. <u>The Complaint Sufficiently Alleges an Association-in-Fact Enterprise.</u>

##### a. The Enterprise is Primarily Engaged in Illegal and Illegitimate Conduct – Not "Ordinary Business Activities."

The gravamen of the Complaint is that each of the various Defendants associated together for the common purpose of orchestrating a complex, widespread scheme to fraudulently inflate recoveries for nonexistent or unrelated injuries [Compl. ¶ 4]. Defendants achieved this by using runners to secure clients, providing unnecessary and excessive medical treatment, and knowingly transmitting false documents to fraudulently increase recoveries in personal injury lawsuits. The

Complaint further alleges that the association-in-fact intentionally used its members' "facially legitimate" professional credentials to carry out the fraud scheme and *avoid* its detection [Compl. ¶¶ 229-41; 265]. The Complaint therefore alleges the enterprise was primarily engaged in *illegal and illegitimate conduct*, such that the whole of the operation of the enterprise was directed towards furthering the Fraud Scheme, and Defendants committed the alleged predicate acts in furtherance of and as a necessary step for the execution of the Fraud Scheme [Compl. ¶ 230]. *See Capital 7 Funding v. Wingfield Capital Corp.*, No. 17-CV-2374, 2020 U.S. Dist. LEXIS 95654, at *47 (E.D.N.Y. May 29, 2020).

Medical-Defendants suggest the Complaint alleges nothing more than "ordinary business activities" and "ordinary" business referrals [Memo at 4, 16, 18, 23, 25]. They also attempt to impermissibly re-cast the Complaint's allegations and mischaracterize the nature of the association-in-fact *enterprise* based on the occupations of the individual participants [Memo at 25 (citing *Reich v. Lopez*, 858 F.3d 55, 60-61 (2d Cir. 2017)]. But *Reich* says nothing of the sort. *See id.* at 61-62 n.4 (explaining that the distinction is between "primarily legitimate and primarily illegitimate *enterprises*" and distinguishing between situations where the *enterprise* is a "large, ramified corporation" versus a criminal association-in-fact) (emphasis in original). Nor is there anything "ordinary" about using runners to secure clients, making referrals for the purpose of providing unnecessary medical procedures, performing unnecessary and excessive medical treatment, and knowingly transmitting false documents to fraudulently increase recoveries in personal injury lawsuits.

Moreover, the nature and purpose of the enterprise itself turns on the allegations in the Complaint (as opposed to members' occupations). *See Reich*, 858 F.3d at 60-61 n.4 (focusing on the alleged nature and acts of the enterprise, not its individual participants or employees). An

association-in-fact's use of licensed professionals to carry out a fraud scheme and claim that its members conducted legitimate business activities *outside* their participation in the enterprise does not create an inference that the enterprise was "primarily legitimate." *See Capital 7 Funding*, 2020 U.S. Dist. LEXIS 95654, at *47 (relying on the *plaintiffs'* allegations and noting that even some legitimate conduct would not destroy the illegitimate classification of the enterprise).

Medical-Defendants' contention to the contrary "fails to take seriously the court's obligation at this stage to assume the truth of the well-pleaded factual allegations in the complaint and to draw all reasonable inferences in favor of plaintiff." *Allstate Ins. Co. v. Lyons*, 843 F.Supp.2d 358, 370 (E.D.N.Y. 2012). Furthermore, Defendants' attempt to characterize its business activities and referrals as "ordinary" practices and services are fact disputes not resolvable at the 12(b)(6) stage.

**b. The Association-in-Fact is Properly Pled.**

To be actionable under RICO, an enterprise need only have "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle, 556 U.S. at* 946; *see also State Farm Mut. Auto. Ins. Co. v. Cohan*, No. 09-CV-2990, 2009 U.S. Dist. LEXIS 125653, at *20-21 (E.D.N.Y. Dec. 30, 2009) (explaining that pleading a hierarchical structure is not necessary and proof of a pattern of racketeering activity is sufficient to permit an inference that an enterprise existed). The Complaint plainly satisfies the requirements for pleading an association-in-fact enterprise.

The Complaint alleges Defendants formed an association-in-fact enterprise with a common purpose: to fraudulently obtain insurance proceeds from FedEx vis-à-vis inflated insurance claims, personal injury lawsuits, and settlements and judgments [Compl. ¶¶ 86, 89, 118, 155,195, 225, 229, 230-31]. *Uber Techs., Inc. v. Simon & Simon, P.C.*, No. 25-5365, 2026 U.S. Dist. LEXIS

103792, at *57-58 (E.D. Pa. May 11, 2026) (holding association-in-fact enterprise of lawyers and doctors had a "shared purpose—manufacturing fraudulent evidence of accident-induced serious injuries to enable [the lawyers] to extract artificially inflated settlements"). Another alleged purpose of the enterprise was an increased number of patients due to referrals between the various Defendants [Compl. ¶¶ 19, 86, 88, 102, 211, 230, 240, 248, 254].

Second, the Complaint alleges a structure, hierarchy, and relationships among Defendants, who operated as a "unit' by performing the following roles: (i) Ikhilov recruited claimants to stage motor vehicle accidents and claim non-existent injuries, filed personal injury lawsuits on behalf claimants, represented claimants in those personal injury lawsuits, transmitted documentation related to those lawsuits, and directed claimants to medical providers and litigation funding companies [Compl. ¶¶ 4, 19, 89-90, 118, 140, 155, 195-197, 224-53]; (ii) Funding-Defendants provided litigation loans to claimants, the proceeds of which were then redistributed among Defendants [Compl. ¶¶ 14, 56, 196, 226]; and (iii) Medical-Defendants, who referred Claimants to one another and transmitted information about them, diagnosed and treated non-existent, preexisting, or chronic injuries and conditions with unsupported diagnoses, unnecessary medical treatments, and sought reimbursement therefor, recouping money and inflating the value of personal injury lawsuits [Compl. ¶¶ 4, 88, 101-252, 254-58, Ex. B]. Third, the Complaint alleges the association-in-fact has sufficient longevity because it began on or before 2017 and has permitted Defendants to participate in those affairs through a pattern of racketeering [Compl. ¶¶ 81, 96, 231, 251]; *Boyle*, 556 U.S. at 946.

Medical-Defendants argue they and other Defendants did not share the common purpose of insurance fraud because they were acting to promote their own independent pecuniary interests vis-à-vis "ordinary business activities" [Memo at 15-18]. But this belies the detailed allegations

documenting the symbiotic nature of the various enterprise members. Specifically, the Complaint alleges each Defendant's participation in the Fraud Scheme was in furtherance of and a necessary step for its execution [Compl. ¶ 86, 118, 155, 195, 225, 230]. More, importantly, contrary to Medical-Defendants' assertion [Memo at 16], the Complaint *does* allege Defendants were paid with and shared income – i.e., the proceeds from the litigation funding loans – with one another [Compl. ¶¶ 156, 196, 226]. Moreover, the stated common purpose of the enterprise was to fraudulently *inflate* insurance claims and personal injury lawsuits, which furthered and perpetuated the Fraud Scheme enterprise [Compl. ¶¶ 4, 86, 118, 155, 195, 225, 231]. The inflation of the claims and lawsuits is demonstrated by the exemplar Claimant lawsuits [Compl. ¶¶ 118, 155, 195, 225]. Indeed, the alleged interplay between various Medical-Defendants' specialties (i.e., gatekeeper, physical therapy, radiology, pain management, and ultimately, lucrative surgical specialists) is demonstrative of the collaboration and agreement among them to inflate fraudulent claims in pursuit of reciprocal ill-gotten financial gains [e.g., Compl. ¶¶ 254-57]. The claimants did not independently seek treatment from a random assortment of providers. Rather, the Complaint alleges they were directed into a recurring network of providers through attorney referrals and coordinated treatment pathways [Compl. ¶¶ 14-16, 19, 88, 102, 231, 238, 253]. In some instances, the Complaint further alleges that the underlying accidents themselves were staged, meaning the entire treatment process existed only because Defendants first generated the claims and then directed the claimants through the Fraudulent Treatment Protocol [Compl. ¶¶ 81-95].

This interdependence among actors suffices to plead a continuing unit functioning with a common design. *See United States v. Applins*, 637 F.3d 59, 74 (2d Cir. 2011) (association-in-fact enterprise requires only "evidence of an ongoing organization, formal or informal, and that the various associates function as a continuing unit"). Unlike *Cedar Swamp Holdings, Inc. v. Zaman*,

upon which Medical-Defendants rely, this is not the situation where one common yet independent bad actor perpetrated various frauds with the aid of different co-defendants. *See* 487 F.Supp.2d 444 (S.D.N.Y. 2007). Here, the various Defendants could not function independently. Ikhilov could not prosecute inflated claims without collaboration between the gateway clinics, the physical therapists, and the radiology findings, which in turn supported the surgical providers' recommendations for invasive and expensive procedures. The Fraud Scheme could only succeed (i.e., be profitable) with the consent and collaboration of all. These detailed allegations clearly allege common purpose by Defendants to engage in a course of conduct and work together to achieve such purposes and are sufficient (especially at the pleading stage) to permit "the inference that defendants were on notice of the general nature of the enterprise." [Compl. ¶¶ 4, 86, 118, 155, 195, 225, 231]; *see AIU Ins.*, 2005 U.S. Dist. LEXIS 29666, at *23-24.

Medical-Defendants argue that the Complaint alleges nothing more than "a few isolated instances of healthcare providers practicing in the same geographic proximity providing 'routine medical referrals from one provider to another'" [Memo at 15]. But, once again, this is not what the Complaint alleges. The Complaint alleges the Fraud Scheme has been ongoing since at least 2017 and uses eight specific exemplar claimants to illustrate similar cases that are part of the scheme [Compl. ¶¶ 81, 96, 231, 251, Ex. B]. The exemplar claimants are not "isolated incidents" but indicative of a broad and pervasive Fraud Scheme that has been operating for years. The Complaint further alleges Defendants used a "closed-loop referral system" – i.e., the same providers, addresses, and referral networks – to implement the Fraudulent Treatment Protocol at the heart of the Fraud Scheme [Compl. ¶ 88, 102, 231, 238]. This "closed-loop referral system" is more than just a haphazard association of businesses located in the "same geographic proximity" that occasionally make business referrals to one another. Instead, it is a closed, tight-knit group of

individuals and entities that work closely together to commit fraud. "These allegations plausibly suggest coordinated participation in a shared scheme rather than isolated professional services or unrelated parallel conduct." *Uber*, 2026 U.S. Dist. LEXIS at *63-64.

The Complaint also clearly establishes Defendants operated as a continuing unit. Although *Boyle* notes the concept of "association" requires both interpersonal relationships and a common interest, nothing therein mandates each defendant have a personal relationship with *every* other defendant, only that they function together as an association-in-fact over a sufficient period to demonstrate longevity: "Members of the group *need not* have fixed roles; *different members* may perform *different roles* at *different times*," and "the group need not have a name, regular meetings, dues, or established rules" but may "engage in spurts of activity punctuated by periods of quiescence." *See* 556 U.S. at 948 (emphasis added).

Medical-Defendants' assertion the Complaint fails to allege a laundry list of specifics regarding the enterprise and activities of its members [Memo at 18] is belied by the extensive, factual details illustrated by the manner in which Defendants associated, coordinated, communicated, and carried out the Fraud Scheme, which Defendants fail to dispute or contest. Not only does this ignore that FedEx's allegations regarding an association-in-fact enterprise are not required to satisfy Rule 9(b) particularity but are covered by the more generous pleading standard of Rule 8(a), *Boyle* does not require that all defendants have a personal relationship with one another, only that they function together as an association-in-fact over a sufficient period to demonstrate longevity. Moreover, it is not necessary that every conspirator knew or agreed with every other conspirator or that all had full knowledge of the scope of the conspiracy. *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989). The Second Circuit has even upheld RICO convictions where most defendants participated in the enterprise "for less than the entire period; some were 'in

and out' of it; and a few took part throughout almost the entire period." *See United States v. Panza*, 750 F.2d 1141, 1145 (2d Cir. 1984).

And contrary to Medical-Defendants' claim, the Complaint *is* replete with allegations – both direct and circumstantial – of interaction and communications between Ikhilov and Medical-Defendants. For example, the Complaint repeatedly alleges Ikhilov coordinated claimants' medical services and treatment with Medical-Defendants and filed fraudulent documents, including documents from Medical-Defendants, with state courts in support of claimants' lawsuits [Compl. ¶¶ 16, 89, 118, 140, 155, 195, 197, 224, 227, 231]. Presumably, Ikhilov would not file documents provided by Medical-Defendants unless they interacted and communicated with one another.

Although the Complaint adequately alleges Defendants interacted and communicated with one another to withstand a motion to dismiss, information regarding their exact of communication and interaction is within the control and possession of Defendants (not FedEx) and requires discovery to ascertain.

Similarly, a reasonable inference arises Defendants knew one another and agreed to participate in the Fraud Scheme together. The Complaint alleges Medical-Defendants functioned as "repeat provider clusters" that included the "same providers, addresses, and referral networks" across claims including, but not limited to, the 632 Utica Avenue cluster (e.g. NYC Care PT) for Claimant A, the Rockland Pain Management network centered at 1 Pearlman Drive for Claimant D, and the Macintosh Medical/Four Square Physical Therapy hub at 89-25 130th Street for Claimant H [Compl. ¶¶ 88, 102, 231, 248]. The Complaint repeatedly alleges Ikhilov coordinated claimants' medical services and treatment with Medical-Defendants and filed fraudulent documents, including documents from Medical-Defendants, with state courts in support of claimants' lawsuits [Compl. ¶¶ 16, 89, 118, 140, 155, 195, 197, 224, 227, 231]. And the Complaint

alleges Funding-Defendants provided litigation funding loans to the claimants, the proceeds of which were redistributed among Defendants [Compl. ¶¶ 156, 196, 226]. These permit the inference that defendants were aware of each other and agreed to participate with each other in the enterprise. *See AIU Ins.*, 2005 U.S. Dist. LEXIS 29666, at *23-24.

Medical-Defendants' misplaced reliance on *Rao v. BP Products N. Am., Inc.* is distinguishable. The case involved a nonsensical RICO claim brought by the *perpetrator* of a fraud scheme *against* the company he defrauded as well as his co-participants in a bribery scheme[5] and stands in stark contrast to FedEx's detailed allegations. *See* 539 F.3d at 395-96, 400. Unlike the complex scheme at issue here, *Rao* involved just four defendants, and many of the RICO elements were "set forth in boilerplate fashion … and did not provide a timeframe for the events in question ...." *See id.* The scant factual allegations in the complaint contained no allegations about how the four participants were associated and failed to set forth a pattern of related acts in connection with an enterprise's conduct. *See id.* In fact, enterprise allegations even conflicted, as the first allegation claimed that BP's employees stood to benefit by *defrauding* BP, while third allegation only benefitted BP. *See id.* Medical-Defendants also overstate the value of *Malek v. AXA Equit. Life Ins. Co.*, No. 20-CV-04885, 2023 U.S. Dist. LEXIS 54123, at *40 (E.D.N.Y. Mar. 29, 2023), as the plaintiff in that case essentially failed to make *any* allegations with regard to *any* relationship between the parties.

Nor does the Complaint allege, as Medical-Defendants suggest, a "rimless hub-and-spoke structure" [Memo at 15]. Not only do the alleged communications and referrals create an inference of knowledge among Defendants, the referrals among Medical-Defendants establish a rim and

[5] Following a temporary injunction hearing six months before the motion to dismiss, the magistrate found that Rao (the plaintiff) had been "actively engaged in bribery and fraud," and "BP [the Defendant] acted in good faith and was justified" in terminating his franchises. *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 95 (7th Cir. 2009).

destroy any argument that FedEx failed to allege an association-in-fact enterprise. This is not a novel concept, as courts have recognized similar theories and pleadings are sufficient to assert RICO claims against lawyers and treating physicians alleged to be vital actors who facilitated submission of fraudulent claims by issuing misleading prescriptions and reports and filing fraudulent documents. *See Uber*, 2026 U.S. Dist. LEXIS 103792, at *57-58; *Sky Med. Supply, Inc. v. SCS Support Claims, Servs., Inc.*, 17 F.Supp.3d 207, 225 (E.D.N.Y. 2014); *AIU Ins.*, 2005 U.S. Dist. LEXIS 29666, at *8-9; *Halima*, 2009 U.S. Dist. LEXIS 22443, at *15.

Indeed, the Enterprise's structure is evidenced by stable referral pipelines to recurring addresses and providers, including, but not limited to, the 632 Utica Avenue cluster (e.g. NYC Care PT) for Claimant A, the Rockland Pain Management network centered at 1 Pearlman Drive for Claimant D, and the Macintosh Medical/Four Square Physical Therapy hub at 89-25 130th Street for Claimant H [Compl. ¶ 248]. In addition, the Complaint alleges Medical-Defendants remained active participants in the Enterprise long after treatment ended: "The medical provider defendants were likewise engaged in the claims throughout their entirety because not only were they to provide medical services in accordance with their respective roles, but, upon information and belief, they agreed and remain(ed) committed to testify as treating experts for which they are paid a substantial sum from the proceeds of the claim." [Compl. ¶ 230]. Thus, the relationship among Defendants was not a one-time handoff of patients from one provider to another. Rather, the Enterprise allegedly functioned as an ongoing collaborative arrangement extending from the origination of the claim through treatment, litigation, settlement, and, if necessary, trial testimony.

Furthermore, Medical-Defendants remained engaged in the litigation and claims throughout the entirety of the Fraud Scheme [Compl. ¶ 230]. Their involvement was not limited to medical diagnosis and treatment alone [Compl. ¶ 230]. Instead, "they remain(ed) committed to

testify as treating experts" for two reasons: to get paid from the proceeds of the claims and provide coordinated testimony that "maintain[ed] the lies of the claim" [Compl. ¶ 230]. This was far from "routine medical care" [Compl. ¶ 230].

Nor is the use of medical referrals somehow *not* indicative of "interpersonal relationships," as Medical-Defendants oddly argue [Memo at 19]. If anything, the use of referrals establishes the opposite – i.e., Defendants were sufficiently close professionally (i.e., possessed interpersonal relationships) to make referrals to one another. This is especially true given the fact that Defendants knew the referrals were made to implement the Fraud Scheme and therefore were *not* "routine medical referrals" as Medical-Defendants claim.

More to the point, the Supreme Court has repeatedly declared that there is no "heightened standard for RICO enterprises" and "rejected attempts to graft onto the statute formal strictures that would tend to exclude amorphous or disorganized groups of individuals from being treated as RICO enterprises." *United States v. Kelly*, 128 F.4th 387, 409-11 & n.6 (2d Cir. 2025); *Boyle*, 556 U.S. at 950 (warning that the Supreme Court "repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe"). FedEx's enterprise allegations fall well within the scope enunciated in *Boyle*.

Finally, Medical-Defendants incredulously represent to this Court that a RICO enterprise must be "separate and apart from the pattern of racketeering activity" [Memo at 20-22][6] even though the Supreme Court, Second Circuit, and this District have repeatedly made clear this is not a requirement under RICO. To be sure, Second Circuit recently addressed – and rejected – these same attempts to limit RICO's scope that Medical-Defendants advance here. In no uncertain terms,

[6] They cite *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004) as support for these erroneous statements of law.

the *Kelly* Court made clear that proof of a RICO enterprise and pattern of racketeering activity need not be "distinct and independent, as long as the proof offered is sufficient to satisfy both elements." 128 F.4th at 409-11 & n.6-7 (distinguishing *Satinwood* and explaining that a contrary rule would "contradict" and be "flatly inconsistent with" both *Turkette* and *United States v. Mazzei*, 700 F.2d 85 (2d Cir. 1983)). Although *Kelly* may be a new opinion, its holdings are not; as succinctly explained 20 years ago by a court in the District, "under *Mazzei,* enterprise minus racketeering acts can equal zero." *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 425 F.Supp.2d 484, 499 (S.D.N.Y. 2006).

The Complaint pleads a connection among Defendants for the purpose of orchestrating a widespread fraud scheme to defraud FedEx for Defendants' financial benefit [Compl. ¶¶ 86, 89, 118, 155,195, 225, 229, 230-31]. The conduct alleged is serial, and the participation of each Defendant regarding one or more claimants was necessary to and in furtherance of the scheme of taking an uninjured claimant – via referrals, diagnoses, scans, tests, treatments, and paid testimony – and misrepresenting to FedEx that the claimants were severely injured and required expensive, invasive, and ongoing medical treatment and therapy. At its core, the Complaint alleges an interdependent working together to achieve a common purpose, and Plaintiffs have met the "low threshold" of alleging an enterprise. *Uber*, 2026 U.S. Dist. LEXIS 103792, at *57-59 (holding plaintiff sufficiently alleged an association-in-fact enterprise of lawyers and doctors in a RICO scheme similar to the one alleged here).

### 2. <u>**The Complaint Properly Alleges Racketeering.**</u>

A plaintiff states a claim for a substantive violation of RICO when the plaintiff alleges the following elements: "(1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001). "Racketeering activity" – i.e., the

commission of predicate acts – encompasses, among other things, mail and wire fraud and Travel Act violations. 18 U.S.C. § 1961(4). A "pattern of racketeering activity" requires at least two acts of racketeering activity within ten years. *Id.* § 1961(5). Because the requirements of section 1962(c) must be established as to each individual defendant, a plaintiff must allege that each defendant committed or aided and abetted the commission of two predicate acts. *DeFalco*, 244 F.3d at 306; *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992).

**a. Mail and Wire Fraud are Properly Pled.**

In addition to the reasons stated in Section II.F.3 of the Ikhilov Response, mail and wire fraud are sufficiently pled.

Medical-Defendants do not even attempt to address the disjunctive test to establish a strong inference of fraudulent intent. Instead, they argue the use of "intent" and "intentionally" in the Complaint's allegations does not create a strong inference of intent [Memo at 34]. But FedEx did not and has never made that argument.

Medical-Defendants also argue their later identification of injuries that emergency room evaluations failed to initially identify is not evidence of their fraudulent intent [Memo at 34]. But the nature and extent of claimants' injuries later identified by Medical-Defendants are so fundamentally different from those described in the emergency room records that a reasonable inference of fraud arises. For example, according to the emergency room records, "the FDNY found no trauma to Claimant D's back as shown in the snippet from the pre-hospital care summary . . . ." [Compl. ¶ 145]. "Following Claimant D's evaluation at the emergency room, Montefiore emergency department personnel confirmed the lack of trauma . . . ." [Compl. ¶ 146]. But the diagnosis radically changed when Claimant D retained Ikhilov and experienced the Fraudulent Treatment Protocol. "[I]nitial complaints of neck and lower back pain which didn't

even warrant imaging during her emergency room encounter, resulted in months of physical therapy, acupuncture and chiropractic treatments, trigger point injections, a discectomy and hemilaminectomy to Claimant D's lumbar spine." [Compl. ¶ 155]. It stretches credulity to believe that Medical-Defendants simply "identified" injuries that resulted in months of significant medical procedures and treatment that emergency room personnel failed to detect.

Further, the case cited by Medical-Defendants in support of this argument does not apply here. In *Allstate Ins. Co. v. Advanced Health Professionals, P.C.*, the court found the plaintiffs' amended complaint failed to plead the requisite inference of fraudulent intent because plaintiffs failed to explain why the medical treatment provided by defendants to the exemplar claimants was unnecessary, worthless, or fraudulent. 256 F.R.D. at 60. Here, in contrast, the Complaint repeatedly explains why the medical services provided by Medical-Defendants were unnecessary and fraudulent as part and parcel to the fraudulent treatment protocol they implemented.

In a similar vein, Medical-Defendants argue the Complaint fails to satisfy the Rule 9(b) standard by "lumping Defendants together" [Memo at 34]. But the Complaint does not "lump Defendants together" because it does not vaguely attribute the Complaint's predicate acts to *all* Defendants but instead "inform[s] each defendant of the nature of his alleged participation in the fraud." *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). This is sufficient to satisfy 9(b). *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987). "Consistent with the purpose of Rule 9(b), Defendants are sufficiently on notice as to the nature of the scheme, when it occurred, and who took part." *Landow*, 2022 U.S. Dist. LEXIS 57715, at *17. "In a complex RICO suit, this is enough." *Id.*; *see Uber Techs*, 2026 U.S. Dist. LEXIS 103792, at *45-46 (holding Uber sufficiently alleged an enterprise of lawyers and doctors committed mail and wire fraud because the complaint "alleges the lawyers operated a 'conveyor belt' referring

claimants to [doctors] and directing these providers to generate fraudulent medical records reflecting serious and permanent injuries”).

**b. The Litigation Activities Support FedEx’s RICO Claims.**

As explained in the Section II.F.3 to the Ikhilov Response, Medical-Defendants’ suggestion that litigation activities cannot be RICO predicate offenses [Memo at 30-32] ignores the nature of the Complaint allegations and contrary case law in this Circuit.

Medical-Defendants’ suggestion that “the *entire* purported ‘scheme’ alleged in the complaint cannot form a RICO predicate act because it is based on litigation activity” [Memo at 30] (emphasis added) throws the baby out with the bath water. The entire scheme is *not* predicated on litigation activity alone because the Complaint also alleges extrinsic activities necessary to support the Fraud Scheme [Compl. ¶¶ 4, 81-95, 156, 196, 226, 229-60, 324, Ex. B]. Medical-Defendants’ misplaced reliance on the factually inapposite *Yes I Can Licensed Behavior Analyst PLLC v. Green Tree Capital LLC* only serves to highlight this distinction. *See* No. 24 Civ. 7360, 2025 U.S. Dist. LEXIS 264961 (S.D.N.Y. Dec. 23, 2025) (explaining that the only pertinent predicate allegations involved default judgment actions seeking inflated attorney’s fees, which fell short of systemic abuse of the legal system and even failed to sufficiently allege that the judgments were fraudulently secured). In other words, the *Yes I Can* defendants’ litigation activities were not predicate acts because they were “intrinsic to the litigation itself” and not “collateral conduct abusive of the litigation process itself.” *Black v. Ganieva*, 619 F.Supp.3d 309, 343 (S.D.N.Y. 2022).

Likewise, Medical-Defendants’ attempt to downplay the scope of allegations and longevity of the scheme [Memo at 30] distorts the Complaint’s detailed allegations of their pervasive abuse of the legal system through a widespread fraud scheme that has been ongoing since 2017 [Compl. ¶¶ 81, 96, 231, 251, Ex. B]. Nor does categorizing their participation by accident reduce the total number of fraudulent claims for which damages are sought, as these claims are mere exemplars of

the numerous fraudulent claims resulting from the Fraud Scheme [*Id.*]. *See Grafman*, 655 F.Supp.2d at 228 (citing cases and explaining that the use of exemplars in cases involving numerous fraudulent acts is certainly appropriate); *see also Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993) (stating RICO liability attaches to a defendant for any participation in in the enterprise's affairs). Indeed, it is likely that after discovery, the number of fraudulent claims for which damages are sought will increase significantly. Medical-Defendants improperly ask this Court to adopt their alternative interpretation of the Complaint's allegations. The Court must decline this improper request.

**c. Travel Act Violations Are Adequately Alleged.**

For the reasons stated *infra* in Section C of FedEx's Response to Nexray's Supplemental Memorandum of Law, the Complaint adequately alleges Travel Action Violations.

**3. <u>The Complaint Pleads a Pattern of Racketeering Activity.</u>**

A "pattern of racketeering activity" consists of predicate acts that are related and that amount to, or threaten, continued criminal activity. *H.J. Inc.*, 492 U.S. at 239. Relatedness is a "flexible" concept; acts are related when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 238-40. The Second Circuit analyzes relatedness through the concepts of horizontal and vertical relatedness. *Reich*, 858 F.3d at 60-61. Continuity may be closed-ended, through related predicates extending over a substantial period, or open-ended, through conduct that by its nature threatens repetition. *H.J. Inc.*, 492 U.S. at 241-42; *Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242-44 (2d Cir. 1999).

**a. Relatedness and Continuity are Satisfied Because the Enterprise was Primarily Illegitimate.**

FedEx incorporates Section II.C.a, *infra*. In cases such as this where the association-in-fact enterprise's business is primarily illegitimate, relatedness and continuity can generally be satisfied by allegations linking each predicate act to the enterprise. *See Capital 7 Funding*, 2020 U.S. Dist. LEXIS 95654, at *47; *United States v. Burden*, 600 F.3d 204, 216-17 (2d Cir. 2010); *see Spool v. World Child Int'l. Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (explaining the continued existence of the enterprise itself supports an inference of continuity). At the motion to dismiss stage, courts defer to the Complaint's well-pleaded characterization of the enterprise's illegitimate nature. *E.g.*, *SKS Constructors, Inc. v. Drinkwine*, 458 F.Supp.2d 68, 78 (E.D.N.Y. 2006) (deferring to plaintiff's pattern allegations despite reservations about whether they could ultimately be established at trial).

Taken as a whole, the Complaint alleges that the association-in-fact enterprise was primarily in the business of racketeering through wire and mail fraud. As explained below, each of Defendants' mail and wire fraud predicate acts were related to the enterprise because they were the manner in which the enterprise enacted, furthered, and ultimately monetized the fraud scheme and achieved its purpose of defrauding FedEx. Because the enterprise was primarily illegitimate and the predicate acts were vertically related the Complaint sufficiently alleges a pattern of racketeering.

**b. Alternatively, the Complaint Sufficiently Pleads a Racketeering Pattern Even if the Enterprise were Primarily Legitimate.[7]**

Where an alleged enterprise is "primarily a legitimate business," such as a corporation or other legal entity, courts analyze relatedness and continuity differently. Vertical relatedness means

[7] FedEx pleads each of the following subsections in the alternative.

the acts are related to the enterprise; horizonal relatedness means the acts are related to each other. *CMG Holdings Grp. v. Wagner*, No. 15-CV-5814 (JPO), 2016 U.S. Dist. LEXIS 121135, at *16 (S.D.N.Y. 2016). Closed-ended continuity involves "a series of related predicate acts extending over a substantial period of time." *Spool*, 520 F.3d at 183. Open-ended continuity requires "activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Id.*

**i. The Predicates are Vertically Related.**

Vertical relatedness involves a "simpler" disjunctive analysis that typically imposes a low burden of pleading:

> [It] requires only that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, *or because the offense related to the activities of the enterprise*.

*Reich*, 858 F.3d at 60-61 (emphasis added); *see also United States v. Polanco*, 145 F.3d 536, 541 (2d Cir. 1998).

The Complaint satisfies *Reich*. The alleged enterprise activities included recruiting claimants, routing them through recurring treatment chains, generating false medical diagnoses to transform nonexistent or unrelated injuries into purportedly serious injuries requiring subsequent extensive medical treatment, incorporating false medical records into claims and legal filings to support inflated personal-injury suits, agreeing to provide false expert testimony regarding the causation and damages, and seeking excessive payments from FedEx [Compl. ¶¶ 81-94, 229-60]. The alleged predicates acts – submission of false claims, treatment and billing records, diagnostic and operative reports, pleadings, bills of particulars, and electronic filings – were the very mechanisms the enterprise employed to accomplish its activities and objective of defrauding Plaintiff to obtain excessive and unwarranted recoveries [Compl., Ex. B].

Medical-Defendants suggest vertical relatedness fails because they were independently capable of examining a patient or preparing a medical record. To get there, they selectively quote only the first part of *Reich*'s disjunctive test by emphasizing the word "solely" and omitting that vertical relatedness exists also where "the offense related to the activities of the enterprise" [Memo at 25]. The Second Circuit has long made clear its vertical relatedness test is a disjunctive, either-or inquiry. *See United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) (highlighting the disjunctive nature with "(1) . . . , or (2)"); *see also Burden*, 600 F.3d at 217 (holding predicates may be related to the enterprise even when defendant could have committed act absent connection to enterprise). In short, FedEx has met its low burden of pleading the predicates are vertically related.

**ii. The Predicates are Horizontally Related.**

Where an alleged enterprise is "primarily a legitimate business," courts determine whether there is a horizontal relationship between the predicate acts themselves by analyzing whether they share same or similar "purposes, results, participants, victims, or methods of commission." *Reich*, 858 F.3d at 60-61 (cleaned up); *see also H.J. Inc.,* 492 U.S. at 240; *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989) (en banc). Moreover, the "relationship [between the predicate acts] need not be direct; an indirect relationship created by the relationship of each act to the enterprise will suffice." *Burden*, 600 F.3d at 216.

The Complaint alleges direct horizontal connections among the predicates through their common purposes, victim, results, methods, claimant chains, recurring participants. The alleged predicate acts shared the same purpose, sequencing, recurring methods, and results. Collisions were staged or exploited; claimants were funneled into a connected treatment network; and minor complaints were escalated through false diagnoses, imaging, injections, and surgeries. [Compl. ¶¶ 81-94]. Through the repeated use of false NF-3 forms, treatment notes, diagnostic reports and

operative records, billing submissions, verified pleadings, bills of particulars, electronic court filings, and associated mail or wire transmissions, each of the Defendants manufactured, generated, and caused the transmission of false medical and litigation evidence portraying minor or low-impact accidents as having caused serious injuries [Compl. ¶¶ 35, 43, 51, 73, 81-89, 97-281, Ex. B]. But the medical records, reports, bills, and pleadings are not alleged as independent, disconnected, or rogue acts; the Complaint alleges each Defendant supplied, strengthened, or transmitted evidence used to support the same category of personal-injury claims, satisfy New York's threshold for tort litigation, and increase the value of claims against FedEx [Compl. ¶¶ 35, 43, 51, 73, 81-89, 97-281, Ex. B]. The Complaint further alleges Defendants collectively targeted the same victim – FedEx – because its commercial vehicles traveled predictable routes and carried substantial liability coverage and the recurring treatment, documentation, billing, and litigation steps were directed toward imposing medical, investigative, defense, and settlement costs on FedEx [Compl. ¶¶ 81-94, 239-81]. While some immediate recipients of particular records may have varied, the pleaded object and intended financial target remained the same.

Medical-Defendants contend there is no overlap between the predicate acts or allegations linking the Defendants. But they ignore the structure of the Fraud Scheme and the roles of the enterprise participants. For example, while Medical-Defendants had different roles in the Fraud Scheme (e.g., gatekeepers vs. treaters) and different practice areas (e.g., physical therapists, chiropractors, acupuncturists, orthopedists, and neurologists), Claimants were directed to and referred between different providers based on the nature of Claimants' alleged accidents and various injuries [Compl. ¶¶ 81-86]. The roles were an intentional feature of the scheme, not proof the acts were unrelated. They constitute complementary steps in the same recurring protocol by which false claims and treatment were converted to unwarranted payments and fraudulent

recoveries, and they were necessary due to regulations requiring exhaustion of non-invasive procedures before advanced interventions.[8] What's more, the participants *did* materially overlap. Ikhilov played a critical role in coordinating claims A through H. Other defendants recur within and across claimant groups, including Apazidis and Total Orthopaedics in Claims A, B, and G; Cean and the associated pain-management participants in Claims A through C; Kaisman in Claims D through F; Bay Ridge and Murray in Claims D, E, G, and H; and King and the King P.C. in Claims C and H [Compl. ¶¶ 97-224]. And that overlap describes just the eight exemplar claimants.

Unlike *Reich*, the racketeering acts alleged here were not done simply "to help" the enterprise; they were the necessary means and activities Defendants performed to enact, obfuscate, and monetize the Fraudulent Treatment Protocol on behalf of the enterprise [Compl. ¶¶ 96, 118, 155, 195, 225, 229, 231, 256, 265, 269, 288, 301, Ex. B]. The alleged acts have common participants, a common victim, recurring documents and treatment sequences, interconnected medical and litigation functions, a common serious-injury objective, and the same intended financial result and therefore satisfy RICO's relatedness requirement.

**iii. The Complaint Alleges Open-Ended Continuity.**

In cases where the enterprise is primarily a legitimate business, open-ended continuity is satisfied where it would be reasonable to infer the acts of mail fraud constituted the regular way of conducting the enterprise's affairs. *Sky Med.*, 17 F.Supp.3d at 228. Here, the Complaint alleges at least 67 predicate acts directly committed by the named Defendants, including at least 51 direct predicate acts by Medical-Defendants related to just the eight exemplar claimants. [Compl. ¶¶ 35, 43, 51, 73, 81-94, 97-260, 274-81, Ex. B]. The alleged mail and wire fraud were not isolated

[8] In fact, any perceived *lack* of significant overlap between Medical-Defendants was necessary to conceal the Fraud Scheme. Surely Congress did not intend for RICO to reach only the enterprises dumb enough to hatch easily identifiable schemes.

departures from otherwise lawful operations but constituted the recurring method by which the enterprise transformed fraudulent treatment into claims for payment and enhanced litigation recoveries [Compl. ¶¶ 4, 88, 231, 229, 231, 239, 248, Ex. B]. To be sure, the Complaint alleges this behavior has been ongoing since at least 2017 [Compl. ¶ 231].

Medical-Defendants' "inherently terminable" argument defines the alleged scheme too narrowly. Although the treatment or lawsuit of an individual claimant may eventually end, the Complaint alleges this has not and will not end the enterprise's activities due to the vast nature of the Fraud Scheme. Instead, new claimants allegedly have and will continue to enter materially similar referral, treatment, documentation, and litigation sequences following unrelated accidents [Compl. ¶¶ 97-224]. Moreover, where claims are still active, more fraudulent transmissions are certain to occur because, at the bare minimum, some closing documents must be filed and FedEx will incur expenses to review them. These allegations fundamentally distinguish this case from the finite looting scheme in *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 466-68 (2d Cir. 1995) and the discrete rupture of a particular business relationship in *Spool*, 520 F.3d at 185-86. Considered together with the alleged recurrence of the same protocol across new accidents and claimants and the continued operation of the alleged association, those allegations plausibly establish a threat of continued racketeering activity. Further, alongside the alleged recurrence of the same protocol across new accidents and claimants and the continued operation of the alleged association, it reasonable to infer the alleged predicates were the regular way that the enterprise conducted its affairs and will continue to do so into the future. *See Drinkwine*, 458 F.Supp.2d at 78.

**iv. The Complaint Alleges Closed-Ended Continuity.**

Closed-ended continuity requires "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. Duration is the primary consideration in this

Circuit, although courts also consider the number and variety of predicates, participants, victims, and schemes. *Cofacrèdit*, 187 F.3d at 242. While the Second Circuit has never held that activity lasting less than two years was sufficiently substantial, it has never held that it is insufficient as matter of law. *Id*. Here, the Complaint alleges at least 67 predicate acts directly committed by the named Defendants, including at least 51 direct predicate acts by Medical-Defendants related to just the eight exemplar claimants. [Compl. ¶¶ 35, 43, 51, 73, 81-94, 97-260, 274-81, Ex. B]. The Complaint alleges this behavior has been ongoing with the exemplar Claimants from May 2017 through at least late 2025 [*Id.*].

Apart from generalities, Medical-Defendants do not challenge the continuity allegations regarding any specific Defendant and ignore the detailed allegations in Exhibit B. Although the § 1962(c) must ultimately be established as to each defendant, that does not require the Court to pretend that acts committed by different participants in an alleged coordinated enterprise occurred in separate factual universes. *See*, *e.g., CMG Holdings Grp.*, 2016 U.S. Dist. LEXIS 121135, at *16-18 (examining the predicate acts for additional enterprise participants for purposes of closed-ended continuity and holding that allegations of related predicate acts extending over multiple years and carried out by overlapping participants adequately pleaded continuity and a pattern of racketeering activity).

Nor does it follow that closed-ended continuity must be reconstructed using only documents each defendant personally placed in the mail or transmitted by wire. Liability extends to anyone who "causes" the use of the mails or interstate wires in executing a fraudulent scheme. *See* 18 U.S.C. §§ 1341, 1343. To be liable, a defendant need only do so with knowledge that use of the mails will follow in the ordinary course of business or when such use is reasonably foreseeable – even if the defendant did not personally intend the particular mailing. *Pereira v.*

*United States*, 347 U.S. 1, 8-9 (1954). The mailing itself need not contain a false representation if it was made "incident to an essential part of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989).

Because mail-and wire-fraud liability is not limited to the person who physically placed an item in the mail or personally initiated a wire transmission, the Complaint plausibly alleges over 200 additional predicate acts attributable to Medical-Defendants because those acts were done with knowledge interstate mails or wires would be used to execute the scheme, such as future medical records, bills, pleadings, and damages contentions was an ordinary, necessary, and reasonably foreseeable means of executing the scheme [Compl. ¶¶ 81-94, 97-224, 229-60, 274-81].

### *D. The Complaint Properly Alleges a RICO Conspiracy.*

Section 1962(d) of RICO makes it "unlawful for any person to conspire to violate any of the provisions of [§ 1962(c)]." 18 U.S.C. § 1962(d). "RICO conspiracy requires proof: (a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering." *Moss v. First Premier Bank*, No. 13-cv-5438, 2024 U.S. Dist. LEXIS 174341, at *11 (E.D.N.Y. Aug. 2, 2024). Allegations of a § 1962(d) conspiracy are analyzed under the "more liberal pleading requirements" of Rule 8(a). *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F.Supp.2d 141, 153 (E.D.N.Y. 2005).[9]

The Complaint sets forth a viable RICO conspiracy claim. First, as explained *supra*, the Complaint adequately pled an association-in-fact enterprise. For this reason alone, the Complaint has alleged a RICO conspiracy. *See Gov't Emps. Ins. Co. v. Wellmart RX, Inc.*, No. 19-CV-4414,

[9] Plaintiff adopts and incorporates the discussion of the basic law regarding RICO conspiracy set for thin Section A of the Stand Up Opposition, below.

2022 U.S. Dist. LEXIS 112274, at *18 (E.D.N.Y. June 24, 2022). Second, the Complaint alleges the commission of racketeering acts by each 1962(c) Defendant in furtherance of the enterprise's affairs [Compl. Ex. B]. This creates an "unmistakable" inference of an agreement to join the conspiracy as to the 1962(c) Defendants. *Sky Med.*, 17 F.Supp.3d at 230-31; *see also United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009). In addition, the Complaint alleges each Defendant agreed to participate in a conspiracy to violate Section 1962(c) by agreeing to conduct the affairs of the enterprise through a pattern of racketeering, including mail and wire fraud and Travel Act violations [Compl. ¶¶ 79, 141, 198, 228, 230, Ex. B]. Based on their status and activities in the Fraud Scheme, a plausible inference arises that Defendants agreed to join the Fraud Scheme with the intent that its overall goals be effectuated – defrauding FedEx and others for Defendants' financial benefit [Compl. ¶¶ 90, 156, 196, 226]. *See Angermeir v. Cohen*, 14 F.Supp.3d 134, 154-56 (S.D.N.Y. 2014). Finally, a plausible inference arises Defendants knowingly and willingly participated in the Fraud Scheme because they received or expected to receive a share of the profits by distributing proceeds from litigation funding loans and providing paid expert testimony after their "routine business had concluded" [*Id.*].

Medical-Defendants argue the RICO conspiracy claim is nevertheless subject to dismissal because FedEx pled the cause of action in "conclusory fashion" based on "threadbare, boilerplate allegations" [Memo at 36]. But, for the reasons stated *supra*, the Complaint does not rely on "threadbare, boilerplate allegations." Furthermore, the cases cited by Medical-Defendants are inapposite. In *Campos v. Lavinsky*, No. 22-CV-1278, 2022 U.S. Dist. LEXIS 206208 (E.D.N.Y. Nov. 14, 2022), the Court dismissed a *pro se* plaintiff's lawsuit that contained RICO substantive and conspiracy claims because the plaintiff failed to "allege *any* RICO enterprise, predicate acts, a pattern of RICO activity or assert *any* plausible facts to suggest that Defendants engaged in an

agreement to commit RICO violations. *Id.* at *7 (emphases added). In other words, the *Campos* complaint "rest[ed] on rank speculation" – unlike the Complaint here. *Aghaeepour v. Northern Leasing Sys., Inc.*, 763 F.Supp.3d 580, 593 (S.D.N.Y. 2025) involved a directed verdict following the close of evidence in a jury trial, rather than a case still in the pleading stages where no discovery has taken place. *See id.* At the pleading stage, such agreement may be shown by circumstantial facts and need not be proven by direct evidence of a written contract or formal meeting. *See Salinas v. United States,* 522 U.S. 52, 64 (1997); *Applins*, 637 F.3d at 81. Finally, in *In re Trilegiant Corp., Inc.*, 11 F.Supp.3d 82 (D. Conn. 2014), the Court determined the plaintiff failed to allege a RICO enterprise and therefore did not assert a viable substantive RICO claim. *Id.* at 108-09. But, for the reasons discussed *supra*, the Complaint properly alleges a RICO enterprise, which, by definition, alleges an agreement among Defendants sufficient for conspiracy. Accordingly, the Court should deny Defendants' motion to dismiss the RICO conspiracy claim. *See Drinkwine*, 458 F.Supp.2d at 81; *see CPT Med. Servs.*, 375 F.Supp.2d at 153.

### *E. FedEx's RICO, Common Law Fraud, Aiding-and-Abetting Fraud, Unjust Enrichment, and Section 349 Claims are not Time-Barred.*

A four-year statute of limitations applies to civil RICO claims. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012). Civil RICO actions are subject to a "separate accrual rule" – i.e., "a new claim accrues, triggering a new four-year limitations period each time plaintiff discovers, or should have discovered an injury caused by the predicate violations." *Bingham v. Zolt*, 66 F.3d 553, 560 (2d Cir. 1995). "The logical end result is that a plaintiff may sue for any injury he discovers or should have discovered within the four years of the commencement of his suit, regardless of when the RICO violation causing such injury occurred." *Bankers Trust*, 859 F.2d at 1103. "An injury is 'discoverable' when a plaintiff has constructive notice of facts sufficient to

create a duty to investigate further into the matter." *Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F.Supp. 435, 444 (E.D.N.Y. 1997).

Statute of limitations is an affirmative defense for which Defendants have the burden of proof. *United States v. Livecchi*, 711 F.3d 345, 352 (2d Cir. 2013). "Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008).[10] Knowledge of the fraud will be imputed to a plaintiff if there are circumstances sufficient to alert a reasonable person to the probability that he or she has been defrauded. *Curi,* 978 F.Supp. at 444. "The question of constructive knowledge and inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a motion to dismiss . . ." *Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402, 1408 (S.D.N.Y. 1996). A statute of limitations defense may only be raised in a Rule 12(b)(6) motion if the defense appears on the face of the complaint. *Liberty Ins. Corp. v. Brenman*, No. 14-CV-5892, 2016 U.S. Dist. LEXIS 26360, at *8 (E.D.N.Y. Feb. 29, 2016). Indeed, when raising an affirmative defense in a motion to dismiss, "[the] defense must be supported by facts appearing on the face of the complaint and the motion may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *World Wrestling Entm't, Inc.*, 425 F.Supp.2d at 508.

At the outset, in *Rotella*, the Supreme Court reasoned that under an injury occurrence rule similar to the one adopted by the Second Circuit, the RICO provision "recognizing the possibility of finding a pattern of racketeering in predicate acts 10 years apart . . . could in theory open the

[10] *See In re Issuer Plaintiff Initial Public Offering Antitrust Litig.,* No. 00 Civ. 7804, 2004 U.S. Dist. LEXIS 3892, at *18 (S.D.N.Y. Mar. 12, 2004) ("[B]ecause questions of fact exist as to whether Plaintiff should have discovered the facts alleged in their complaint prior to the expiration of the statute of limitations period, such determination is inappropriate on a motion to dismiss").

door to proof of predicate acts occurring 10 years before injury and 14 before commencement of litigation." 528 U.S. at 555 (comment added). In other words, the four-year limitations period simply prevents a plaintiff from *recovering* for a predicate act outside the period. However, that predicate may still be asserted as a basis for holding a defendant liable for *subsequent* injuries occurring within the limitations period.

The Complaint alleges the Fraud Scheme began at least in 2017 and continues to the present day [Compl. ¶ 81]. Each administrative or investigative expense and out-of-pocket payment incurred by FedEx as a result of the Fraud Scheme constitutes a separate injury that occurred on the date the expense was incurred or the payment was made. *Allstate Ins. Co. v. Valley Physical Med. & Rehab.*, 475 F.Supp.2d 213, 229 (E.D.N.Y. 2007), *rev'd on other grounds*, 555 F.Supp.2d 235 (E.D.N.Y. 2008).

Defendants have wholly failed to satisfy their burden of prevailing on the defense. Defendants make no attempt to identify (1) a specific date certain by which Plaintiff knew or reasonably should have discovered its RICO injuries or (2) the specific claims that should be dismissed.[11] The Complaint does not allege facts, let alone contain uncontroverted evidence on its face, indicating FedEx knew or should have known of the injuries it suffered from the Fraud Scheme to implicate limitations. In fact, the Complaint alleges the opposite: the facially valid invoices and documentation supporting the Fraud Scheme submitted to FedEx and others contained and were designed to contain materially false statements [Compl. ¶¶ 262-63]. As a result, Plaintiff could not and did not discover their RICO injuries based on the mere filing of claims. *See Halima*, 2009 U.S. Dist. LEXIS 22443, at *15-16, *22. If anything, the statute of limitations is

[11] Defendants make no effort to sort through any of these issues apart from a cursory suggestion of nebulous "storm warnings".

subject to equitable tolling on the basis that Defendants concealed their fraud. *CPT Med. Servs.*, 2008 U.S. Dist. LEXIS 71156, at *32.

Defendants' argument that FedEx's RICO claims are barred by the statute of limitations necessarily assumes facts beyond the pleadings and have yet to be developed, presumably, through discovery. *State Farm Mut. Auto. Ins. Co. v. Accurate Medical, P.C.*, No. 07-CV-0051, 2007 U.S. Dist. LEXIS 74459, at *2 (E.D.N.Y. Oct. 4, 2007). There is insufficient information from the face of the Complaint for the Court to determine whether, as a matter of law, plaintiffs "knew or should have known" of the injuries from the Fraud Scheme within the limitations period (at least regarding those injuries that pre-date the filing of the Original Complaint) or whether equitable tolling applies. *Liberty Ins. Corp.*, 2016 U.S. Dist. LEXIS 26360, at *4. Therefore, the Court should not dismiss Plaintiffs' RICO claims as time-barred.

As to the fraud and aiding and abetting fraud claims, the limitations period is the greater of (1) six years from the date of the fraud's commission or (2) two years from the time the plaintiff discovered or could with reasonable diligence have discovered the fraud. *Faison v. Lewis,* 25 N.Y.3d 220, 234 (2015) (fraud); *Krog Corp. v. Vanner Group, Inc.*, 158 A.D.3d 914, 917 (3d Dept 2018) (aiding and abetting fraud).

As above, Defendants' argument that FedEx's fraud/aiding and abetting fraud claims are barred by the statute of limitations necessarily assumes facts beyond the pleadings, which clearly plead that Defendants concealed their fraudulent acts and FedEx relied upon documentation designed to contain materially false statements. Not only does this implicate the discovery rule (specifically a part of the limitations for fraud), it also implicates equitable estoppel. *See Poulard v. Delphin*, No. 24-30152025, U.S. App. LEXIS 11887, at *6 (2d Cir. May 16, 2025) ("In New

York, equitable estoppel is applicable ... where the defendant conceals from the plaintiff the fact that he has a cause of action . . ."). As such, dismissal at this stage is premature at best.[12]

Finally, as to FedEx's unjust enrichment and Section 349 claims, as noted above, Defendants' actions concealed their fraudulent actions so as to equitably estop them from asserting limitations here. In addition, any actionable claims arising after April 7, 2023 would not be subject to the regular three-year limitations period for unjust enrichment and Section 349 claims.

Hence, it is premature at best as to whether limitations could apply here as to any of the claims asserted by FedEx. As such, Defendants' motion to dismiss as to limitations should be denied.

### *F. The Court Should Exercise Supplemental Jurisdiction Over FedEx's State Law Claims.*

A district court may exercise supplemental jurisdiction over state law claims "so related to claims in the action with such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution." 28 U.S.C. § 1367(a). Here, FedEx's state law claims derive "from a common nucleus of operative fact" with the RICO Claims and therefore form part of the same case or controversy. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). Accordingly, the Court should continue to exercise supplemental jurisdiction over the state law claims because the Complaint alleges viable RICO claims, which grants the Court subject-matter jurisdiction based on federal question jurisdiction.

In addition, the Court has subject-matter jurisdiction over this lawsuit based on diversity jurisdiction [Compl. ¶ 8]. The Complaint alleges the adverse parties are diverse: FedEx is a citizen of the State of Tennessee and the State of Delaware [Compl. ¶ 11] and the named Defendants are

[12] In any event fraud/aiding and abetting fraud that took place after April7, 2020 (under the regular 6-year limitations period), always remains actionable.

either citizens of the State of New York or the State of New Jersey [Compl. ¶¶ 12-13, 20, 23, 34, 36-38, 40-42, 44-45, 48-50, 52, 54, 56-59, 74-75]. The amount in controversy exceeds $75,000 [Compl. ¶ 273]. As a result, the Court "may be required to consider [FedEx's] state claims because the [] complaint alleges that the Court's jurisdiction is also based on diversity of citizenship." *Schmidt v. Fleet Bank*, No. 96 Civ. 5030, 1998 U.S. Dist. LEXIS 1041, at *43-44 (S.D.N.Y. Feb. 4, 1998).

The presence of "John Does 1-50" in the Complaint does not require dismissal, as it does not deprive the court of diversity jurisdiction. Although "[w]hether the naming of 'John Does' as defendants destroys diversity-based subject matter jurisdiction is an open question in this circuit," *Schmidt*, 1998 U.S. Dist. LEXIS 1041, at *43, courts in this District have held that inclusion of John Doe defendants at the pleading stage does not destroy diversity. *See e.g., Taylor v. Doe*, No. 1:20-cv-03398, 2021 U.S. Dist. LEXIS 129358, at *2 n.1 (S.D.N.Y. July 12, 2021). Instead, diversity is destroyed only if an unknown defendant is later found to share the plaintiff's domicile. *Id.* at *2 n.1. Accordingly, whether pleading John Doe Defendants affects diversity jurisdiction is a "factual inquiry" to be resolved later in the litigation and "should not present any impediment to this Court's exercise of jurisdiction under 28 U.S.C. § 1332" at this time. *See Schmidt*, 1998 U.S. Dist. LEXIS 1041, at *43; *Merhej v. I.C.S. Int'l Custody Sys.*, No. 13 Civ. 869, 2014 U.S. Dist. LEXIS 5504, at *5-6 n.1 (S.D.N.Y. Jan. 9, 2014).

Neither case cited by Medical-Defendants alters this analysis. In *Leifer v. Doe*, No. 22-cv-1770, 2025 U.S. Dist. LEXIS 224662, at *8-10 (E.D.N.Y. Nov. 14, 2025), the Court held diversity of citizenship lacking because, in addition to not pleading the domicile of the John Doe defendants, the Plaintiff pled the domiciles of the *named* defendants was unknown. That is not the situation here where the Complaint pled the named defendants' domiciles [Compl. ¶¶ 12, 13, 20, 23, 34, 36-

38, 40-42, 44, 45, 48-50, 52, 54, 56-59, 74, 75]. In *E-Distributors, Inc. v. Woitkowski*, No. 25-CV-02337, 2026 U.S. Dist. LEXIS 74768, at *4 (E.D.N.Y. Apr. 6, 2026), the Court dismissed the plaintiff's original complaint for lack of subject matter jurisdiction because the plaintiff "could not identify the citizenship" of the named defendant(s) – not because John Doe defendants were named in the complaint.

The Court can and should exercise jurisdiction over FedEx's state law claims because diversity jurisdiction is satisfied. In the alternative, the Court can and should exercise supplemental jurisdiction because the federal-question jurisdiction is satisfied on the basis the RICO Claims are viably pled, as discussed *supra*.

### *G. FedEx Sufficiently Pled Its State-Law Claims.*

#### 1. <u>The Fraud Claim is Adequately Pled.</u>

A common law fraud claim is adequately pled when a plaintiff alleges a defendant makes: "(1) a material representation or omission of fact; (2) [] with knowledge of its falsity; (3) with scienter or an intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) [that] such reliance caused damage to the plaintiff." *Allstate Ins. Co. v. New Century Pharm. Inc.*, No. 19 Civ. 5702, 2021 U.S. Dist. LEXIS 155361, at *12 (E.D.N.Y. Aug. 13, 2021).

As stated in Section D.2.a., the first two elements of common law fraud have been satisfied. Similarly, as discussed in Section D.2.a., the Complaint adequately alleges Defendants intended to defraud FedEx and others. Third, as discussed in Section C.3, FedEx reasonably relied on Defendants' misrepresentations, which caused FedEx's damages.

#### 2. <u>The Aiding-and-Abetting Fraud Claim is Adequately Pled.</u>

Medical-Defendants argue the aiding-and-abetting fraud claim fails because FedEx cannot show it reasonably relied on Defendants' fraudulent statements, which "were directed to FedEx

rather than the Claimants" [Memo at 40], relying on *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 828 (2016). But *Pasternack* held mere reliance through a third-party is insufficient to establish reliance *unless* the "third party acted as a conduit to relay the false statement to plaintiff." *Pasternack*, 27 N.Y.3d at 828. Similarly, the Second Circuit has expressly held that fraud claims "premised on indirect communications ... with intent that they be conveyed to and relied on by [Plaintiff]" are actionable. *Amusement Indus., Inc. v. Stern*, 721 F.App'x 9, 12 (2d Cir. 2018). Further, "a fraudulent misrepresentation made with 'notice in the circumstances of its making' that the person to whom it was made would communicate it to third parties subjects the person making the representation to liability to the third party." *Ostano Commerzanstalt v. Telewide Systems, Inc.*, 794 F.2d 763, 766 (2d Cir. 1986).

Here, the Complaint clearly alleges the documents generated by Defendants contained misrepresentations and omissions of fact [Compl. Ex. B]. The Complaint also clearly alleges Defendants intentionally submitted or caused the submission of some of these documents to FedEx [Compl. ¶¶ 89, Ex. B, pp. 4, 7, 11-12, 14-16, 18-19, 22]. Accordingly, the issue of third-party reliance is not present because documents were sent directly to FedEx. But even if FedEx received some documents "indirectly," the allegations are sufficient to meet the *Pasternack* exception: FedEx was among the intended recipients of those false representations. Specifically, the Complaint alleges Defendants knowingly provided fraudulent medical documentation to FedEx and others to initiate litigation, inflate claims, and seek payments and settlements [Compl. ¶¶ 89, 141, 198, 228, 241, 258]. FedEx was the party responsible for payment of any settlements or judgments related to litigation of the fraudulent claims [Compl. ¶¶ 264, 266, 268-73]. As the party responsible for these payments, FedEx necessarily was an intended recipient and target of Defendants' false representations [Compl. ¶¶ 81, 264, 266, 268-73].

Further, the Complaint alleges Defendants created their fraudulent documents with "notice in the circumstances of their making" that they would be submitted to FedEx. Defendants intended the fraudulent medical claims and reports, resulting lawsuits, and attendant documentation to be communicated to FedEx directly and through various conduits – defense counsel and the courts – for the purposes of the Fraud Scheme. FedEx relied on the fraudulent reports, the injuries and treatment founded upon same, and lawsuits seeking to capitalize on the injuries and treatment to determine whether to settle or continue to defend the litigation, all resulting in the damages alleged in the Complaint (which continue to accrue to date). As a result, Defendants are liable for their misrepresentations to FedEx. *Ostano Commerzanstalt*, 794 F.2d at 766.

**3. <u>The Unjust Enrichment Claim is Not Duplicative.</u>**

The unjust enrichment claim is not duplicative of the fraud claim and should not be dismissed. First, the two claims seek distinct and different damages: the unjust enrichment claim seeks actual and consequential damages whereas the fraud claim seeks actual and consequential damages and the investigative costs incurred to detect Defendants' fraudulent conduct [Compl. Count III; Count IV]; *Cooper v. Anheuser-Busch, LLC*, 553 F.Supp.3d (S.D.N.Y. 2021). Second, the two claims have distinct elements – e.g., unjust enrichment usually requires the defendant obtain a 'benefit that in "equity and good conscience' should be paid to the plaintiff and not be guilty of wrongdoing as required by fraud. *Corsello v. Verizon, N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012). As a result, a reasonable trier of fact could find a defendant was unjustly enriched at the plaintiff's expense without finding the defendant committed fraud. *McCracken v. Verisma Sys.*, No. 6:14-cv-06248, 2017 LEXIS 73666, at *23 (W.D.N.Y. May 15, 2017). Finally, a plaintiff may plead unjust enrichment in the alternative when a jury could find unjust enrichment on one view of the evidence or a different theory of recovery on a different view of the facts. *Nachman v. Tesla,*

*Inc.*, No. 22-CV-5976, 2023 U.S. Dist. LEXIS 176468, at *15 (E.D.N.Y. Sept. 30, 2023). Here, the unjust enrichment claim does not duplicate the fraud claim because a jury could find Defendants were unjustly enriched at FedEx's expense but did not possess the intent to defraud FedEx. *See Haraden Motorcar Corp. v. Bonarrigo*, No. 1:19-cv-01079, 2020 U.S. Dist. LEXIS 68666, at *29 (N.D.N.Y. Apr. 20, 2020).

**4. FedEx Pled a Viable Section 349 Claim.**

A complaint adequately pleads a Section 349 by alleging "a defendant has engaged in (1) consumer-oriented conduct, that is (2) materially misleading, and that (3) the plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Plavin v. Grp. Health Inc.*, 35 N.Y.3d 1, 10 (2020). An action under GBL Section 349 need only meet the pleading requirements of Rule 8(a). *Woods v. Maytag Co.*, 807 F.Supp.2d 112, 128 (E.D.N.Y. 2011). A defendant's conduct is "consumer-oriented" when it is has a "broader impact on consumers at large," constitutes a standard or routine practice "that potentially affect similarly situated consumers," or causes "some harm to the public at large." *Plavin*, 35 N.Y.3d at 10; *North State Autobahn, Inc. v. Progressive Ins. Group Co.*, 102 A.D.3d 5, 14-15 (A.D. 2d Dept. 2012); *Securiton Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995).

Here, the Complaint alleges numerous staged accidents and fabricated injuries to take advantage of New York's no-fault system and, ultimately, the court system [Compl. ¶¶ 81-86]. Although FedEx was the immediate target, the Fraud Scheme has a wide impact on consumers far beyond FedEx. As set forth in the Complaint, the Fraud Scheme has resulted in "clogged Court dockets, needless investigative, legal, other claims and defense-related spend, and fraudulently obtained settlements and awards, and nationally, e.g. wrongfully driving up the cost of legitimate insurance business operations, resulting in needlessly escalating premiums to the ultimate

consumers of liability insurance and the cost of healthcare (i.e., everyone)" [Compl. ¶ 312].

Indeed, the New York Governor has noted fraudulent claims of this nature are "driving up costs for everyone" [Compl. ¶ 313; https://www.governor.ny.gov/news/money-your-pockets-governor-hochul-highlights-proposals-bring-down-costs-vehicle-insurance]. The New York Department of Financial Services recognized the vast impact of staged car accidents on consumers at large [Compl. ¶¶ 313-16]. This is neither a "one-off" and or a "contractual dispute" with no impact beyond FedEx. The Fraud Scheme damages New York consumers by increasing insurance premiums, the public at large by providing false information to New York state courts and is a standard routine practice that could potentially affect similarly situated customers. *Lyons*, 843 F.Supp.2d 358 (holding defendants' scheme that fraudulently stripped millions of dollars from Allstate was "consumer oriented" because the scheme "likely increased the premiums of consumers"); *Securiton Magnalock Corp.*, 65 F.3d at 264 (providing false information to a state regulatory agency contrary to the public interest). As such, Defendants' conduct qualifies as consumer oriented. *North State Autobahn*, 953 N.Y.S.2d at 103 (stating that plaintiff need only show that defendant's conduct had an "impact" on consumers to be consumer-oriented). *Lyons* and is directly on point for this action. *See* 843 F.Supp.2d at 375-76.

## III. CONCLUSION

For the reasons stated herein, Medical-Defendants' Motion to Dismiss the Complaint should be denied in its entirety, together with any such other and further relief as the Court deems just and proper. Furthermore, to the extent the Court identifies deficiencies in the Complaint, Plaintiff can, pursuant to *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015), amend the Complaint to address those deficiencies once the Court has identified them.

## WORD COUNT CERTIFICATION

Pursuant to Local Civil Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, as supplemented by the Court's July 6, 2026, Order, the undersigned hereby certifies that the foregoing Memorandum of Law contains 12,860 words, excluding the caption, table of contents, table of authorities, signature block and required certificates, and the certification as to the foregoing relies upon the word count feature of the word-processing system used to prepare the document, Microsoft Word.

Dated: October 30, 2026

*/s/ William J. Clay*
**WILLIAM J. CLAY**

## PART II: RESPONSES TO INDIVIDUAL DEFENDANTS' SUPPLEMENTAL ARGUMENTS[13]

## INDIVIDUAL SECTION I – STAND UP MRI OF MANHATTAN, P.C.

FedEx submits the following in response to Defendant Stand Up MRI of Manhattan, P.C.'s ("Stand Up") Supplemental Memorandum of Law in Further Support of its Motion to Dismiss.

### *A. The Complaint is not Required to Satisfy Rule 9(b) or Plead a Pattern of Racketeering Activity Against Stand Up, a Conspirator.*

Stand Up argues the Complaint should be dismissed because it fails to plead with particularity the fraudulent statements made by Stand Up or the pattern of racketeering activity that it committed [Memo at 1-2, 4]. But the Complaint is not required to plead either requirement against Stand Up because it is not a 1962(c) defendant. *See United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987), *cert. denied*, 486 U.S. 1022 (1988) ("[t]he focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d)"); *see also DeFalco*, 244 F.3d 286 (the "requirements of section 1962(c)," such as a pattern of racketeering activity or that mail and wire fraud be pled with particularity, "must be established as to each individual defendant").

Rather, the Complaint alleges Stand Up violated Section 1962(d) (RICO conspiracy) [Compl. ¶¶ 279-82]. Allegations of a § 1962(d) conspiracy are analyzed under the "more liberal pleading requirements" of Rule 8(a). *CPT Med. Servs.*, 375 F.Supp.2d at 153. "To plead RICO conspiracy under § 1962(d), the plaintiff need only allege that the "conspirator . . . intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal

---

[13] Plaintiff adopts and incorporates by reference all arguments set forth in the joint sections of the Opposition that apply to each Defendant group. For each Defendant group, Plaintiff also adopts and incorporates by reference the arguments made in their supplemental responses to the extent those arguments apply to a respective Defendant group.

offense.'" *F3Ea Funding, LLC v. Rapid Realty Franchise LLC*, No. 18-CV-01734, 2019 U.S. Dist. LEXIS 243118, at *12 (E.D.N.Y. 2019). "[I]t suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas,* 522 U.S. at 65 .

As a result, "there is no requirement of some overt act or specific act" by defendants to be liable for RICO conspiracy. *Salinas,* 522 U.S. at 65 (stating "[t]he RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act . . . ."). The only requirement is "that *defendants* agreed to commit at least two predicate acts, not that defendants themselves committed the two predicate acts, or even that these acts were carried out." *CPT Med. Servs.*, 375 F.Supp.2d at 160 (emphasis added). "It is not a requirement that a defendant commit predicate acts to be liable as a RICO conspirator." *United States v. Aleskerova*, 300 F.3d 286, 292-93 (2d Cir. 2002). A defendant may be found guilty of conspiracy, but not guilty of committing a substantive RICO violation. *CPT Med. Servs.*, 375 F.Supp.2d at 152.

"Although there must be a meeting of the minds, the agreement need not be express." *Moss*, 2024 U.S. Dist. LEXIS 174341, at *19. A defendant's agreement to join a conspiracy can also be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of wrongdoing. *Angermeir*, 14 F.Supp.3d at 154. "A defendant may agree to join a RICO conspiracy without knowing the identities of 'all the other conspirators' and without 'full knowledge of all the details of the conspiracy.'" *Applins*, 637 F.3d at 75 (2d Cir. 2011). When "properly pled, an association-in-fact enterprise, by definition, implies an agreement among its constituent defendants, whose association with one another creates the enterprise." *Wellmart RX, Inc.*, 2022 U.S. Dist. LEXIS 112274. "[I]f the [plaintiff] proves the existence of a RICO enterprise, we need inquire only whether an alleged conspirator knew what the other conspirators 'were up to' or whether the situation would logically lead an alleged conspirator 'to suspect he was part of the

larger enterprise." *United States v. Fertides*, No. 22-2291-cr, 2024 U.S. App. LEXIS 16546, *7-8 (2d Cir. 2024). Similarly, a defendant's knowing and willing participation in a conspiracy may be inferred from circumstantial evidence, such as the defendant "received or expected to receive a share of the profits from the conspiracy." *Aleskerova*, 300 F.3d at 292-93.

The Complaint sets forth a viable RICO conspiracy claim against Stand Up. First, the Complaint provides specific allegations that Stand Up – through its actions – agreed to facilitate the Fraud Scheme's goal of "converting staged or low-impact collisions involving FedEx vehicles into high-value lawsuit by manufacturing serious injuries and economic loss greater than basic-economic loss" [Compl. ¶ 229]. For example, an IME performed *four weeks* after the alleged accident revealed "a lack of clinical correlation…necessary to justify fusion" [Compl. ¶ 115]. Yet, Stand Up produced a report of an MRI it performed of Claimant A's cervical spine approximately *four years* after Claimant A's alleged accident that purportedly revealed injuries to Claimant A's neck and spine, which were then used to justify spinal fusion surgery performed by Defendant Apazidis [Compl. ¶¶ 114, 115].

Radiological reports, such as the one produced by Stand Up, served as the foundational lynchpin that was used and relied upon by other Medical-Defendants to render additional, more lucrative medical services and by Ikhilov to increase the value of Claimants' personal injury lawsuits [Compl. ¶¶ 239, 244-45, 247, 255].

Second, a plausible inference arises Stand Up knowingly and willingly participated in the Fraud Scheme because it received or expected to receive a share of the ill-gotten profits from it: proceeds from the Claimants' litigation funding loans [Compl. ¶¶ 4, 19, 86, 88, 102, 156, 176, 196, 211, 226, 230, 240, 248, 252, 254, 260, 264, 268-73]. Accordingly, and for the reasons set forth

herein and in Section II.D of the Opposition, FedEx has properly alleged a RICO conspiracy claim against Stand Up.

***B. The Complaint Properly Alleges Stand-Up Participated in the Enterprise.***

For the reasons stated in Section II.C.1 of the Opposition, the Complaint adequately pled an association-in-fact. To show a defendant's "participation" in a RICO enterprise, a plaintiff need only demonstrate that the defendants played *some* part in the operation of the enterprise – even if not the predominant one. *Reves*, 507 U.S. at 179 (1993). Courts in the Second Circuit have noted "the participation requirement is a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *Allstate Ins. Co. v. CPM Med. Supply Inc.*, No. 23 CV 5864, 2024 U.S. Dist. LEXIS 153880, at *18 (E.D.N.Y. Aug. 27, 2024). A defendant's participation in an enterprise need only satisfy the notice pleading requirement of Rule 8(a). *State Farm Mut. Auto. Ins. Co. v. Kalika*, No. 04 CV 4631, 2006 U.S. Dist. LEXIS 97454, at *45 (E.D.N.Y. Mar. 16, 2006).

Here, the Complaint alleges Stand Up had some part in directing and participating in the enterprise's affairs. In particular, the Complaint alleges Stand Up created radiological reports "that regularly overstated or mischaracterized findings, omitted degenerative conditions or identifying injuries unsupported by films, allowing the Enterprise to make decisions justifying injections, repeat imaging, or surgical consultations" [Compl. ¶ 239]; *see also* [Compl. ¶¶ 114, 115, 190, 239, 244-45, 247, 255]. These actions facilitated Ikhilov's prosecution of Claimants' fraudulent personal injury lawsuits [Compl. ¶¶ 89, 140, 196-97, 224, 227]. Accordingly, Stand Up participated in the enterprise. *AIU Ins.,* 2005 U.S. Dist. LEXIS 29666, at *28 (stating defendant doctors participated in enterprise by treating insureds and providing misleading prescriptions which facilitated the submission of fraudulent claims to plaintiffs).

### C. *FedEx has Standing to Assert its RICO Claims.*

For the reasons stated in Section II.B of the Opposition, FedEx's damages are clear and definite, were proximately caused by the Fraud Scheme, including Stand Up's participation in it, and were not required to satisfy reasonable reliance. In addition, Stand Up's argument that it performed Claimant A's MRI in July 2023 does not "directly undercut Plaintiff's theory of causation" because the Complaint alleges the fraudulent radiological reports were, in addition to other medical services provided by other Defendants, used to inflate the value of the Claimants' lawsuits and settlement and judgments – not just initiate the lawsuits [Compl. ¶¶ 86, 118, 156, 195, 225, 231, 241, 252].

## INDIVIDUAL SECTION II – NEW YORK PM ASSOCIATES, INC., NEW YORK PAIN MANAGEMENT GROUP, PLLC, AND CONRAD F. CEAN, M.D.

FedEx submits the following in response to Defendants Conrad Cean, M.D., New York Pain Management Group, PLLC, and New York Pain Management Associates, Inc.'s (collectively, "Cean Defendants") Memorandum of Law in Support of Their Motion to Dismiss.

### ***A. The Complaint Sufficiently Alleges Cean Defendants' Participation.***

For the reasons stated in Section C.1 of the Opposition, the Complaint adequately pled an association-in-fact. To show a defendant's "participation" in a RICO enterprise, a plaintiff need only demonstrate that the defendants played *some* part in the operation of the enterprise – even if not the predominant one. *Reves*, 507 U.S. at 179. Second Circuit courts have noted "the participation requirement is a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *Allstate Ins. Co. v. CPM Med. Supply Inc.*, No. 23 CV 5864, 2024 U.S. Dist. LEXIS 153880, at *18 (E.D.N.Y. Aug. 27, 2024). A defendant's participation in an enterprise need only satisfy the notice pleading requirement of Rule 8(a). *State Farm Mut. Auto. Ins. Co. v. Kalika*, No. 04 CV 4631, 2006 U.S. Dist. LEXIS 97454, at *45 (E.D.N.Y. Mar. 16, 2006).

Here, the Complaint alleges Cean Defendants directed and participated in the Enterprise. Specifically, the Complaint alleges Pain Management Defendants, including Cean Defendants, served as the "injection treatment" arm of the Fraud Scheme and their role was to overlap with Gatekeeper Defendants or continue more aggressive treatment following the end of "conservative care." [Compl. ¶ 246]. The Complaint further alleges Pain Management Defendants created reports indicating that physical therapy, chiropractic treatment, and acupuncture had failed and, as a result, more aggressive treatment was warranted, including trigger point injections and epidural steroid injections [Compl. ¶ 246]. Most importantly, the Complaint alleges that "[i]t was the Pain Management Defendants' decisions on what kind and the number of injections to administer such

that the planned failure of care would provide support for the ultimate treatment of surgical intervention." [Compl. ¶ 246].

These treatment determinations facilitated Ikhilov's prosecution of Claimants' fraudulent personal injury lawsuits by creating records of purportedly failed conservative care, supporting more invasive procedures, increasing the apparent severity of the alleged injuries, and driving subsequent litigation positions advanced by other members of the Enterprise [Compl. ¶¶ 86, 89, 103-104, 118, 120, 122, 132, 155, 181, 224, 240, 246, 256]. The Complaint specifically alleges Cean examined and treated Claimants A, B, and C, administered or directed pain-management treatment, referred claimants for additional treatment, and performed procedures that furthered the Fraudulent Treatment Protocol [Compl. ¶¶ 103-04, 120, 122, 132, Ex. B]. The Complaint also alleges Cean routinely self-referred or caused claimants to be referred for pain-management injections performed under anesthesia [Compl. ¶ 47].

Thus, Cean Defendants are not alleged to have merely provided routine pain-management services; they are alleged to have exercised discretionary authority over a critical component of the Enterprise's affairs by determining when conservative care had purportedly failed, what injections would be administered, how many injections would be performed, and when claimants should progress toward surgical intervention [Compl. ¶ 246]. Accordingly, the Complaint plausibly alleges Cean Defendants participated in the operation or management of the enterprise. *See Reves*, 507 U.S. at 179. *AIU Ins.*, 2005 U.S. Dist. LEXIS 29666, at *28 (stating defendant doctors participated in enterprise by treating insureds and providing misleading prescriptions which facilitated the submission of fraudulent claims to plaintiffs).

### *B. The Complaint Sufficiently Pled Cean Defendants Committed Predicate Acts of Mail and Wire Fraud and With a Strong Inference of Fraudulent Intent.*

The Complaint alleges Cean Defendants committed at least six predicate acts of mail and wire fraud in furtherance of the Fraud Scheme [Compl. Ex. B, pp. 2, 6, 7, 10]. The Complaint satisfies Rule 9(b). First, the Complaint alleges the contents of the communications (i.e., Cean Defendants' claim forms and examination and injection records) and why they were fraudulent. "The Pain Management Defendants would create reports indicating that they physical, chiropractic and acupuncture therapy failed and, as a result, more aggressive treatment was warranted such as trigger point and epidural steroid injections" [Compl. ¶ 246]. But these reports were created for the Fraudulent Treatment Protocol, which "placed [claimants] into a predetermined treatment protocol of physical therapy, chiropractic manipulation and acupuncture that necessarily escalated to interventional injections and ultimately surgery . . . to create the basis for seeking six- or seven-figure recovery via personal injury action" [Compl. ¶ 87]. Second, the Complaint alleges Cean Defendants sent those communications [Compl. Ex. B, pp. 2, 6, 7, 10]. Third, the Complaint alleges the dates when the communications occurred [Compl. Ex. B, pp. 2, 6, 7, 10]. And the transmission of those claims and documentation to others [Compl. Ex. B, pp. 2, 7, 10] was in furtherance of the Fraud Scheme and therefore constitute mail and wire fraud regardless of whether claims and documentation contained fraudulent information. *Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F.Supp. 2d 153, 177 (E.D.N.Y. 2010).

Cean Defendants argue "professional judgment, clinical assessment, or differences of medical opinion" do not make those decisions fraud [Memo at 3]. However, the Complaint explains why Cean Defendants' statements regarding Claimants' alleged injuries and the need for the medical treatments that Cean Defendants performed are fraudulent: in some instances neither Claimants' accidents nor their injuries ever occurred (as reflected by, among other things, their

absence in emergency room records or contrary findings or imaging that failed to corroborate the alleged injury) and the medical services Cean Defendants performed were medically unnecessary and fraudulent [Compl. ¶¶ 4, 86, 87, 118, 155, 195, 225, 229-30, 246, 256, 262]. Unlike the case cited by Cean Defendants, *Allstate Ins. Co. v. Advanced Health Professionals, P.C.,* the Complaint explains why Cean Defendants' medical services and medical documentation were fraudulent. *See* 256 F.R.D. 49, 59-62 (D. Conn. 2008) ("This Chart, however, gives *no* factual explanation of why the statements were fraudulent …"). Moreover, under New York law, statements of opinion *are* actionable as fraud. *M&T Bank Corp. v. McGraw-Hill Cos., Inc*., 126 A.D.3d 1414, 1416 (4th Dept. 2015). Finally, disagreements about medical diagnoses and treatments are issues of fact to be resolved at a later stage in this litigation – not a motion to dismiss. "Whether the lawyers and doctors acted innocently, exercised legitimate professional judgment … presents fact disputes not appropriately resolved today." *Uber Techs.*, 2026 U.S. Dist. LEXIS 103792, at *64.

For the reasons stated in Section II.C of the Opposition, the Complaint pleads Cean Defendants possessed a "strong inference" of fraudulent intent.

### *C. The Complaint Sufficiently Pled Cean Defendants Conspired to Violate RICO.*

The Complaint sets forth a viable RICO Conspiracy claim against Cean Defendants. First, for the reasons stated in Section C.1 of the Opposition, *supra*, the Complaint sufficiently alleges an association-in-fact enterprise in which Cean Defendants participated, which is sufficient to find they agreed to further the Fraud Scheme's goals. *Wellmart RX, Inc.*, 2022 U.S. Dist. LEXIS 112274, at *18. Second, because the Complaint alleges Cean Defendants "personally committed several acts of racketeering in furtherance of the enterprise's affairs, the inference of an agreement [to join the conspiracy] is unmistakable." *Sky Med.*,17 F.Supp.3d at 30-31. Third, the Complaint alleges Cean Defendants – through their actions – agreed to facilitate the Fraud Scheme's goal of

"converting staged or low-impact collisions involving FedEx vehicles into high-value lawsuit by manufacturing serious injuries and economic loss greater than basic-economic loss" [Compl. ¶ 229]. Specifically, the Complaint alleges Pain Management Defendants, which included the Cean Defendants, served as the "injection treatment" arm of the Fraud Scheme and that their role was to overlap with the Gatekeeper Defendants or continue more aggressive treatment following the end of "conservative care." [Compl. ¶ 246]. The Complaint further alleges that the Pain Management Defendants created reports indicating that physical therapy, chiropractic treatment, and acupuncture had failed and, as a result, more aggressive treatment was warranted, including trigger point injections and epidural steroid injections [Compl. ¶ 246]. These reports were created for and part and parcel of the Fraudulent Treatment Protocol, which "placed [claimants] into a predetermined treatment protocol of physical therapy, chiropractic manipulation and acupuncture that necessarily escalated to interventional injections and ultimately surgery . . . . to create the basis for seeking six- or seven-figure recovery via personal injury action" [Compl. ¶ 87].

Second, a plausible inference arises Cean Defendants knowingly and willingly participated in the Fraud Scheme because it received or expected to receive a share of the ill-gotten profits from it: proceeds from the Claimants' litigation funding loans [Compl. ¶¶ 4, 19, 86, 88, 102, 156, 176, 196, 211, 226, 230, 240, 248, 252, 254, 260, 264, 268-73]. Accordingly, and for the reasons set forth in Section II.D of the Opposition and Section A of the Stand-Up Opposition, FedEx has properly alleged a RICO conspiracy claim against Cean Defendants.

### *D. The Complaint Sufficiently Pled Cean Defendants Aided and Abetted Fraud.*

The Complaint properly alleges an aiding-and-abetting fraud claim against Cean Defendants. "To establish liability for aiding and abetting fraud under New York law, the plaintiffs must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the

defendant provided substantial assistance to advance the fraud's commission." *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014). Cean Defendants challenge the second and third elements – its knowledge of and provision of substantial assistance to the further the Fraud Scheme [Memo at 8].

"Actual knowledge need only be pleaded generally, cognizant, particularly at the pre-discovery stage because the plaintiff lacks access to the very discovery materials which would illuminate a defendant's state of mind." *Oster v. Kirschner*, 77 A.D.3d 51, 55 (1st Dept. 2010). That is because "[p]articipants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud." *Id.* at 55-56. Accordingly, actual knowledge of the fraud is discerned from the "surrounding circumstances" and "may be averred generally," which is satisfied when plaintiffs "plead the events which give rise to an inference of knowledge." *Id.*; *Krys*, 749 F.3d at 129.

Here, the "surrounding circumstances" described in the Complaint permit the reasonable inference that Cean Defendants actually knew of the Fraud Scheme. The Complaint alleges Pain Management Defendants like Cean Defendants served as the "injection treatment" arm of the Fraud Scheme and that their role was to overlap with the Gatekeeper Defendants or continue more aggressive treatment following the end of "conservative care." [Compl. ¶ 246]. The Complaint further alleges the Pain Management Defendants created reports indicating that physical therapy, chiropractic treatment, and acupuncture had failed and, as a result, more aggressive treatment was warranted, including trigger point injections and epidural steroid injections [Compl. ¶ 246]. These reports were created for and part and parcel of the Fraudulent Treatment Protocol, which "placed [claimants] into a predetermined treatment protocol of physical therapy, chiropractic manipulation and acupuncture that necessarily escalated to interventional injections and ultimately surgery . . . .

to create the basis for seeking six- or seven-figure recovery via personal injury action" [Compl. ¶ 87]. Moreover, Cean Defendants were part of the "closed-referral loop" of medical providers to whom claimants were routed by Defendants for "surgery on an accelerated timeline" [Compl. ¶¶ 88, 102, 246]. Based on these allegations, it is more than reasonable to infer Cean Defendants had actual knowledge of the Fraud Scheme.

Substantial assistance constitutes "a substantial contribution to the perpetration of the fraud." *JPMorgan Chase Bank v. Winnick*, 406 F.Supp.2d 247, 257 (S.D.N.Y. 2005). It exists "when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [fraud] to occur." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006). Substantial assistance can be inferred from the circumstances alleged in the complaint. *Oster*, 77 A.D.3d at 55-56. A defendant who provides the means by which the perpetrators of a fraud carry out their scheme can be found to have substantially assisted the perpetrators. *Id.*

The Complaint adequately pled Cean Defendants provided substantial assistance to the Fraud Scheme. The Complaint alleges Pain Management Defendants like Cean Defendants served as the "injection treatment" arm of the Fraud Scheme and that their role was to overlap with the Gatekeeper Defendants or continue more aggressive treatment following the end of "conservative care." [Compl. ¶ 246]. The Complaint further alleges the Pain Management Defendants created reports indicating that physical therapy, chiropractic treatment, and acupuncture had failed and, as a result, more aggressive treatment was warranted, including trigger point injections and epidural steroid injections [Compl. ¶ 246]. These actions undoubtedly constitute substantial assistance to the Fraud Scheme. *See, e.g., Carbon Inv. Partners, LLC v. Bressler*, No. 20 Civ 3617, 2021 U.S. Dist. LEXIS 166293, at *25-26 (S.D.N.Y. Sept. 1, 2021) (stating "the inquiry is whether

[defendant] took actions that enabled the fraud"). Accordingly, the Complaint adequately pled aiding and abetting fraud against Cean Defendants. *Id.*

***E. The Complaint Pled an Unjust Enrichment Claim.***

For the reasons stated in Section II.G.3 of the Opposition, the unjust enrichment claim is not duplicative of the fraud claim. Furthermore, the Complaint alleges Cean Defendants received benefits to which they were not entitled: proceeds from the Claimants' litigation funding loans that were financed through the settlements and judgments paid by FedEx [Compl. ¶¶ 90, 156, 196, 226].

## INDIVIDUAL SECTION III – NEXRAY MEDICAL IMAGING, P.C. D/B/A SOUL RADIOLOGY

FedEx submits the following in response to Defendant Nexray Medical Imaging, P.C. d/b/a Soul Radiology's ("Nexray") Supplemental Memorandum of Law in Further Support of Its Motion to Dismiss.

### *A. FedEx's Claims are Not Time-Barred.*

For the reasons stated in Section II.G of the Opposition, FedEx's RICO, Common Law Fraud, Aiding-and-Abetting Fraud, and Section 349 Claims are not time-barred.

### *B. The Complaint Sufficiently Alleges Nexray's Participation.*

For the reasons stated in Section II.C.1 of the Opposition, the Complaint adequately pled an association-in-fact. To show a defendant's "participation" in a RICO enterprise, a plaintiff need only demonstrate the defendants played *some* part in the operation of the enterprise – even if not the predominant one. *Reves*, 507 U.S. at 179. A defendant's participation in an enterprise need only satisfy the notice pleading requirement of Rule 8(a). *State Farm Mut. Auto. Ins. Co. v. Kalika*, No. 04 CV 4631, 2006 U.S. Dist. LEXIS 97454, at *45 (E.D.N.Y. Mar. 16, 2006).

Here, the Complaint alleges Nexray directed and participated in the Enterprise. Specifically, the Complaint alleges Nexray generated radiological reports "that regularly overstated or mischaracterized findings, omitted degenerative conditions, or identified injuries unsupported by films, allowing the Enterprise to make decisions justifying injections, repeat imaging, or surgical consultations." [Compl. ¶ 239]; *see also* [Compl. ¶¶ 114, 115, 190, 239, 244-245, 247, 255]. The Complaint further alleges Radiology Defendants "served as the central diagnostic component of the Fraudulent Treatment Protocol" and "exercised decision-making authority over whether to report a non-existing injury or omit findings of chronic and degenerative disease." [Compl. ¶ 244]. These diagnostic determinations facilitated Ikhilov's prosecution of

Claimants' fraudulent personal injury lawsuits by driving subsequent treatment recommendations, invasive procedures, and litigation positions advanced by other members of the enterprise. [Compl. ¶¶ 89, 140, 196, 197, 224, 227, 239, 245, 247, 255]. Thus, Nexray is not alleged to have merely performed routine imaging services; it is alleged to have exercised discretionary authority over a critical component of the enterprise's affairs and to have provided the diagnostic findings upon which subsequent enterprise activity depended. *See Reves*, 507 U.S. at 179. Accordingly, the Complaint plausibly alleges that Nexray participated in the operation or management of the enterprise. *AIU Ins.*, 2005 U.S. Dist. LEXIS 29666, at *28 (stating defendant doctors participated in enterprise by treating insureds and providing misleading prescriptions which facilitated the submission of fraudulent claims to plaintiffs).

### ***C. The Complaint Sufficiently Pled Nexray Committed Travel Act Violations and Mail and Wire Fraud With a Strong Inference of Fraudulent Intent.***

For the reasons stated in Section II.C.2.a of the Opposition, the Complaint adequately asserts Nexray committed mail and wire fraud.

In particular, the Complaint alleges Nexray committed at least two predicate acts of mail and wire fraud in furtherance of the Fraud Scheme [Compl. Ex. B, p. 17]. Exhibit B identifies the dates of the communications, the nature of the communications, the content of the communications (i.e., Nexray's verification of treatment form and accompanying physical therapy records)the sender, and the role those communications allegedly played in furthering the fraud scheme. [*Id.*]. Radiology Defendants "regularly overstated or mischaracterized findings, omitted degenerative conditions or identified injuries unsupported by films" and "exercised authority over whether to identify injuries that did not exist or omit chronic and degenerative findings that would undermine causation," which were then used to justify additional treatment and invasive procedures [Compl. ¶¶ 239, 244-47, 255]. Further, Nexray's transmission of claims and documentation to others

[Compl. Ex. B, p.17] was in furtherance of the Fraud Scheme and therefore constitute mail and wire fraud regardless of whether claims and documentation contained fraudulent information. *Curtis & Assocs., P.C.*, 758 F.Supp.2d at 177).

Nexray argues the Complaint fails to satisfy the Rule 9(b) because it "improperly lumps Nexray together with other Defendants even though Nexray had no involvement beyond one ordinary MRI" [Memo at 6]. But the Complaint does no such thing. It attributes predicate acts directly to Nexray, and the allegations inform Nexray "of the nature of its alleged participation in the fraud." *See Mills*, 12 F.3d at 1175 (cleaned up). Nexray is "sufficiently on notice as to the nature of the scheme, when it occurred, and who took part." *Gov't Emps. Ins. Co. v. Landow*, No. 21-CV-1440, 2022 U.S. Dist. LEXIS 57715, at *17 (E.D.N.Y. Mar. 29, 2022). "In a complex RICO suit, this is enough." *Id.*; *see also Uber Techs.*, 2026 U.S. Dist. LEXIS 103792, at *45-46.

In addition to the reasons stated in Section II.C of the Opposition, the Complaint sufficiently pleads Nexray possessed a "strong inference" of fraudulent intent. Specifically, it alleges that Dr. Weiner (the owner of Soul Radiology) and Marvin Moy were charged in a federal healthcare fraud prosecution involving insurance fraud and the manipulation of diagnostic findings [Compl. ¶ 24]; that Weiner pleaded guilty to healthcare fraud; and that a co-defendant in that case under oath that he and Weiner agreed injuries would be falsely reported in MRI reports [Compl. ¶¶ 26-27]. The Complaint additionally alleges the existence and substance of communications reflecting efforts to influence radiological interpretations and MRI reporting practices. [Compl. ¶¶ 30-33]. At the pleading stage, the Court must accept Plaintiff's allegations as true and draw all reasonable inferences in Plaintiff's favor. When combined with the Complaint's detailed allegations regarding Nexray's role in generating allegedly misleading diagnostic findings, these facts support a strong inference of fraudulent intent.

Finally, Nexray incorrectly recasts the Complaint as alleging a mere "generalized profit motive" [Memo at 7]. But the Complaint does not allege Nexray' motive was to be profitable by legal means. Rather, it alleges Defendants' – including Nexray's – motive was to receive monetary reimbursements by committing fraud [Compl. ¶¶ 229-48, 255-57]. These allegations concern intentional conduct allegedly designed to advance the Enterprise's fraudulent objectives, not merely the pursuit of lawful profits. In cases involving insurance claims, Eastern District courts have repeatedly found this to be sufficient to give rise to a strong inference of fraudulent intent.[14] *Lyons*, 843 F.Supp.2d at 373; *Erlikh*, 2019 U.S. Dist. LEXIS 34257, at *16; *Government Emps. Ins. Co. v. Li-Elle Serv., Inc.,* No. 12-CV-2157, 2013 U.S. Dist. LEXIS 31630, at *19 (E.D.N.Y. Feb. 11, 2013). At the pleading stage, those allegations are more than sufficient to distinguish a lawful profit motive from participation in a fraudulent enterprise. See *AIU Ins.*, 2005 U.S. Dist. LEXIS 29666, at *28; *Allstate Ins. Co. v. CPM Med. Supply Inc.*, No. 23-CV-5864, 2024 U.S. Dist. LEXIS 153880, at *18 (E.D.N.Y. Aug. 27, 2024).

The Complaint also adequately alleges Travel Act violations against Nexray. The Travel Act is violated when a person travels in interstate commerce or uses mail or any facility in interstate or foreign commerce to facilitate the promotion, management, establishment or carrying on, of an unlawful activity, and performs an additional act in furtherance of that unlawful activity. 18 U.S.C. § 1952(a); *see also United States v. Jenkins*, 943 F.2d 167, 172 (2d Cir. 1991). Violation of New York Penal Law § 215.00 (bribery of a witness) is an unlawful activity under the Travel Act. 18 U.S.C. § 1952(b). New York Penal Law § 215.00 describes "bribery" as "bribing a witness" by conferring, or offering or agreeing to confer, any benefit upon a witness or a person about to be

[14] Note that under New York law submitting misleading documentation to an insurer for the purpose of obtaining benefits is fraud. *See, e.g.,* N.Y. Pen. Law § 176.05 (defining insurance fraud); N.Y. Ins. Law § 403 (defining fraudulent insurance act).

called as a witness in any action or proceeding to influence the testimony of the witness. N.Y. PEN. LAW § 215.00. Allegations of bribery need only satisfy Rule 8(a), which requires giving a "defendant fair notice of the plaintiff's claim and the ground upon which it rests." *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 318 (S.D.N.Y. 2009).

The Complaint alleges Defendants, including Nexray, conferred or offered to confer "benefits" to Claimants by (1) providing them "litigation funding loans" [Compl. ¶¶ 4, 156, 196, 226], (2) redistributing a portion of those loans to Claimants and Defendants [Compl. ¶¶ 4, 156, 196, 226], and (3) transmitting fraudulent claim documents for authorization and payment for medical services provided to Claimants, which were unnecessary, not causally related to the alleged accident, and inflated Claimants' lawsuit settlement values [Compl. ¶¶ 4, 88, 89, 91, 92, 93, 141, 198, 228, 241, 250, 258]. Defendants reasonably should have believed Claimants would be witnesses in their own personal injury lawsuits. *People v. Bell*, 73 N.Y.2d 153, 164 (1989). The Complaint also alleges benefits would be conferred upon Medical-Defendants, such as Nexray, because they "agreed and remain(ed) committed to testify as treating experts for which they are paid a substantial sum from the proceeds of the claim" [Compl. ¶ 230].

The Complaint alleges Defendants "facilitated" the promotion of bribery of a witness by use of the mail (e.g., mailing fraudulent medical documentation to FedEx and others [Compl. ¶¶ 5, 88, 91-93, 140-41, 197-98, 227-28, 241, 250, 258, 269-70, Ex. B]) and use of facilities in interstate commerce to perform surgeries [Compl. ¶ 258 n.6]. *Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.,* No. 14-cv-7349, 2016 U.S. Dist. LEXIS 44265, at *25 (S.D.N.Y. Mar. 31, 2016). Defendants performed additional acts in furtherance of the unlawful activity by redistributing litigation funding loan proceeds to Claimants and Medical-Defendants who provided courtroom testimony. This is sufficient to allege a violation of the Travel Act. *Jenkins*, 943 F.2d at 173.

### *D. The Complaint Sufficiently Pled Nexray Conspired to Violate RICO.*

In a footnote, Nexray suggests the RICO conspiracy claim against it must fail because the Complaint fails to adequately assert a substantive RICO violation and fails plead an agreement to commit predicate acts. In addition to the arguments in Section II.D of the Opposition and Section A of the Stand-Up Opposition, the Complaint pleads a RICO conspiracy against for the following reasons.

Case law in the circuit makes clear that a defendant may be found guilty of a RICO conspiracy, but not guilty of committing a substantive RICO violation. *CPT Med. Servs.*, 375 F.Supp.2d at 152. Allegations of a § 1962(d) conspiracy are analyzed under the "more liberal pleading requirements" of Rule 8(a). *Id.* at 153. "To plead RICO conspiracy under § 1962(d), the plaintiff need only allege that the "conspirator ... intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense.'" *F3Ea Funding*, 2019 U.S. Dist. LEXIS 243118, at *12. "[I]t suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas,* 522 U.S. at 65.

A defendant's agreement to join a conspiracy can be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of wrongdoing. *Angermeir*, 14 F.Supp.3d at 154. A defendant's knowing and willing participation in a conspiracy may be inferred from circumstantial evidence, such as the fact that the defendant "received or expected to receive a share of the profits from the conspiracy." *Aleskerova*, 300 F.3d at 292-93. When "properly pled, an association-in-fact enterprise, by definition, implies an agreement among its constituent defendants, whose association with one another creates the enterprise." *Wellmart RX, Inc.*, 2022 U.S. Dist. LEXIS 112274, at *18. Finally, the Complaint's allegations that Nexray committed at least two racketeering acts in furtherance of the enterprise's affairs [Compl. at Ex. B] creates an

"unmistakable" inference of an agreement to join the conspiracy and is sufficient to allege a RICO conspiracy. *Sky Med.*, 17 F.Supp.3d at 230-31.

Because the Complaint sufficiently alleged the existence of an association-in-fact enterprise, along with Nexray's commission of one or more affirmative acts in furtherance of the enterprise's objectives, it sufficiently alleges a RICO conspiracy claim against Nexray.

### ***E. The Complaint Sufficiently Alleges Plaintiff's State Law Claims Against Nexray.***

For the reasons stated in Section II.G of the Opposition, the Complaint adequately alleges Plaintiff's state law claims against Nexray for common-law fraud, aiding and abetting fraud, unjust enrichment, GBL § 349, and for declaratory judgment.

## INDIVIDUAL SECTION IV – ARDEN M. KAISMAN, M.D.

FedEx submits the following in response to Defendant Arden M. Kaisman, M.D.'s ("Kaisman") supplemental argument for dismissal. Kaisman's submission largely restates the arguments to which FedEx has interposed opposition in Part I, *supra*. FedEx addresses here only contentions unique to Kaisman: that he is "mentioned in only six pages" of the Complaint; that his conduct was "standard pain management treatment" insufficient to constitute predicate acts; that FedEx has failed to plead his knowing participation; and that settlement of the underlying tort actions bars this suit. Each fails.

### *A. Kaisman's Motion Rests on Facts Outside the Complaint.*

As an initial matter, Kaisman's memorandum improperly rests on factual assertions found nowhere in the Complaint and unsupported by any declaration or exhibit: that his treatment was "standard," that it was "approved and paid for by Allstate," that he last saw Claimant D on May 3, 2024, that he recommended trigger point injections, and that FedEx "did not plead fraud" in the Kings County action [Memo at 6-8]. On a Rule 12(b)(6) motion the Court is confined to the pleading, documents incorporated in it and matters of which judicial notice may be taken. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). Counsel's unsworn characterization of his client's practice is none of these and should be disregarded. FedEx need only plead facts supporting a plausible inference of liability, with well-pleaded allegations accepted as true and every reasonable inference drawn in its favor. *Bell Atl. Corp.*, 550 U.S. at 556. Kaisman concedes as much [Memo at 9]. Rule 9(b) requires particularity, not pre-discovery proof, and permits knowledge and intent to be alleged generally where the surrounding facts support the inference. Whether Kaisman knew the imaging and emergency-room findings did not support his surgeries is a question for the factfinder, not one resolved by relabeling the conduct "standard pain management."

### *B. The Complaint Pleads Kaisman's Specific Conduct, Not Group Allegations.*

Kaisman's central theme, that he is "mentioned in only six pages", confuses page count with sufficiency. Rules 8 and 9(b) ask whether the Complaint tells Kaisman what he did, when, and why it was fraudulent. It does, by name and date, for all three occupants of the vehicle, on each of whom Kaisman performed either cervical or lumbar discectomies or both.

As to Claimant D, the Complaint alleges that her December 4, 2021 lumbar MRI showed only "multilevel degenerative changes . . . most significant at L4-5" with no acute findings, and that her cervical MRI was negative for herniation [Compl. ¶¶ 149-50]. On June 14, 2022, Kaisman examined her, authored a report misidentifying her emergency-care hospital, diagnosed "protruding discs" with radiculopathy, pronounced those findings "causally related" to the accident, omitted any mention of the degenerative findings, and recommended a lumbar discectomy, which he performed one week later [Id. ¶¶ 151-52]. The claim form, operative records (July 8, 2022), and examination records (July 26, 2022) Kaisman transmitted by wire or mail are pleaded as predicate acts [Compl. Ex. B at 13-14].

As to Claimants E and F, both were routed through the same intake provider to the same MRI facility on the same day, then to Kaisman a week apart (February 7 and 14, 2022), where he issued identical recommendations for lumbar and cervical discectomies "out of alleged medical necessity" [Compl. ¶¶ 234-36]. He performed multi-level lumbar discectomies, annuloplasties, discograms, and epidural injections on each, then cervical discectomies, all within two to seven weeks [Id. ¶¶ 158-60, 164-66].

These are not "standard pain management" allegations. They identify the speaker, the statements (diagnoses, causation opinions, necessity recommendations, operative reports), the dates, the channel (the no-fault and tort-claim process that ultimately reached FedEx), and why the

statements were false (negative or degenerative imaging, benign emergency room findings, and cookie-cutter surgical recommendations on compressed timelines) [Id. ¶¶ 247, 249, 257-58, 262]. That satisfies Rule 9(b). Kaisman's authority against attributing fraud to "defendants" generically, *Mills*, 12 F.3d at 1175, is beside the point where the pleading attributes specific statements to him. Nor must each mailing be false; as this Court has held, "any mailing that is incident to an essential part of the scheme satisfies the mailing element," and in complex RICO cases "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)." *CMG Holdings Grp.*, 2016 U.S. Dist. LEXIS 121135, at *8, *11 (applying *Mills*; exhibit enumerating each predicate act's date, participants, content, and role sufficed); accord *Boritzer v. Calloway*, 2013 U.S. Dist. LEXIS 11119, at *27 (S.D.N.Y. Jan. 24, 2013) (Oetken, J.). Exhibit B does exactly that for Kaisman.

### *C. Kaisman Misstates the Elements and Standard of § 1962(c) and § 1962(d).*

Kaisman argues he cannot be liable because he did not "recruit" claimants, "receive Fraud Scheme proceeds," or "refer" patients, and because the Complaint does not say "when" he and seventy-two others reached a "meeting of the minds" [Memo at 7, 11]. None of that is required, and the error begins with his statement of the elements. He recasts § 1962(c) as requiring that "Defendant Kaisman" personally commit "two or more predicate acts" [Memo at 10], *citing Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). *Moss* contains no such requirement; it asks whether the defendant participated in the conduct of an enterprise's affairs through a pattern of racketeering. He then relabels the enterprise "the Fraud Scheme," conflating the pleaded association-in-fact [Compl. ¶ 276] with the scheme it carried out, and collapses § 1962(c) and § 1962(d) into a single demand that he "committ[ed] predicate criminal acts" [Memo at 10].

Under § 1962(c), an enterprise is operated "not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Reves,* 507 U.S. at 184. The Complaint alleges Pain Management Defendants and Surgical Defendants, Kaisman among them, held "decision-making authority" over which procedures to perform and when, and chose to operate on compressed timelines "notwithstanding objective negative findings of the emergency room" [Compl. ¶¶ 246-47 and ¶ 257 (Kaisman's discectomy recommendation executed one week later for Claimant D)].

A physician who generates the false diagnoses and operative reports on which the scheme depends is no passive vendor; he is the instrumentality by which the enterprise manufactures its "threshold-satisfying records" [Id. ¶ 260]. *Azrielli v. Cohen Law Offices*, 21 F.3d 512 (2d Cir. 1994), and *Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.*, 832 F.Supp. 585 (E.D.N.Y. 1993), on which Kaisman relies, involved attorneys who rendered legal services to a scheme devised and executed by others; neither insulates a defendant who authors the fraudulent content himself. This Court has cited *Azrielli* for open-ended continuity, not for any professional-services safe harbor. *Boritzer*, 2013 U.S. Dist. LEXIS 11119, at *35-36 (Oetken, J.). Kaisman's reliance on *Crab House of Douglaston, Inc. v. Newsday, Inc.*, 418 F.Supp.2d 193, 203-05 (E.D.N.Y. 2006), is likewise misplaced; that enterprise failed because it included the scheme's victim, whose interests were incompatible with the common purpose.

Courts in this Circuit routinely sustain RICO claims against no-fault providers alleged to have generated unnecessary treatment and billing and treat a provider's "assertions regarding [its] lack of involvement with the alleged enterprise" as "factual questions that are not appropriate at this stage." *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14-cv-9792, 2015 U.S. Dist. LEXIS 86795, at *5-7 (S.D.N.Y. June 18, 2015); *see also Gov't Emps. Ins. Co. v. Landow*, 2022 U.S. Dist.

LEXIS 57715, at *17 (E.D.N.Y. Mar. 29, 2022) (providers "on notice as to the nature of the scheme, when it occurred, and who took part"; "[i]n a complex RICO suit, this is enough").

Kaisman's § 1962(d) formulation, that FedEx must allege he "participated in the Fraud Scheme by committing predicate criminal acts" [Memo at 10], is wrong for the reasons in Part I, *supra*. A RICO conspirator need not commit, or even agree to commit, any predicate (or criminal) act; it suffices that he "adopt the goal of furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 63-65. His own authority agrees: *Baisch v. Gallina* asks only whether the defendant "knew about and agreed to facilitate the scheme." *Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003). Nor must a conspirator know every co-conspirator or when the agreement was formed. *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000). Agreement is pleaded circumstantially: Kaisman received three occupants of one vehicle through the same Ikhilov-directed referral chain, issued identical surgical recommendations for two of them a week apart, performed the same two operations on each within weeks, and transmitted the records into the no-fault and tort-claim process [Compl. ¶¶ 155, 234-36, 242-43, 258]. That pattern plausibly supports the inference that he understood and agreed to his role.

***D. Underlying Settlement Does Not Defeat Causation or Injury.***

Kaisman contends the Complaint is a "second bite at the litigation apple" because FedEx settled the Kings County action brought by Claimants D, E, and F [Memo at 7-8], and that his treatment was "approved and paid for by Allstate" [Memo at 115-17]. Neither assertion is in the Complaint. The settlement point is an unpleaded affirmative defense, cognizable on a Rule 12(b)(6) motion only if it appears on the face of the Complaint. *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998). It does not. Kaisman was not a party to the state action, and the Complaint pleads no release of any claim against him.

Even if Allstate approved his bills, that approval would not break the causal chain. FedEx's injury does not depend on who first paid Kaisman's bills. The Complaint pleads FedEx's own losses: payments within its self-insured retention, investigative and claims-handling expenses, defense costs, and expert fees [Compl. ¶¶ 252, 266, 269-71] incurred in responding to the records and filings alleged to be false. FedEx's reliance is not an element of its RICO claims [Id. ¶ 267]; the question is proximate cause, and a plaintiff need not show that it relied on the defendant's misrepresentations to establish it. *Bridge*, 553 U.S. at 661. FedEx was the target of the scheme, and bore these costs directly; there is "no more immediate victim" [Compl. ¶¶ 4, 272].

Reliance is separately pleaded for the common-law fraud claim: the submissions appeared facially valid, the no-fault deadlines and the tort suits compelled FedEx to process and defend them [Compl. ¶¶ 262, 264, 290]. To the extent Kaisman's premise is that FedEx settled, the Complaint alleges that inflated settlements were an intended product of the scheme [Id. ¶¶ 252, 260], and a party who pays a fraudulently inflated claim does not forfeit its remedy by paying. See *Centro Empresarial Cempresa S.A. v. América Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (release procured by fraud is voidable). Whether FedEx's reliance was justified is a fact question. *See Fayda*, 2015 U.S. Dist. LEXIS 86795, at *7.

***E. The Remaining State-Law Claims Are Adequately Pled.***

Kaisman's common law fraud, unjust enrichment, aiding-and-abetting, and GBL § 349 arguments are generic and answered in Part I, *supra*. Three points are specific to him. First, Kaisman asserts the Complaint "did not plead that Defendant Kaisman obtained a benefit from the Plaintiff" [Memo at 13]. The Complaint alleges litigation-funding proceeds were redistributed to Medical Defendants [Compl. ¶ 156] and the scheme was designed to produce inflated settlements and related payments by FedEx [Id. ¶¶ 252, 260]. That relationship is not "too attenuated" at the

pleading stage, *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011), and FedEx may plead unjust enrichment in the alternative to fraud. FED. R. CIV. P. 8(d)(2). Second, Kaisman's awareness of the negative imaging and benign emergency findings he omitted pleads actual knowledge and performing the surgeries and generating the records that drove settlement value is "substantial assistance" [Compl. ¶¶ 151-52, 236, 247]. Third, Kaisman's § 349 argument ignores that the Complaint alleges a standardized treatment protocol applied to every claimant funneled through the Ikhilov pipeline, not a private dispute between two parties [Id. ¶¶ 240-41, 248-51].

For these reasons and those set forth in Part I, *supra*, Kaisman's motion should be denied in its entirety. In the alternative, FedEx requests leave to amend to address any deficiency the Court identifies. FED. R. CIV. P. 15(a)(2).

## INDIVIDUAL SECTION V – BAY RIDGE ORTHOPEDIC ASSOCIATES, P.C.

FedEx submits the following in response to Defendant Bay Ridge Orthopedic Associates, P.C.'s ("Bay Ridge") Motion to Dismiss.

### *A. FedEx has Standing to Assert its RICO Claims.*

For the reasons stated in Section II.B. of the Opposition, FedEx's damages were proximately caused by the Fraud Scheme, including Bay Ridge's participation in it [Compl. ¶¶ 153, 161, 183, 22-23, Ex. B, pp. 14, 21].

### *B. The Complaint is not Required to Satisfy Rule 9(b) or Plead a Pattern of Racketeering Activity Against Bay Ridge, a Conspirator.*

Bay Ridge argues the Complaint should be dismissed because it fails to plead with particularity the fraudulent statements made by Bay Ridge or the pattern of racketeering activity that it committed [Memo at 5-6]. But the Complaint is not required to plead either requirement against Bay Ridge because it is not a 1962(c) defendant. *See Persico*, 832 F.2d at 714 ("[t]he focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d)"); *see also DeFalco*, 244 F.3d 286 (the "requirements of section 1962(c)," such as a pattern of racketeering activity or that mail and wire fraud be pled with particularity, "must be established as to each individual defendant").

Rather, the Complaint alleges Bay Ridge violated Section 1962(d) (RICO conspiracy) [Compl. ¶¶ 279-82]. Allegations of a § 1962(d) conspiracy are analyzed under the "more liberal pleading requirements" of Rule 8(a). *CPT Med. Servs.*, 375 F.Supp.2d at153. "To plead RICO conspiracy under § 1962(d), the plaintiff need only allege that the "conspirator . . . intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal

offense.'" *F3Ea Funding*, 2019 U.S. Dist. LEXIS 243118, at *12 . "[I]t suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas,* 522 U.S. at 65.

As a result, "there is no requirement of some overt act or specific act" by defendants to be liable for RICO conspiracy. *Salinas,* 522 U.S. at 65 (stating "[t]he RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act . . . ."). The only requirement is "that *defendants* agreed to commit at least two predicate acts, not that defendants themselves committed the two predicate acts, or even that these acts were carried out." *CPT Med. Servs.*, 375 F.Supp.2d at 160 (emphasis added). "It is not a requirement that a defendant commit predicate acts to be liable as a RICO conspirator." *Aleskerova*, 300 F.3d at 292-93. A defendant may be found guilty of conspiracy, but not guilty of committing a substantive RICO violation. *CPT Med. Servs.*, 375 F.Supp.2d at 152.

A defendant's agreement to join a conspiracy can be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of wrongdoing. *Angermeir*, 14 F.Supp.3d at 154. A defendant's knowing and willing participation in a conspiracy may be inferred from circumstantial evidence, such as the fact that the defendant "received or expected to receive a share of the profits from the conspiracy." *Aleskerova*, 300 F.3d at 292-93. When "properly pled, an association-in-fact enterprise, by definition, implies an agreement among its constituent defendants, whose association with one another creates the enterprise." *Wellmart RX, Inc.*, 2022 U.S. Dist. LEXIS 112274, at *18.

The Complaint sets forth a viable RICO conspiracy claim against Bay Ridge. First, the Complaint provides specific allegations that Bay Ridge – through its actions – agreed to facilitate the Fraud Scheme's goal of "converting staged or low-impact collisions involving FedEx vehicles into high-value lawsuit by manufacturing serious injuries and economic loss greater than basic-

economic loss" [Compl. ¶ 229]. For example, Bay Ridge performed spinal surgery on Claimant D despite Claimant D's spinal injuries not being "acute" but degenerative in nature, not being caused by Claimant D's alleged accident, and later determined to be "not medically necessary" [Compl. ¶¶ 149-54]; *see also* [Compl. ¶¶ 161-62, 183]. Similarly, Bay Ridge performed spinal surgery on Claimant H "[d]espite the lack of objective evidence of any injury or limitation whatsoever on the date of the accident . . . ." [Compl. ¶¶ 222-23]. Lucrative surgeries, such as those performed by Bay Ridge, were the means by which Defendants maximized tort recoveries: "[o]nce a claimant had surgery or surgeries, the settlement demands and recovery in a tort action reached its maximum potential" [Compl. ¶ 247]. And, in fact, Bay Ridge submitted claim forms and examination records to maximize the value of Claimant D's and H's lawsuits and recoveries [Compl. Ex. B, pp. 14, 21].

Second, a plausible inference arises Bay Ridge knowingly and willingly participated in the Fraud Scheme because it received or expected to receive a share of the ill-gotten profits from it: proceeds from the Claimants' litigation funding loans [Compl. ¶¶ 4, 19, 86, 88, 102, 156, 176, 196, 211, 226, 230, 240, 248, 252, 254, 260, 264, 268-73]. Accordingly, and for the reasons set forth in Section II.D of the Opposition and Section A of the Stand-Up Opposition, FedEx has properly alleged a RICO conspiracy claim against Bay Ridge.

### ***C. The Complaint Properly Pled an Association-in-Fact Enterprise.***

For the reasons stated in Section II.C of the Opposition, the Complaint adequately pled an association-in-fact enterprise that is separate and apart from the pattern of racketeering activity.

Furthermore, Bay Ridge's arguments that it did not have "any connection with any Defendants," did not coordinate or communicate with any other Defendants concerning Claimants D, F, G, and H, and Bay Ridge "acted independently and without the influence of any other defendant" [Memo at 4] is belied by the allegations made by Defendant Murray in his Answer

[ECF 87] and Third-Party Complaint [ECF 99], which seek contribution and indemnity claims from Defendant Baum and other Defendants in the event Murray is liable for his conduct alleged in the Complaint. In particular, the Answer alleges other Defendants owed Murray a duty and breached it by "fail[ing] to provide complete and accurate medical records regarding patients seen, examined, and treated by Dr. Murray." [ECF 87 ¶ 367]. The Third-Party Complaint similarly alleges Defendant Baum owed Murray a duty and breached it by "fail[ing] to provide complete and accurate medical records regarding patients seen, examined, and treated by Dr. Murray." [ECF 99 ¶ 28]. The Third-Party Complaint also alleges the surgeries performed by Defendant Murray "were on patients that were referred to Dr. Murray by Dr. Baum and Bay Ridge" [ECF 99 ¶ 12]. At the very least, Murray's attempt to disclaim liability based on Baum's and other Defendants' failure to provide complete and accurate medical records to Murray demonstrates Defendants were connected, communicated, and coordinated with one another, and Bay Ridge did not act independently. Moreover, the Third-Party Complaint provides an example of the "closed-loop" referral system alleged in the Complaint.

***D. The Complaint Properly Pled State Law Claims.***

For the reasons stated in Section II.G of the Opposition, FedEx's state law claims are properly pled.

In addition, regarding the fraud claim, Bay Ridge argues that "differences in medical opinion" do not make those disagreements RICO-worthy [Memo at 6]. However, under New York law, statements of opinion *are* actionable as fraud. *M&T Bank Corp.*, 126 A.D.3d at 1416; *see also In re IBM Corp. Sec. Litig.*, 163 F.3d at 109 (expression of opinion can be actionable as fraud if "the speaker does not genuinely and reasonably believe it or if it is without a basis in fact"). Further, the Complaint explains why Bay Ridge's medical documents contained false information: the

alleged injuries identified in the documents were not supported by the emergency room diagnoses or independent medical opinions and the surgeries were unnecessary because they were not supported by radiological reports or caused by the claimants' accidents [Compl. ¶¶ 149-54, 161-62, 183, 222, 223]. *See Gov't Emps. Ins. Co. v. Advanced Comprehensive Lab'y, LLC*, No. 20-CV-2391, 2020 U.S. Dist. LEXIS 224868 (E.D.N.Y. Dec 1, 2020); *Sky Med.*, 17 F.Supp.3d at 228. Further, disagreements about medical diagnoses and treatments are issues of fact to be resolved at a later stage in this litigation – not a motion for failure to state a claim for relief, which is determined almost exclusively on the allegations in the Complaint. "Whether the lawyers and doctors acted innocently, exercised legitimate professional judgment . . . presents fact disputes not appropriately resolved today." *Uber Techs.*, 2026 U.S. Dist. LEXIS 103792, at *64.

Regarding the unjust enrichment claim, Bay Ridge argues the Complaint does not allege "how Bay Ridge was enriched at its expense" [Memo at 8]. But the Complaint does allege Bay Ridge received benefits to which it was not entitled: the proceeds from the Claimants' litigation funding loans, which were financed through the settlements and judgments paid with FedEx's money, were distributed to Bay Ridge and other Defendants [Compl. ¶¶ 90, 156, 196, 226].

The Complaint properly alleges an aiding-and-abetting fraud claim against Bay Ridge. "To establish liability for aiding and abetting fraud under New York law, the plaintiffs must show (1) the existence of a fraud; (2) the defendants' knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Krys*, 749 F.3d at 127. Bay Ridge challenges the second and third elements – its knowledge of and provision of substantial assistance to the further the Fraud Scheme [Memo at 8].

"Actual knowledge need only be pleaded generally, cognizant, particularly at the pre-discovery stage because the plaintiff lacks access to the very discovery materials which would

illuminate a defendant's state of mind." *Oster*, 77 A.D.3d at 55. That is because "[p]articipants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud." *Id.* at 55-56. Accordingly, actual knowledge of the fraud is discerned from the "surrounding circumstances" and "may be averred generally," which is satisfied when plaintiffs "plead the events which give rise to an inference of knowledge." *Id.*; *Krys*, 749 F.3d at 129.

Here, the "surrounding circumstances" described in the Complaint permit the reasonable inference that Bay Ridge actually knew of the Fraud Scheme. The Complaint alleges Surgical Defendants like Bay Ridge "provided the surgeries needed to maximum tort recoveries," "utilized the alleged failure of conservative treatment, e.g., physical therapy, injections, etc. as the basis for reporting that a surgery was necessary," and "base[d] reasonableness and medical necessity on the underlying medical documentation generated by the Radiology, Gatekeeper, and Pain Management Defendants" [Compl. ¶ 247]. Moreover, Bay Ridge was part of the "closed-referral loop" of the "same surgeons" to whom claimants were routed by Defendants for "surgery on an accelerated timeline" [Compl. ¶¶ 88, 102, 223, 247]. Based on these allegations, it is more than reasonable to infer Bay Ridge had actual knowledge of the Fraud Scheme.

Substantial assistance constitutes "a substantial contribution to the perpetration of the fraud." *Winnick*, 406 F.Supp.2d at 257 (S.D.N.Y. 2005). It exists "when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [fraud] to occur." *Lerner*, 459 F.3d at 295. Substantial assistance can be inferred from the circumstances alleged in the complaint. *Oster*, 77 A.D.3d at 55-56. A defendant who provides the means by which the perpetrators of a fraud carry out their scheme can be found to have substantially assisted the perpetrators. *Id.*

The Complaint adequately pled Bay Ridge provided substantial assistance to the Fraud

Scheme. The Complaint alleges Bay Ridge took actions that enabled the Fraud Scheme to occur by "provid[ing] the surgeries needed to maximum tort recoveries," "utiliz[ing] the alleged failure of conservative treatment, e.g., physical therapy, injections, etc. as the basis for reporting that a surgery was necessary," and "bas[ing] reasonableness and medical necessity on the underlying medical documentation generated by the Radiology, Gatekeeper, and Pain Management Defendants" [Compl. ¶ 247]. Indeed, Bay Ridge performed spinal surgery on Claimant D despite Claimant D's spinal injuries not being "acute" but degenerative in nature, not being caused by Claimant D's alleged accident, and later determined to be "not medically necessary" [Compl. ¶¶ 149-54]; *see also* [Compl. ¶¶ 161-62, 183]. Similarly, Bay Ridge performed spinal surgery on Claimant H "[d]espite the lack of objective evidence of any injury or limitation whatsoever on the date of the accident . . . ." [Compl. ¶¶ 222, 223]. These actions undoubtedly constitute substantial assistance to the Fraud Scheme. *See, e.g., Carbon Inv. Partners*, 2021 U.S. Dist. LEXIS 166293, at *25-26 (stating "the inquiry is whether [defendant] took actions that enabled the fraud"). Accordingly, the Complaint adequately pled an aiding-and-abetting fraud action against Bay Ridge. *Id.*

### ***E. The Complaint Adequately Pled a Declaratory Judgment Claim.***

For the reasons stated Section II.M of the Ikhilov Response, the Complaint adequately pleads a claim for declaratory relief.

**INDIVIDUAL SECTION VI – FAST CARE MEDICAL DIAGNOSTICS, PLLC**

FedEx submits the following in response to Defendant Fast Care Medical Diagnostics, PLLC's ("Fast Care") Memorandum of Law in Support of Motion to Dismiss.

***A. FedEx has Standing to Assert its RICO Claims.***

For the reasons stated in Section II.B of the Opposition, FedEx's damages are clear and definite and were proximately caused by the Fraud Scheme.

Additionally, the Complaint more than adequately alleges that this Court has Article III (i.e., constitutional) standing. To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Establishing an injury in fact is a "low threshold," and the injury "need not be capable of sustaining a valid cause of action." *Ross v. Bank of America, N.A.(USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (explaining that it is something less than proximate cause). Any physical or monetary injury to a plaintiff constitutes a concrete injury in fact under Article III. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Any monetary loss suffered by the plaintiff satisfies this element; "[e]ven a small financial loss" suffices. *Nat. Res. Defense Council, Inc. v. U.S. Food and Drug Admin.,* 710 F.3d 71, 85 (2d Cir. 2013). "Further, a liability, including a contingent liability may be a cognizable legal injury." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016). Regarding traceability (i.e., the causal connection between the plaintiff's injury and the defendant's action), the standard is lower than that of proximate causation. *Rothstein v. UBS AG,* 708 F.3d 82, 91-92 (2d Cir. 2013). A defendant's conduct that injures a plaintiff indirectly, after intervening conduct by another person, is sufficient under Article III. *Id.*

Here, FedEx has adequately alleged Article III standing. The Complaint alleges FedEx directly paid "before any insurance carrier assume[d] responsibility" the following "out of pocket"

costs and expenses: (1) indemnity payments, (2) the costs incurred defending (as part of FedEx's duty to defend) the lawsuits filed by Ikhilov, and (3) the costs and expenses of investigating, administering, and settling the fraudulent claims at issue in this lawsuit [Compl. ¶¶ 5, 141, 160, 198, 228, 252, 260, 264, 266, 269-73]. In addition, the Complaint alleges FedEx "suffered damages in the form of business-interruption costs, diversion of internal resources, increased claim reserves, adverse loss experience, and administrative burden" [Compl. ¶ 271]. But for the submission, filing, and prosecution of fraudulent personal injury lawsuits by Defendants, FedEx would not have made SIR payments and would not have incurred expenses to defend the insureds and investigate, administer, and settle claims and lawsuits [Compl. ¶¶ 84, 290]. The damages sought in this action would redress these injuries by compensating FedEx for the payments it made and the expenses it incurred. This is sufficient for this Court to have subject-matter jurisdiction. *See e.g., Roosevelt Rd. Re, Ltd. v. Haggar*, No. 24-CV-1549, 2026 U.S. Dist. LEXIS 50451, at *19-20 (Mar. 11, 2026) (holding insurance entities have constitutional standing to sue for damages suffered from a RICO scheme similar to the one alleged here).

***B. The Complaint Adequately Pled a Pattern of Racketeering Activity.***

For the reasons stated in Section II.C.3 of the Opposition, the Complaint adequately pled a pattern of racketeering activity.

***C. The Noerr-Pennington Doctrine does not Apply.***

Fast Care's reliance on the *Noerr-Pennington* doctrine is misplaced [Memo at 9-10]. The *Noerr-Pennington* doctrine "protects efforts to influence governmental action through litigation and lobbying . . . including concerted actions before courts and administrative agencies and concerted efforts incident to litigation, such as pre-litigation threat letters and settlement offers." *Singh v. NYCTL 2009-A Trust*, 683 F.App'x 76, 77 (2d Cir. 2017). By definition, the doctrine does

not protect non-petitioning activity – i.e., activity "where a governmental entity is not involved and the complained of action does not pertain to influencing governmental decision making." *Styleline Studios Int'l Ltd. v. Litvack*, No. 24-cv-01192, 2025 U.S. Dist. LEXIS 76711, at *44 (E.D.N.Y. Apr. 22, 2025). Because the doctrine is an affirmative defense, "Plaintiff's claims are not dismissible under the *Noerr-Pennington* doctrine unless it is apparent from the face of the FAC this this defense necessarily applies." *360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC*, No. 19 Civ. 8760, 2020 U.S. Dist. LEXIS 161531, at *11 (S.D.N.Y. Sept. 3, 2020). Furthermore, "Plaintiff has no affirmative obligation to plead facts to show that the *Noerr-Pennington* doctrine does not apply, i.e., that the sham exception applies." *Id.*

Here, the Complaint alleges Defendants recruited claimants to stage accidents, directed medical providers to provide fraudulent medical treatment and create false medical reports and records for use in support of obtaining higher personal injury lawsuit values and settlement demands, arranged high-interest funding loans for Claimants, and arranged interstate treatment of Claimants [Compl. ¶¶ 81-94, 229-60]. These activities did not involve a governmental entity nor are they attempts to influence governmental decision making. Nor are these activities "concerted efforts incident to litigation," such as a prelitigation "threat letter" or a settlement offer. *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 100 (2d Cir. 2000). Accordingly, Defendants' non-petitioning activities are not protected by the *Noerr-Pennington* doctrine. *CT Espresso LLC v. Lavazza Coffees Corp.*, No. 22cv377, 2022 U.S. Dist. LEXIS 211760, at *8-9 (E.D.N.Y. Nov. 22, 2022).

Moreover, under the "sham exception," the *Noerr-Pennington* doctrine does not apply when the defendant's petitioning activities are a "mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." *Octane Fitness, LLC v. ICON Health &*

*Fitness, Inc.*, 572 U.S. 545, 556 (2014). When the "defendant is accused of bringing a whole series of legal proceedings," the "relevant issue is "whether the legal challenges are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival" – i.e., for harassment. *Primetime 24 Joint Venture*, 219 F.3d at 101. The Second Circuit has noted that "it is immaterial that some of the claims might, 'as a matter of chance,' have merit." *Id.*

Here, the Complaint alleges Defendants engaged in a series of lawsuits for the improper purpose of fraudulently "inducing Plaintiff to make payments for claims that were not legitimate" [Compl. ¶¶ 4, 81, 96, 231, 251, 289]. The Complaint alleges Ikhilov went beyond their role as legal counsel by referring Claimants to medical providers who provided fraudulent medical diagnoses, treatments, and reports; directing Claimants' medical treatment; and directing Claimants to obtain high-interest funding loans [Compl. ¶¶ 4, 14, 19, 56, 89, 90, 118, 140, 155, 195, 197, 224, 226-27, 243, 253]. The Complaint alleges Defendants repeated this process across numerous claimants and cases over several years [Compl. ¶¶ 81, 96, 231, 251]. These allegations support a plausible inference that Defendants filed cases not out of a genuine interest in redressing grievances, but as part of a pattern of successive filings undertaken for purposes of harassment and to fraudulently extract insurance payments from FedEx through the process of litigation. "At this early stage, these allegations are sufficient to overcome Defendant's *Noerr-Pennington* defense" because the sham exception is plausibly alleged. *MMS Trading Co. PTY Ltd. v. Hutton Toys, LLC*, No. 20-CV-1360, 2021 U.S. Dist. LEXIS 60376, at *28-30 (E.D.N.Y. Mar. 29, 2021); *see also Uber Techs.*, 2026 U.S. Dist. LEXIS 103792.

***D. The Litigation Activities Pled in the Complaint Support FedEx's RICO Claims.***

For the reasons stated in Section II.C.2.b of the Opposition, Defendants' litigation activities are predicate acts that support FedEx's RICO Claims.

***E. The Complaint Properly Alleges a RICO Conspiracy Claim.***

For the reasons stated in Section II.D of the Opposition and Section A of the Stand-Up Opposition, the Complaint properly alleges a RICO Conspiracy claim.

***F. The Fraud Claim Satisfies Rule 9(b).***

For the reasons stated in Sections II.C.2.a and II.G.1 of the Opposition, the Complaint's fraud claim satisfies Rule 9(b).

## WORD COUNT CERTIFICATION

Pursuant to Local Civil Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, as supplemented by the Court's July 6, 2026 Order, the undersigned hereby certifies that the foregoing Individual Responses in Opposition to Defendants' Motions to Dismiss each contains 2,500 or less words, excluding the caption, table of contents, table of authorities, signature block and required certificates, and the certification as to the foregoing relies upon the word count feature of the word-processing system used to prepare the document, Microsoft Word.

Dated: October 30, 2026

*/s/ William J. Clay*

**WILLIAM J. CLAY**